UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| W&T OFFSHORE, INC., | * | CIVIL ACTION |
| | * | NO: 17-07102 |
| | * | |
| vs. | * | |
| | * | |
| DAVID BERNHARDT, SECRETARY, | * | SECTION: D |
| UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR; AND | * | JUDGE: WENDY B. VITTER |
| GREGORY J. GOULD, DIRECTOR, | * | |
| OFFICE OF NATURAL RESOURCES | * | MAGISTRATE JUDGE: |
| REVENUE, UNITED STATES DEPARTMENT | * | DANA DOUGLAS |
| OF THE INTERIOR | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## W&T OFFSHORE, INC.'S STATEMENT OF
## UNCONTESTED MATERIAL FACTS

Pursuant to Local Rule 56.1, and in support of its Motion for Summary Judgment, W&T

Offshore, Inc. ("W&T") submits this statement of material facts as to which there are no genuine

issues to be tried.

**1.** W&T seeks judicial review of a final decision (the "Final Decision") by the United States

Department of the Interior ("DOI" or "Interior") ordering W&T to pay millions of dollars in

additional royalties on oil and gas produced from two offshore federal leases in the Gulf of

Mexico.[1]  Amended Complaint for Judicial Review of Administrative Action and for Declaratory

---

[1] Interior's Final Decision is set forth in a pair of rulings by the Interior Board of Land Appeals ("IBLA"): *W&T Offshore, Inc.*, 189 IBLA 238 (2017) [the "2017 IBLA Decision"], IBLA PLEADING0003040-3071; and *W&T Offshore, Inc. (On Reconsideration)*, 194 IBLA 24 (2018) [the "2018 IBLA Decision"], IBLA PLEADING0003129-3151.  In this proceeding for judicial review of final agency action, references to the Administrative Record will be to the page numbers stamped on the record filed by Federal Defendants.  Documents included in the portion of the Administrative Record from W&T's appeal to the ONRR Director are identified as: ######.

1

and Injunctive Relief [*hereinafter* "Amended Complaint"] ¶ 1 (ECF No. 26); Federal Defendants'

Answer [*hereinafter* "Answer"] ¶ 1 (ECF No. 29).

2. Interior has the authority to issue federal oil and gas leases pursuant to the Outer

Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§1331 *et seq.* Until June 18, 2010, Interior's

Minerals Management Service ("MMS") administered the offshore federal leasing program; on

June 18, 2010, the MMS was renamed the Bureau of Ocean Energy Management, Regulation, and

Enforcement ("BOEMRE"), which thereafter was subdivided into three agencies, including the

Office of Natural Resources Revenue ("ONRR"). *See* 75 Fed. Reg. 61051 (Oct. 4, 2010). Thus,

the MMS permitted the installation and operations of the pipeline at issue, the BOEMRE issued

the October 4, 2010, Order to Report and Pay Additional Royalties (the "Order")[2] that W&T

appealed, and the ONRR Director rendered the initial decision on appeal.[3] In the Final Decision,

the IBLA upheld the Order and the ONRR Director's decision.

3. This dispute concerns W&T's obligations as lessee of two oil and gas leases granted by

DOI on behalf of the United States pursuant to Section 8 of the OCSLA, 43 U.S.C. § 1337: Lease

OCS-G 007952 (Mississippi Canyon Block 718) and Lease OCS-G 13687 (Mississippi Canyon

Block 674).

4. Effective May 1, 1999, Mariner Energy, Inc. ("Mariner") and Burlington Resources

Offshore Inc. ("Burlington Resources") (W&T's predecessor in interest) entered into a Unit

Operating Agreement governing their rights and obligations with respect to the "Pluto Unit,"

---

Documents included in the portion of the Administrative Record from W&T's appeal to the IBLA are identified as: IBLA PLEADING#######.

[2] Order to Report and Pay Additional Royalties (Oct. 4, 2010), 003319-003385.

[3] IBLA PLEADING0002894-2915 (the "Director's Decision").

which included acreage from the two leases identified above.  Unit Operating Agreement, Mississippi Canyon 718 Unit (Effective May 1, 1999), 000827-979.  The Unit Operating Agreement was at arm's-length (*i.e.*, Mariner and Burlington Resources were not affiliated companies).  Mariner held a 51% interest in the unitized acreage, and Burlington Resources held a 49% interest in the unitized acreage.  Effective January 1, 2002, Burlington Resources assigned its interest in the Pluto Unit leases to Offshore Energy I LLC (a wholly-owned affiliate of W&T), which thereafter assigned its interest in the leases to W&T.  W&T and Mariner were not affiliated companies.  Throughout the two pipeline remediation events at issue in this appeal, which occurred between 2003 and 2006, Mariner owned a 51% interest in the production from the Pluto Unit, and W&T owned a 49% interest in that production.  During this time, Mariner acted as the Designated Operator of the Pluto Unit.  The Pluto Unit was a "subsea tieback development" – the two unit leases were "located approximately thirty miles from [the] host facility, which is a fixed platform located on South Pass Block 89B."  Affidavit of Cory Loegering ¶ 16 (March 2, 2011) [*hereinafter* "Loegering Affidavit"], IBLA PLEADING0002769-2777.

5.  Effective April 30, 1999, Mariner acquired a Right-of-Way for the installation and operation of a pipeline to transport production from the Pluto Unit.  Amended Complaint ¶ 9; Answer ¶ 9.

6.  Subsequently, Mariner and Burlington Resources constructed a pipeline ("Pluto Flowline"), which was used to transport Pluto Unit production approximately 30 miles from the unit wells to a fixed platform located on South Pass Block 89B  (the "Host Platform") from which those wells were controlled.  Amended Complaint ¶ 9; Answer ¶ 9.

7.  In December 1999, Mariner and Burlington Resources sold the Pluto Flowline to MEGS, LLC ("MEGS").  Amended Complaint ¶ 9; Answer ¶ 9.

**8.**  As a condition of that sale, Mariner and MEGS executed an "Operations and Maintenance Agreement" whereby Mariner (as operator of the Pluto Flowline) assumed the obligation to "supervise and pay for all repairs … to the Gathering System[.]"  Operations and Maintenance Agreement, § 2.3(iv) (December 29, 1999), IBLA PLEADING0002795-2816.

**9.**  Additionally, Mariner and Burlington Resources entered into a "Gas Gathering Agreement" with MEGS pursuant to which MEGS agreed to transport unit production via the Pluto Flowline.  Gas Gathering Agreement (Dec. 29, 1999), 000671-702.

**10.** By agreement dated April 28, 2004, W&T (49%) and Mariner (51%) purchased the Pluto Flowline from MEGS.    Purchase and Sale Agreement (April 28, 2004), IBLA PLEADING0002346-2393; *see also* Amended Complaint ¶ 9; Answer ¶ 9.  Mariner operated the Pluto Flowline at all relevant times.  Amended Complaint ¶ 9; Answer ¶ 9.  The Gas Gathering Agreement and the Operations and Maintenance Agreement terminated contemporaneously with Mariner and W&T's purchase of the Pluto Flowline in 2004; thereafter, Mariner continued to operate the Pluto Flowline pursuant to the Unit Operating Agreement.  *See* 000825.

**11.** "The transport of multiphase product, which consists of a mixture of oil, gas, condensates and water in the same pipeline presents design and maintenance challenges in order to maintain flow assurance.  Key environmental factors affecting flow assurance include temperature and pressure in the flowing product.  The most common obstructions to flow assurance are the formation of hydrates and paraffin, which can greatly reduce the stream flow rate or block the flow completely[.] … Deep water pipelines are typically subject to high pressure and cold temperatures. Under these conditions, ice crystals can form from water vapor existing in the gas stream.  Paraffin, which has a high carbon value molecular structure, is usually dissolved in the crude oil and liquid condensates.  It can also become solid if cooled to the critical temperature at which wax crystals

4

begin to appear, which is referred to as cloud point temperature.  This temperature is highly specific to the chemical composition of the specific flow product.  When paraffin is present, it changes the flow into a turbulent and more viscous flow than normal flow, and can progressively accumulate around the pipe inner walls, thereby reducing the flow downstream and eventually choking off the flow if not removed."  Expert Report of Dr. A.H. Mousselli, Ph.D., P.E., pp. 1-2 (Nov. 21, 2014) [*hereinafter* the "Mousselli Report"], IBLA PLEADING0002778-2794.  *See also* Loegering Affidavit ¶¶ 11-15.

12. "Because each production stream possesses its own unique qualities (*e.g.*, amount of liquid hydrocarbons, amount of water, temperature, pressure, etc.), there is no standard solution to solving the challenges to flow assurance for production from subsea wells.  Preventing the formation of hydrates and paraffin is a well-specific, flowline-specific and formation specific problem."  Loegering Affidavit ¶ 15.  *See also* Mousselli Report, p. 3 ("each flow product possesses a unique set of parameters and requires individual analysis to come up with the best prevention, maintenance, and remedial solutions.").  *See also*, R.J. Brown and Associates for the Minerals Management Service, Deepwater Pipeline Maintenance and Repair Manual, § 3.2.1 (June 1, 1992) ("Each repair solution is different in terms of location, operating conditions of the pipeline, nature and severity of the damage, consequences in interruption of production, time of year, local available repair equipment and available information on which repair requirements can be determined."), 002866-003107 [*hereinafter* the "Pipeline Repair Manual"].

13. During the remediation events at issue, Mariner was a leader in the Gulf of Mexico in designing, installing, and operating deep water subsea tieback developments.  Loegering Affidavit ¶¶ 8, 9.  As Operator of the Pluto Flowline, Mariner "sample[d] all fluids at the formation and conduct[ed] extensive laboratory analysis to determine the best method of paraffin inhibition" for

each production stream. *Id.* at ¶ 15 (March 2, 2011).  Mr. Cory Loegering was Mariner's Vice President of Petroleum Engineering from August 2002, until September 2006, and Mariner's Vice President of Deepwater from September 2006, through November 2010.  Loegering Affidavit ¶ 4. He was personally involved in the design, construction, operation, and remediation of the Pluto Flowline.  *Id.* at ¶¶ 4-6, 16.  When the Pluto Flowline became plugged with paraffin, discussed below, Mr. Loegering was personally involved in the decisions regarding remediation.  *Id.* at ¶¶ 16-25.

14. Production from the Pluto No. 2 Well, located on Mississippi Canyon Block 674, commenced in December 1999.  Amended Complaint ¶ 11; Answer ¶ 11.

15. Mariner elected "[c]hemical inhibition [] as the flow assurance method … after careful and considerable engineering analysis and implemented [chemical treatment] from the start of production on the recommendation of various chemical treatment experts."  Loegering Affidavit, ¶ 16.  In keeping with its election, Mariner injected "significant volumes of paraffin inhibition chemicals" "throughout the producing life of the Pluto No. 2 [W]ell[.]"  *Id.* at ¶ 17.  Thus, Mariner attempted to prevent the formation of plugs by introducing chemicals into the production stream through state-of-the-art methods that were designed and implemented by engineers having extensive experience in subsea transportation.  Loegering Affidavit, ¶ 24.

16. Despite the chemical treatment, in early 2003, the Host Platform began reporting traces of paraffin in the production stream, indicating that the Flowline was partially blocked with paraffin buildup.  *See* Loegering Affidavit, ¶ 18; Amended Complaint ¶ 11; Answer ¶ 11.

17. Mariner Energy considered trying to "pig" the Pluto Flowline to remove paraffin blockage, but elected to adjust the paraffin inhibition chemicals instead because of the substantial risk that a mechanical pig would become stuck in the line.  Loegering Affidavit, ¶ 18.  *See* IBLA

6

PLEADING000879 (reflecting chemical treatment in March 2003), 866-867 (reflecting chemical treatment in May 2003).

18. After extensive chemical treatment of the Pluto Flow Line, Mariner Energy reestablished flow assurance from the Pluto No. 2 well to the Host Platform.  Loegering Affidavit, ¶ 18; *see also* IBLA PLEADING0000870 (May 12, 2003, email reflecting that Mariner had "successfully cleared the pipeline and [was] taking returns @ SP 89").

19. Pursuant to the Operations and Maintenance Agreement, Mariner successfully treated the 2003 paraffin plug with chemicals and restored the flow of oil and gas.  As required by the arm's-length Unit Operating Agreement, W&T paid its share of the remediation costs.  *See* Affidavit of Mike Wichterich, ¶ 9 (April 13, 2011) [*hereinafter* "2011 Wichterich Affidavit"], IBLA PLEADING0001880-1885.  Expenses to restore flow assurance at that time totaled $6,367,469. 2011 Wichterich Affidavit, ¶ 12 (explaining that the cost of the 2003 remediation totaled "$6,367,469 (the amount of AFE #3216, plus a 2.5% construction overhead charge)").  Under the Unit Operating Agreement: (i) Mariner was required to conduct and to "pay all Costs of joint operations," including contracting for services "reasonably necessary for the Operator to conduct" the joint operations (*id.* at Arts. 6.1, 5.1) and to resolve "specific … problems" on the property used for operations "even if not owned by the Joint Account" (*id.* at Exhibit C); and (ii) W&T was obligated to reimburse Mariner for W&T's share of those costs (*see id.* at Art. 6.1 & Exhibit C). Pursuant to the Unit Operating Agreement and the Operations and Maintenance Agreement (two separate arm's-length contracts), "W&T received invoices from Mariner [for the 2003] remediation costs, and W&T paid those costs."  *See* 2011 Wichterich Affidavit, ¶ 9, and attachments thereto, IBLA PLEADING0001886-2332.

**20.** Production from the Pluto No. 2 Well ceased in April 2004 due to low pressure and increased water production.  Amended Complaint ¶ 11.  As a result, Mariner Energy shut-in both the Pluto No. 2 Well and the Pluto Flow Line.  Loegering Affidavit, ¶ 19.  Contemporaneously therewith, Mariner Energy treated the flowline with paraffin and hydrate inhibition chemicals to prevent the formation of blockages during the shut-in period.  Loegering Affidavit, ¶ 19; *see also* IBLA PLEADING0001856 (letter from Mariner notifying BSEE that Mariner would treat the flowline with 500 barrels hydrate and paraffin inhibition chemicals).

**21.** The Pluto No. 3 Well was completed in March 2005 on Mississippi Canyon Block 718 "in order to penetrate a second reservoir[.]"  Loegering Affidavit, ¶ 20.  The Pluto No. 3 Well was located in a water depth of approximately 2800 feet and a seafloor temperature of 39 degrees. Loegering Affidavit, ¶ 21.

**22.** After the Pluto No. 2 Well had ceased production, Mariner undertook efforts to prepare the Pluto Flowline to service production from the Pluto No. 3 Well.  Mariner's efforts included the addition of a new two-mile pipeline tieback extending the Pluto Flowline to the Pluto No. 3 Well and the remediation of paraffin buildup in the Pluto Flowline.  *See* 001449 (In a May 2004 request for a temporary cessation of operations for the right-of-way, Mariner informed BSEE that it would "install a pipeline connecting the" Pluto No. 3 Well to the Pluto flowline).

**23.** In 2005, when Mariner Energy attempted to produce from the Pluto No. 3 Well, it discovered an additional blockage in the Pluto Flowline.  Loegering Affidavit, ¶ 22; Letter from Michael Melancon, Regional Supervisor, MMS, to Cory Loegering, Mariner Energy, Inc. (Oct. 27, 2005), IBLA PLEADING0002824.

**24.** Because its initial attempt to bring the Pluto No. 3 Well to production was unsuccessful due to the blocked line, Mariner "introduce[ed] solvents into [the] pipeline" to attempt to clear the blockage.  IBLA PLEADING0000773&857; *see also* Loegering Affidavit, ¶ 22.

**25.** Subsequently, Mariner "determined that a paraffin plug of unknown length had developed" (Loegering Affidavit, ¶ 22) and pursued chemical remediation of a suspected paraffin buildup. *See, e.g.*, IBLA PLEADING00007378 ("40 bbls Ultra Solve 3800" on Aug. 25, 2005), 7373 (cost report for Aug. 25, 2005, showing chemicals), 1932 (Sept. 10, 2005, invoice for "Techni-Solv 164 GL BLK"), 842 (on Sept. 18, 2005, Mariner Energy "continu[ed] to wash the wax plug and break through to clean out more pipeline"), 7500 (same), 7502 (same), 7442 (same), 7446 (cost report for Sept. 18, 2005, showing chemicals), 1933 (Sept. 19, 2005, invoice for "Techni-Solv 164 GL BLK"), 7451 (cost report for Sept. 19, 2005, showing chemicals), 844 (on Sept. 20, 2005, Mariner Energy "allow[ed] TS-164 solvent to soak on paraffin plug"), 7447 ("Allow TS-165 solvent to soak on paraffin plug" on Sept. 20, 2005), 2066 (Oct. 31, 2005, invoice for "600-750 GAL H Chem tk/D"), 2083 (Feb. 8, 2006, invoice for "600-750 GAL NH Chem"), 2209 (July 6, 2006, invoice for "15x550-gallon SS totes = 8250 gallons of special InSol UAWSI blend for wax chemical soaking and remediation of the Pluto flow line.").  *See also* IBLA PLEADING0002824 (Interior approval of a suspension of production, stating: "A solvent wash was initiated [to remediate the plug] but was interrupted by evacuation for Hurricane Katrina[.]").

**26.** The paraffin contributing to the additional blockage, although discovered in 2005, had gradually collected in the flowline during production from the Pluto No. 2 Well before Mariner shut-in production from the Pluto No. 2 Well and shut-in the Pluto Flowline.  Mousselli Report, at 5 ("Paraffin had already accumulated on the walls of the pipe before idling . . . . [T]he plug would have substantially formed during production."); Loegering Affidavit, ¶ 23 ("This situation could

9

only be detected after the build-up of significant volumes of paraffin in the flow line[.]"). *See also* 2017 IBLA Decision at 266 (the paraffin plug accumulated "prior to the cessation of production" from the Pluto No. 2 Well); Answer ¶ 11 ("Federal Defendants admit that production from Pluto No. 2 ceased in April 2004."); 2017 IBLA Decision at 245 ("At the end of April 2004, Mariner and W&T purchased the Pipeline from MEGS.").

**27.** This paraffin buildup, which was directly attributable to changes in the composition of the production stream from the Pluto No. 2 Well over time, had been masked by increased water in the Pluto No. 2 Well production stream and decreased reservoir pressure.  Loegering Affidavit, ¶ 23; *see also* Mousselli Report, pp. 3-4.

**28.** The chemical treatment was partially successful. *See e.g.*, IBLA PLEADING0000777 (on August 25, 2005, Mariner recovered "55 gallons of paraffin" through the use of a chemical solvent), 842 (on September 18, 2005, Mariner "[broke] through" portions of the paraffin plug and recovered "large amount of paraffin in returns").  However, due to the changes in the chemical composition of the production stream, the chemical treatment Mariner had used to remediate the first plug in 2003 was not effective in preventing or remediating the second plug discovered in 2005.  Mousselli Report, p. 3 ("During late life of the well, production contained additional volumes of water as well as heavier molecule paraffin[.]"); Loegering Affidavit, ¶ 23 ("The chemical treatment that had been used successfully before was not able to handle the changing conditions[.]"); IBLA PLEADING0000844 (Sept. 20, 2005, operations report reflecting that Mariner was "unable to [fully] break up" the paraffin plug with chemical solvents alone).

**29.** When chemical remediation proved unsuccessful, Mariner considered alternatives for clearing the blockage, including either undertaking a pigging operation or drilling through the plug during a surface lift operation.  Loegering Affidavit, ¶¶ 23-25.  Mariner eliminated pigging as an

option due to (i) the "very high" risk of permanently plugging the line with a pig, and (ii) the cost of a pigging operation. *Id.* at ¶ 23.  Mariner elected to remediate the flowline rather than replace it because remediation appeared to be the most cost-efficient approach. *Id.* at ¶¶ 23, 25. Accordingly, Mariner used a surface lift operation to remediate the plug, which involved cutting the plugged portion of the Pluto Flowline, lifting it to the surface, and removing the paraffin plug by drilling through it.  Loegering Affidavit, ¶ 25; Amended Complaint ¶ 14; Answer ¶ 14.  "The flow line was recovered to the surface using the Helix Q4000, and the flow line was drilled out using a snubbing unit to a distance of approximately 24,000 feet."  Loegering Affidavit, ¶ 25.

30. The Pluto Flowline was designed with a "pig launcher/receiver system located on the Marathon platform SP89B."  Purchase and Sale Agreement, Schedule 1.1(a) (April 28, 2004), IBLA PLEADING0002346-2393.  The buildup of the paraffin in the line was "not caused by a construction design flaw[.]"  Loegering Affidavit, ¶ 22.  Further, pigging was not precluded due to any flaw in the flowline; instead, Mariner chose not to pig the line based on its conclusion that the risks of a pigging procedure were too high in the circumstances. *Id.*

31. Mike Wichterich is an accountant who was hired by W&T as a consultant to assist with the royalty accounting relating to the Pluto Unit.  2011 Wichterich Affidavit, ¶ 7.  Mr. Wichterich is not an engineer and was "not involved in the technical aspects of designing, installing, operating, or remediating" the Pluto Flowline.  Declaration of Mike Wichterich (March 23, 2017) [*hereinafter* "2017 Wichterich Declaration"], IBLA PLEADING0001867-1868.  On February 22, 2010, Mr. Wichterich stated in an email that that a "construction design flaw" prevented the pigging of the Pluto Flowline.  002257.  By sworn declaration in 2017, Mr. Wichterich explained that the statement in his February 22, 2010, email was "erroneous" and was "based on an inaccurate assumption[.]"  2017 Wichterich Declaration, ¶¶ 5, 4.

11

**32.** On May 25, 2004, Mariner requested a temporary cessation of operations for the pipeline right-of-way.  IBLA PLEADING0002677-2679.  In its request, Mariner set forth its plan to prepare the Pluto Flowline to handle production from the Pluto No. 3 Well, which plan included both remediating "suspected paraffin deposits" and installing an additional two-mile tieback from the new well to the flowline.  *Id.*  On May 27, 2004, the MMS approved the requested temporary cessation of operations.  IBLA PLEADING0002680.

**33.** The MMS granted two Suspensions of Production ("SOP") to prevent the Pluto Unit leases from expiring pending the remediation of the Pluto Flowline.  First, in November 2005, MMS approved a Suspension of Production to accommodate Mariner's remediation of the Pluto Flowline by recovering the plugged portion of the flowline to the surface.  IBLA PLEADING0002824. Second, in August 2006, MMS approved an additional SOP following the remediation of the pipeline to give Mariner time to test the Pluto Flowline before returning it to service.  IBLA PLEADING0002823.  In approving the SOPs, Interior necessarily determined that Mariner's SOP applications satisfied the regulatory mandate of "a reasonable schedule of work leading to the commencement or restoration of [production from the Pluto Field leases]."  30 C.F.R. §§ 250.171(b) & 250.174.

**34.** Additionally, Mariner submitted a report to the MMS describing the remediation plan, which the MMS approved on June 5, 2006.  0001630.  BSEE notified ONRR of this approval in an email dated May 6, 2013.  001629.

**35.** At the time that Mariner and W&T acquired the Pluto Flowline in April 2004, the paraffin plug rendered it effectively useless.  *See* 2017 IBLA Decision at 266.  After the remediation, Mariner and W&T were able to use the Pluto Flowline to service the Pluto No. 3 Well for years.

*See id.* (paraffin removal returned the pipeline to use); Loegering Affidavit, ¶ 25 ("The operation was a success and the well was returned to production.").

36. The 2005-2006 remediation cost a total of $96,582,101. 2011 Wichterich Affidavit, ¶ 12 (explaining that the cost of the 2005-2006 remediation totaled "96,96,582,101 (the combined amounts from AFE #s 3784 and 4048, which is $94,226,440, plus a 2.5% construction overhead charge)."). W&T's treatment of the remediation costs as "capital" costs on its audited financial statements was approved by an independent auditor, Ernst & Young. *See* Affidavit of Karen Acree ¶¶ 4, 12 (April 12, 2011) [*hereinafter* "Acree Affidavit"], IBLA PLEADING0002829-2830. "Unfortunately significant cost increases were incurred due to mechanical breakdowns on the Q4000 and shutdowns as a result [of the occurrence] of two separate hurricane evacuations during remediation activities." Loegering Affidavit, ¶ 25. *See also* 2011 Wichterich Affidavit ¶ 11 (the remediation costs were "higher than expected due to the very active 2005 hurricane season, which caused weather delays, excessive standby time, and increased demand for labor"). Interior publicly acknowledged that the 2005 hurricane season involved storms that "were the worst in the history of the Gulf of Mexico oil and gas production" and "caused unprecedented and prolonged evacuations, as well as the shut-in of offshore facilities." *E.g.* IBLA PLEADING0002825 (MMS Press Release).

37. The Pluto No. 3 Well commenced production in September 2006 and produced through August 2008. Amended Complaint ¶ 14; *see also* 2017 IBLA Decision at 247; Loegering Affidavit, ¶ 21.

38. Prior to disallowing W&T's deduction of costs, Interior had never before communicated to the regulated community that costs incurred to remediate a flowline through a "surface lift" operation would be considered so out of the ordinary as to preclude a lessee from deducting the

costs of such an operation under Interior's regulations allowing the deduction of "reasonable, actual" transportation costs, whereas costs associated with a mechanical pigging operation may be deductible. Neither had Interior communicated any requirement that operators attempt to use a pigging operation before conducting a surface lift operation to remediate an obstructed flowline. On the contrary, numerous studies made publicly available by Interior reflect that the surface lift remediation procedure was one of the "primary techniques" for repairing subsea pipelines and was "widely used throughout the industry." Pipeline Repair Manual §§ 2.1.7.1, 8.2.3.1. *See also* TAP 317, Project Consulting Services, Inc. for the MMS, Assessment of Deepwater Pipeline Repair in the Gulf of Mexico (May 23, 2000) (describing the surface lift operation as a normal procedure), *available at* https://www.bsee.gov/sites/bsee.gov/files/research-reports//317-ab.pdf; TAP 532aa, Stress Subsea, Inc., Deep Water Response to Underwater Pipeline Emergencies (2005) (recommending that small diameter flowlines be remediated through a surface lift procedure), *available        at*        https://www.bsee.gov/sites/bsee.gov/files/tap-technical-assessment-program//532aa.pdf.

**39.** Costs to remediate the Pluto Flowline for all three years, 2003, 2005, and 2006, totaled approximately $102,949,570. 2011 Wichterich Affidavit, ¶ 12. W&T's share of those costs exceeded $50 million.

**40.** Originally, W&T did not deduct from its royalty payments any costs incurred to transport production from the field to the Host Platform. In 2009, however, W&T amended its prior-period royalty reports to deduct the costs incurred between 2003 and 2006 to remediate the Pluto Flow Line as transportation costs. *See* 2011 Wichterich Affidavit ¶ 9.

**41.** To calculate the gas transportation allowance, W&T: (i) added the remediation costs allocated to gas ($77,138,116) to the portion of lease operating expenses attributable to gas

transportation ($697,541) and the total return on investment attributable to gas ($12,561,109) to come up with a gross allowance figure for gas of $90,396,756; (ii) applied the 50 percent cap on transportation allowances to the gross allowance figure, which resulted in a revised gross allowance of $56,377,178; (iii) multiplied the revised gross allowance figure by the royalty percentage (12.5%), which resulted in a revised figure of $7,047,147; and then (iv) multiplied the $7,047,147 by .49 to account for W&T's ownership interest.  2011 Wichterich Affidavit, ¶ 15.  This calculation yielded a gas deduction of $3,452,883.  *Id.*

**42.** To calculate the oil transportation allowance, W&T: (i) added the remediation costs allocated to oil ($25,624,805) to the portion of lease operating expenses attributable to oil transportation ($234,297) and the total return on investment ($5,442,939) to come up with a gross allowance figure for oil of $31,302,040; (ii) applied the 50 percent cap on transportation allowances to the gross allowance figure, which resulted in a revised gross allowance of $29,601,744; (iii) multiplied the revised gross allowance figure by the royalty percentage (12.5%), which resulted in a revised figure of $3,700,218; and then (iv) multiplied the $3,700,218 by .49 to account for W&T's ownership interest.  2011 Wichterich Affidavit, ¶ 16.  This calculation yielded an oil deduction of $1,813,131.  *Id.*

**43.** "When the gas deduction of $3,452,883 is added to the oil deduction of $1,813,131, the result is $5,266,014 – the transportation allowance that W&T reported on its Form MMS-2014." *Id.* at ¶ 17.

**44.** W&T limited its deductions in accordance with the presumptive regulatory prohibition against taking a transportation allowance in excess of fifty percent of the value of production (30 C.F.R. §§ 1206.109(c) (oil), 1206.156(c) (gas)).  2011 Wichterich Affidavit, ¶¶ 13, 15, 16.  *See also* 2017 IBLA Decision at p. 247.

15

**45.** On October 4, 2010, ONRR's predecessor issued the Order, disallowing W&T's deduction of the remediation costs and directing W&T to remit additional royalties of $4,686,923.73.   The Order disallowed the costs incurred for the 2005-2006 remediation, concluding (i) that the surface lift remediation procedure was neither "normal" nor "prudent" and resulted in an "extraordinary" expenditure, (ii) that Mariner should have attempted to remediate the line through a pigging operation, and (iii) that the costs were not "capital." *Id.* The Order disallowed the costs incurred for the 2003 remediation on the basis that W&T did not incur those costs under an arm's-length transportation contract. *Id.*

**46.** W&T timely appealed the Order to the MMS Director.  W&T's appeal was assigned Docket No. ONRR-10-0128-OCS.  In support of its appeal, W&T submitted the Loegering Affidavit, which established that the surface lift operation was reasonable given the circumstances and that pigging would have been neither normal nor prudent given the circumstances.  W&T also submitted sworn testimony supporting W&T's treatment of the disputed costs as "capital" and establishing that an independent auditor, Ernst & Young, had accepted W&T's treatment of the costs as "capital." 2011 Wichterich Affidavit; Acree Affidavit.  By the time a decision was issued, the ONRR had taken over the royalty collection responsibilities of the former MMS, and W&T's appeal was therefore pending before the ONRR Director.  In a decision issued on May 13, 2014 (the "Director's Decision"), the ONRR Director upheld the Order, notwithstanding the evidence submitted by W&T that directly contradicted the Order's findings.

**47.** W&T timely appealed the Director's Decision to the IBLA, which appeal was docketed as IBLA-2014-0206.  In support of its appeal, W&T submitted the Mousselli Report, which further substantiated that pigging would have been neither normal nor prudent in the circumstances and that the surface lift operation was reasonable.  Additionally, W&T submitted an expert report,

16

which established that: (a) "GAAP requires that amounts spent by W&T to remediate its transportation system should be capitalized" because (1) "the transportation system had an estimated useful life longer than one year[,]" (2) "the remediation costs … extended the life and improved the efficiency" of the Pluto Flowline, (3) "the remediation costs provided benefits over several periods[,]" (4) "the benefits … were not exhausted in the period in which the costs were incurred[,]" and (5) "the condition of the transportation system was improved after it was acquired by W&T"; and (b) "W&T properly capitalized its transportation system on its financial statements." Expert Report of Holly Sharp, CPA, CFE, CFF (Nov. 21, 2014), IBLA PLEADING0002831-2843. Further, W&T demonstrated that the 2003 costs were incurred under arm's-length arrangements and pointed to those arm's-length contracts in the record. On January 27, 2017, the IBLA issued the 2017 IBLA Decision, which affirmed the Director's Decision and denied W&T's appeal. Pursuant to 43 C.F.R. § 4.403, W&T timely filed a Motion for Reconsideration of the Final Decision, which Motion for Reconsideration was docketed as IBLA-2014-0206-1. IBLA PLEADING0000100-2546. W&T's Motion for Reconsideration demonstrated that the IBLA's January 27, 2017 decision was based on material factual conclusions that were erroneous and lacked record support. *Id.* Although ONRR filed a Motion to Strike W&T's Motion for Reconsideration, ONRR never submitted a substantive response to W&T's Motion for Reconsideration. On December 4, 2018, the IBLA issued the 2018 IBLA Decision, which (i) denied W&T's Motion for Reconsideration based on the same analysis underlying its January 27, 2017 decision, and (ii) denied ONRR's Motion to Strike.

48. During its administrative appeal, W&T submitted documentary and testimonial evidence (from both fact witnesses and expert witnesses) substantiating its factual assertions. Interior did not submit any evidence or testimony contradicting the evidence submitted by W&T.

17

Respectfully submitted,

Dated: June 22, 2020

*/s/ Jonathan A. Hunter*
Jonathan A. Hunter
Sarah Y. Dicharry
JONES WALKER, LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana  70170-5100
Telephone:  504-582-8000
Email: jhunter@joneswalker.com
       sdicharry@joneswalker.com

Attorneys for W&T Offshore, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 22, 2020, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.

*/s/ Jonathan A. Hunter*

18