UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| W&T OFFSHORE, INC., | * | CIVIL ACTION |
| | * | NO: 17-07102 |
| | * | |
| vs. | * | |
| | * | |
| DAVID BERNHARDT, SECRETARY, | * | SECTION: D |
| UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR; AND | * | JUDGE: WENDY B. VITTER |
| GREGORY J. GOULD, DIRECTOR, | * | |
| OFFICE OF NATURAL RESOURCES | * | MAGISTRATE JUDGE: |
| REVENUE, UNITED STATES DEPARTMENT | * | DANA DOUGLAS |
| OF THE INTERIOR | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF W&T OFFSHORE, INC.'S**
**<u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Jonathan A. Hunter, T.A. (Bar #18619)
Sarah Y. Dicharry (Bar #34514)
JONES WALKER, LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana  70170-5100
Telephone:  504-582-8000
Email: jhunter@joneswalker.com
          sdicharry@joneswalker.com

Attorneys for W&T Offshore, Inc.

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. iii

TABLE OF EXHIBITS ......................................................................................................... viii

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND ...........................................................................................................4

    A.    Deduction Of Transportation Costs From Royalty Value .......................................4

    B.    Factual Background ...............................................................................................5

    C.    Procedural Background...........................................................................................9

III.  STANDARD OF REVIEW ........................................................................................11

IV.   ARGUMENT...............................................................................................................11

    A.    W&T Properly Deducted The 2005-2006 Remediation Costs. ...........................11

        i.    Interior's Final Decision Deprives W&T Of "Fair Notice."......................12

        ii.   Interior's Conclusion That The 2005-2006 Costs Were Not Reasonable Lacks Any Rational Basis And Contradicts Record Evidence.......................................................................................................17

            a.    Mariner Attempted Chemical Treatment. ......................................18

            b.    Pigging The Pluto Flowline Would Have Been Neither "Normal" Nor "Prudent."..............................................................19

            c.    There Was No Construction Design Flaw. ....................................21

            d.    The Record Contains No Evidence That The Costs Were "Extraordinary".......................................................................23

        iii.  Interior's Decision Violates The "Reasonable, Actual Cost" Regulatory Standard...............................................................................24

            a.    Interior Unlawfully Contradicts The "Overall Structure" Of The Regulations. ....................................................................24

b.    Interior Unlawfully Rewrites The Regulations. .............................26

iv.    The 2005-2006 Pipeline Repair Costs Were "Capital Expenses." ............28

    a.    Regulatory Interpretation ..............................................................28

    b.    Interior's Conclusion That The 2005-2006 Remediation Costs Were Not "Capital" Lacks Any Rational Basis Or Record Support. ...........................................................................30

    c.    The Costs Are Also Deductible as "Maintenance" Costs. .............32

B.    W&T Properly Deducted The Costs Of Repairing The Pluto Flowline in 2003. ..................................................................................................................33

i.    W&T Incurred The 2003 Costs Under An Arm's-Length Contract. .........33

ii.    W&T's Adjustments For The 2003 Remediation Were Timely. ...............34

V.    CONCLUSION ...................................................................................................35

CERTIFICATE OF SERVICE ........................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aircraft Charter Solutions, Inc. v. U.S.*,
   109 Fed. Cl. 398 (2013) ........................................................................................23

*Allentown Mack Sales & Serv. v. NLRB*,
   522 U.S. 359 (1998)..............................................................................................17

*Black Butte Coal Co. v. U.S.*,
   38 F. Supp. 2d 963 (D. Wyo. 1999)......................................................................18

*Christopher v. SmithKline Beecham Corp.*,
   547 U.S. 142 (2012)....................................................................................2, 16, 17

*Continental Res. v. Gould*,
   410 F. Supp. 3d 30, 35 (D.D.C. 2019)............................................................27, 28

*Cotton Petroleum Corp. v. DOI*,
   870 F.2d 1515 (10th Cir. 1989) ............................................................................18

*Devon Energy Production Co., L.P. v. Gould*,
   421 F. Supp. 3d 1213 (D. Wyo. 2019)..................................................................28

*Diamond Shamrock Expl'n Co. v. Hodel*,
   853 F.2d 1159 (5th Cir. 1988) ..............................................................................11

*Dominion Resources, Inc. v. U.S.*,
   219 F.3d 359 (4th Cir. 2000) ....................................................................28, 29, 30

*Elgin Nursing & Rehab. Ctr. v. U.S. HHS*,
   718 F.3d 488 (5th Cir. 2013) ...........................................................................2, 24

*Ensco Offshore Co. v. Salazar*,
   2011 U.S. Dist. LEXIS 163477 (E.D. La. 2011) ..................................................14

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transportation*,
   867 F.3d 564 (5th Cir. 2017) ......................................................................... passim

*FCC v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012)..........................................................................................2, 17

*Fina Oil & Chem. Co. v. Norton*,
   332 F.3d 672 (D.C. Cir. 2003).......................................................................... passim

*General Electric Co. v. United States EPA*,
53 F.3d 1324, 1329 (D.C. Cir. 1995) ....................................................................................14

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) ...............................................................................19, 24, 32

*Holy Cross v. U.S.A.C.E.*,
455 F. Supp. 2d 532 (E.D. La. 2006) ...................................................................................14

*In re Scoggins*,
517 B.R. 206 (E.D. Cal. 2014) .............................................................................................27

*In re Vioxx Prod. Liab. Litig.*,
235 F.R.D. 334 (E.D. La. 2006) ...........................................................................................21

*Jenkins v. Trustmark Nat'l Bank*,
300 F.R.D. 291 (S.D. Miss. 2014) ........................................................................................27

*Jones v. Commissioner*,
242 F.2d 616 (5 Cir. 1957) .......................................................................................28, 29, 30

*Kerr-McGee v. DOI*,
554 F.3d 1082 (5th Cir. 2009) .......................................................................................11, 26

*Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453 (5th Cir. 2005) ...............................................14

*La. Generating, L.L.C. v. Ill. Union Ins. Co.*,
831 F.3d 618 (5th Cir. 2016) .........................................................................................21, 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................................................3, 17, 21

*Mountain Fuel Supply Co. v. United States*,
449 F.2d 816 (10th Cir. 1971), *cert. den.* 405 U.S. 989 (1972)..............................................30

*Phillips Petroleum Co. v. Johnson*,
22 F.3d 616 (5th Cir. 1994) ......................................................................................... *passim*

*Redeemed Christian Church of God v. U.S. Citizenship & Immigration Servs.*,
387 F. Supp. 3d 734 (S.D. Tex. 2016) ...................................................................3, 17, 21, 32

*Santa Fe Snyder Corp. v. Norton*,
385 F.3d 884 (5th Cir. 2004) .........................................................................................11, 26

*Shell Offshore, Inc. v. Babbitt*,
238 F.3d 622 (5th Cir. 2001) ....................................................................................11, 14, 17

*Stoeltzing v. Commissioner*,
266 F.2d 374 (3rd Cir. 1959) ...............................................................................................29

*Texas v. U.S. EPA*,
   690 F.3d 670 (5th Cir. 2012) ...............................................................................19

*Tripoli Rocketry Ass'n v. BATFE*,
   437 F.3d 75 (D.C. Cir. 2006) ...............................................................................24

*In re Triton Energy Ltd. Secs. Litigation*,
   2001 U.S. Dist. LEXIS 5920 (E.D. Tex. 2001) ....................................................32

*United States v. Moss*,
   872 F.3d 304 (5th Cir. 2017) .......................................................................2, 14, 16

*United States v. Wehrli*,
   400 F.2d 686 (10th Cir. 1968) ..............................................................................29

*United Dairy Farmers, Inc. v. U.S.*,
   267 F.3d 510 (6th Cir. 2001) ...........................................................................29, 30

*W&T Offshore, Inc. v. Bernhardt*,
   946 F.3d 227 (5th Cir. 2019) .......................................................................1, 11, 17

*Woods Petroleum Corp. v. DOI*,
   47 F.3d 1032 (10th Cir. 1995) ..............................................................................18

## IBLA Decisions

*W&T Offshore, Inc.*, 189 IBLA 238 (2017) ............................................................ *passim*

*W&T Offshore, Inc. (On Reconsideration)*, 194 IBLA 24 (2018) ......................................... *passim*

## Statutes

5 U.S.C. § 706(2) .................................................................................................. *passim*

30 U.S.C. §1701 *et seq.* ....................................................................................................4

30 U.S.C. § 1702....................................................................................................35

30 U.S.C. § 1721a..................................................................................................34

30 U.S.C. § 1724....................................................................................................34, 35

43 U.S.C. §§ 1331 *et seq.*.......................................................................................4

## Regulations & Regulatory History

30 C.F.R. § 250.171 ..............................................................................................15, 17

30 C.F.R. § 250.174...............................................................................................15

30 C.F.R. § 1206.101 ..................................................................................................32

30 C.F.R. § 1206.102 ....................................................................................................4

30 C.F.R. § 1206.109 ........................................................................................5, 16, 25

30 C.F.R. § 1206.110 ..................................................................................................26

30 C.F.R. § 1206.111 ........................................................................................4, 27, 28

30 C.F.R. § 1206.151 ..................................................................................................32

30 C.F.R. § 1206.152 ....................................................................................................4

30 C.F.R. § 1206.153 ....................................................................................................4

30 C.F.R. § 1206.156 .......................................................................................... *passim*

30 C.F.R. § 1206.157 ........................................................................................5, 26, 28

75 Fed. Reg. 61051 (Oct. 4, 2010).............................................................................4

81 Fed. Reg. 43338 (July 1, 2016) .............................................................................4

## Interior Department Publications

Deepwater Pipeline Maintenance and Repair Manual,
    *available at* https://www.bsee.gov/research-record/tap-165-deepwater-
    pipeline-maintenance-and-repair ....................................................2, 12, 13, 15, 20

Project Consulting Services, Inc. for the MMS, Assessment of Deepwater
    Pipeline Repair in the Gulf of Mexico, (May 23, 2000), TAP 317,
    *available at* https://www.bsee.gov/research-record/tap-317-deep-water-
    pipeline-repair-methods ...........................................................................13, 14, 15

Stress Subsea, Inc., Deep Water Response to Underwater Pipeline Emergencies
    (2005), TAP 532aa,
    *available at* https://www.bsee.gov/research-record/tap-532-dw-rupe-
    deepwater-gulf-mexico-pipelines-induced-damage-characteristics .................14, 15

## Sworn Testimony

Affidavit of Cory Loegering (March 2, 2011),
    IBLA PLEADING0002769-2777................................................................... *passim*

Affidavit of Karen Acree (April 12, 2011),
    IBLA PLEADING0002829-2830.....................................................................10, 31

Affidavit of Mike Wichterich (April 13, 2011),
    IBLA PLEADING0001880-1885 ................................................................................10, 31, 34

Declaration of Mike Wichterich (March 23, 2017),
    IBLA PLEADING0001867-1868 .......................................................................................22

Expert Report of Holly Sharp, CPA, CFE, CFF (Nov. 21, 2014),
    IBLA PLEADING0002831-2843 ....................................................................10, 28, 31, 32

Expert Report of Dr. A.H. Mousselli, Ph.D., P.E. (Nov. 21, 2014),
    IBLA PLEADING0002778-2794 ................................................................................. *passim*

## TABLE OF EXHIBITS

| | |
|---|---|
| **Exhibit 1** | 30 C.F.R. Part 1206 (2015) |
| **Exhibit 2** | Project Consulting Services, Inc. for the MMS, Assessment of Deepwater Pipeline Repair in the Gulf of Mexico, pp. 19, 49 (May 23, 2000), TAP 317, *available at* https://www.bsee.gov/research-record/tap-317-deep-water-pipeline-repair-methods |
| **Exhibit 3** | Stress Subsea, Inc., Deep Water Response to Underwater Pipeline Emergencies (2005), TAP 532aa, *available at* https://www.bsee.gov/research-record/tap-532-dw-rupe-deepwater-gulf-mexico-pipelines-induced-damage-characteristics |

I.     **INTRODUCTION**

W&T Offshore, Inc. ("W&T") challenges a final decision by the United States Department of the Interior ("Interior") requiring W&T to pay millions of dollars in royalties on oil and gas produced from federal leases in the Gulf of Mexico.[1]  As in a recent case holding that another Interior decision unlawfully ordered W&T to pay additional royalties, Interior has exceeded Congressionally-mandated limits on its authority.  *See W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227 (5th Cir. 2019).  W&T has paid all royalties due and is entitled to summary judgment.

At issue is Interior's refusal to allow W&T to deduct costs incurred to repair a subsea pipeline (the "Pluto Flowline") from the value on which W&T paid royalties on oil and gas transported through that pipeline.  W&T incurred these costs after the harsh conditions thousands of feet below the water's surface, including cold temperature and high pressure, twice caused a paraffin accumulation that blocked the flow of oil and gas through the Pluto Flowline.  Based on their business judgment and careful evaluation of the operational risks presented by the pipeline obstruction, W&T and Mariner Energy Inc. ("Mariner") (the Pluto Field Operator) spent more than $100 million to remediate the Pluto Flowline and thereby allow the resumption of royalty-bearing oil and gas to flow from the wells in the Pluto Field.  Most of these costs ($96 million) were incurred in a "surface lift" operation that Mariner conducted only after repeated chemical treatments failed and after Mariner concluded that attempting to clear the obstruction with a

---

[1] Interior's "Final Decision" is set forth in a pair of rulings by the Interior Board of Land Appeals ("IBLA"): *W&T Offshore, Inc.*, 189 IBLA 238 (2017) [the "2017 IBLA Decision"], IBLA PLEADING0003040-3071; and *W&T Offshore, Inc. (On Reconsideration)*, 194 IBLA 24 (2018) [the "2018 IBLA Decision"], IBLA PLEADING0003129-3151.  In this proceeding for judicial review of final agency action, references to the Administrative Record will be to the page numbers stamped on the record filed by Federal Defendants.  Documents included in the portion of the Administrative Record from W&T's appeal to the ONRR Director are identified as: ######.  Documents included in the portion of the Administrative Record from W&T's appeal to the IBLA are identified as: IBLA PLEADING######.

{N4034460.1}                                1

mechanical "pig" presented unacceptable risks.  Thus, Mariner lifted the obstructed section of the

pipeline to the ocean's surface, drilled through the paraffin plug, and reinstalled the unobstructed

section of the Pluto Flowline.

Based on regulations allowing a lessee to deduct its "reasonable, actual" costs of

transportation, W&T deducted a small percentage of the total costs that it incurred to remediate

the Pluto Flowline from its royalty payments.  Second-guessing the lease owners' operational

decisions years after the fact and ignoring the plain facts, Interior rejected W&T's deductions of

the "surface lift" repair costs, finding that W&T should have remediated the Pluto Flowline by

using either chemicals or a mechanical pig to dislodge the plug.  Thus, Interior ordered W&T to

pay additional royalties of $4.7 million.  With interest, Interior's claim exceeds $7 million.

Interior's decision violates numerous principles of administrative law.  *First*, Interior's

decision unlawfully deprived W&T of the "fair notice" that the Supreme Court and Fifth Circuit

have emphatically held that an agency owes a regulated party.[2]  Interior denied W&T's deduction

of the Pluto Flowline repair costs because the "surface lift" procedure used to repair the flowline

purportedly was an "extraordinary" rather than a "normal" remediation operation.  2017 IBLA

Decision at 263.  But Interior has otherwise recognized that the "surface lift" procedure used to

repair the Pluto Flowline is a "primary" and "widely used" technique for repairing subsea

pipelines.[3]  Under the circumstances, it was impossible for W&T to know, "with ascertainable

---

[2] *See*, *e.g.*, *Christopher v. SmithKline Beecham Corp.*, 547 U.S. 142 (2012); *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239 (2012); *United States v. Moss*, 872 F.3d 304, 313-315 (5th Cir. 2017); *ExxonMobil Pipeline Co. v. U.S. Dep't of Transportation*, 867 F.3d 564, 578-580 (5th Cir. 2017); *Elgin Nursing & Rehab. Ctr. v. U.S. HHS*, 718 F.3d 488 (5th Cir. 2013).

[3] *See e.g.*, R.J. Brown and Associates for the Minerals Management Service, Deepwater Pipeline Maintenance and Repair Manual §§ 2.1.7.1, 8.2, 8.2.3.1, 8.2.6.3, 8.2-6 (June 1, 1992), 002866-003107 [*hereinafter* the "Pipeline Repair Manual"].    Also *available at* https://www.bsee.gov/research-record/tap-165-deepwater-pipeline-maintenance-and-repair.

{N4034460.1}                                                2

certainty" as the "fair notice" doctrine requires, that Interior would consider the use of a "surface lift" procedure to be so out of the ordinary as to preclude W&T from deducting the repair costs under Interior's regulations. On this basis alone, W&T is entitled to summary judgment.

*Second*, Interior turned a blind eye to record evidence and improperly rejected uncontradicted expert testimony concerning the pipeline remediation and W&T's treatment of the repair costs as "capital." Whereas Interior has offered no supporting evidence for its position, W&T has offered sworn witness and expert testimonies, documentation, agency studies, and industry standards and practice that support both that the "surface lift" operation was reasonable and that W&T properly treated the related costs as "capital." By "act[ing] contrary to the evidence before it," *ExxonMobil Pipeline Co.*, 867 F.3d at 583, Interior failed to establish a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Redeemed Christian Church of God v. U.S. Citizenship & Immigration Servs.*, 387 F. Supp. 3d 734, 750 (S.D. Tex. 2016) (agency must "provide adequate reasons explaining why it has rejected uncontradicted evidence, including testimonial evidence.").

*Third*, Interior's decision contradicts Interior's royalty valuation regulations. Here, W&T limited its deduction to the presumptive regulatory limitation that transportation allowances may not exceed 50% of the value of the production; and, W&T only deducted costs that the regulations identify as reasonable. Yet, Interior rejected W&T's deductions, and in doing so, unlawfully "rewrite[es] [the royalty valuation] regulations under the guise of interpreting them." *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003); *see also Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994) (royalty payment order failed to apply regulatory criteria). For these and the additional reasons set forth herein, Interior's decision cannot withstand scrutiny.

{N4034460.1}                                              3

II.    **BACKGROUND**

A.    **Deduction Of Transportation Costs From Royalty Value**

Pursuant to statutory authority,[4] Interior collects billions of dollars in royalties on oil and gas produced from offshore federal lands every year.    Under Interior's royalty valuation regulations,[5] the value on which a lessee pays royalty on production sold pursuant to an arm's-length contract is "the *gross proceeds* accruing to the seller under the arm's-length contract, *less applicable allowances*[.]"[6]    Among other available allowances, a lessee is entitled to deduct from its royalty payments the "reasonable, actual costs" of transporting royalty-bearing production.[7] For example, if the lessee produces a barrel of oil in the Gulf of Mexico and sells it to an onshore refinery for $35, and if it cost the lessee $5 to transport the oil to the refinery, then the lessee owes Interior royalty based on $30, rather than on $35, because the lessee may deduct the $5 transportation cost.

When a lessee transports its production through a pipeline that a third party owns, the lessee typically deducts the "arm's-length" fees charged by the pipeline owner.    If, however, the lessee transports production through a pipeline that it owns, then Interior's "non-arm's-length" regulations identify reasonable transportation costs on which the lessee's  deduction "shall be

---

[4] *See* 43 U.S.C. §§ 1331 *et seq.* and 30 U.S.C. §§ 1701 *et seq.*

[5] The remediation events took place from 2003–2006, when Interior's royalty valuation regulations were located at 30 C.F.R. Part 206.  In 2010, the royalty valuation regulations were moved to 30 C.F.R. Part 1206 (*see* 75 Fed. Reg. 61051 (Oct. 4, 2010)), and the IBLA therefore cited to the regulations at Part 1206.  In 2016, Interior revised 30 C.F.R. Part 1206 (81 Fed. Reg. 43338 (July 1, 2016)), but that revision does not affect this lawsuit. Like the IBLA, this brief refers to Interior's pre-2016 valuation regulations at 30 C.F.R. Part 1206.  For the Court's convenience, a copy of referenced version of 30 C.F.R. Part 1206 is attached as Exhibit 1 to this Memorandum.

[6] 30 C.F.R. §§ 1206.102(a), 1206.152(b)(1)(i), 1206.153(b)(1)(i) (emphasis added).

[7] 30 C.F.R. § 1206.111(a); 30 C.F.R. § 1206.156(a).

based," including "capital" costs, operating and maintenance expenses, overhead, depreciation, and a return on undepreciated "capital" investments. 30 C.F.R. §§ 1206.157(b)(2), 1206.111(a)-(c). Finally, to ensure that lessees do not deduct excessive transportation costs, Interior's regulations presumptively limit a lessee's transportation allowance to a maximum of fifty percent of the value of the production that the lessee transports. 30 C.F.R. §§ 1206.109(c) & 1206.156(c).

### B.    Factual Background[8]

**The Pluto Unit.** Effective May 1, 1999, Mariner and Burlington Resources (W&T's predecessor in interest) entered into a Unit Operating Agreement governing their rights and obligations with respect to the "Pluto Unit," which included acreage from Lease OCS-G 007952 (Mississippi Canyon Block 718) and Lease OCS-G 13687 (Mississippi Canyon Block 674). W&T Facts ¶¶ 3-4. Mariner held a 51% interest in the unitized acreage, and Burlington Resources held a 49% interest in the unitized acreage. *Id.* at ¶ 4. Effective January 1, 2002, Burlington Resources assigned its interest in the Pluto Unit leases to Offshore Energy I LLC (a wholly-owned affiliate of W&T), which thereafter assigned its interest in the leases to W&T. *Id.* Throughout the two pipeline remediation events at issue here, which occurred between 2003 and 2006, Mariner owned a 51% interest in the production from the Pluto Unit, and W&T owned a 49% interest in that production. *Id.* The Unit Operating Agreement was an arm's-length agreement. *Id.* The Pluto Unit was a "subsea tieback development" – production from the unit wells was transported via the Pluto Flowline approximately 30 miles to the platform that serviced those wells. *Id.*

**Pluto Flowline Ownership.** Effective April 30, 1999, Mariner acquired a Right-of-Way for the installation and operation of a pipeline; subsequently, Mariner and Burlington Resources

---

[8] For a more detailed description of the facts, *see* W&T Offshore, Inc.'s Statement of Uncontested Facts ("W&T Facts"), filed contemporaneously herewith.

installed the Pluto Flowline. W&T Facts ¶¶ 5-6. In December 1999, Mariner and Burlington Resources sold the Pluto Flowline to MEGS, LLC ("MEGS") and entered into two agreements with MEGS to facilitate the transportation of Pluto Field production through the Pluto Flowline. *Id.* at ¶ 7. Specifically, Mariner and Burlington Resources entered into a Gas Gathering Agreement with MEGS for the transportation of the unit production via the Pluto Flowline. *Id.* at ¶ 9. And, as a condition to the sale, Mariner and MEGS executed an "Operations and Maintenance Agreement," pursuant to which Mariner operated the Pluto Flowline and assumed the obligation to perform and pay for repairs needed to allow continued transportation through the flowline. W&T Facts ¶ 8. By agreement dated April 28, 2004, Mariner (51%) and W&T (49%) purchased the Pluto Flowline from MEGS, after which Mariner continued to operate the flowline. W&T Facts ¶ 10. The Gas Gathering Agreement and the Operations and Maintenance Agreement terminated contemporaneously with Mariner and W&T's purchase of the Pluto Flowline in 2004; thereafter, Mariner continued to operate the Pluto Flowline pursuant to the Unit Operating Agreement and the costs incurred were shared by Mariner and W&T as required under the Unit Operating Agreement. *Id.*

**Flow Assurance Challenges.** The transportation costs in dispute were incurred to remediate the accumulation of paraffin that twice obstructed the flow of Pluto Unit production through the Pluto Flowline. Ensuring flow-assurance through the Pluto Flowline, like any other subsea pipeline, required a fact-specific analysis depending on several factors, including the composition of the production, the temperature of the seawater, and the depth of the flowline. *See* W&T Facts ¶¶ 11-12. At the time the pipeline obstructions occurred, Mariner was a leader in the Gulf of Mexico in designing, installing, and operating deep water subsea tieback developments. W&T Facts ¶ 13. Cory Loegering, a Mariner Vice President who managed dozens of deepwater

subsea tieback projects like the Pluto Unit, was personally involved in the design, construction, operation, and remediation of the Pluto Flowline. *Id.* Interior has acknowledged Mr. Loegering's "proven technical engineering expertise." 2018 IBLA Decision at 42.

**2003 Remediation: Chemical Treatment.** Production from the Pluto No. 2 Well, located on Mississippi Canyon Block 674, began in December 1999. W&T Facts ¶ 14. In 2003, paraffin that had accumulated in the Pluto Flowline partially blocked the flow of production. *Id.* at ¶ 16. Pursuant to the obligations that Mariner incurred (on behalf of the Pluto Unit owners) under the arm's-length Operations and Maintenance Agreement, Mariner successfully remediated the paraffin buildup with chemical treatment. *Id.* at ¶¶ 18-19. In turn, pursuant to the arm's-length Unit Operating Agreement (000827-979), Mariner charged W&T for W&T's share of the remediation costs, and W&T paid its share of those costs, as required. W&T Facts ¶ 19. Mariner and W&T spent $6,367,469 to dissolve the paraffin plug. *Id.* Production from the Pluto No. 2 Well was restored in May 2003 and continued until April 2004. *Id.* at ¶¶ 18, 20; *see also* IBLA PLEADING0001856 (reflecting that the Pluto No. 2 well "was shut in [o]n April 1, 2004"). Then, Mariner and W&T acquired the Pluto Flowline from MEGS. W&T Facts ¶ 10.

**2005-2006 Remediation: Chemical Treatment & Surface Lift.** In 2004, contemporaneously with shutting-in production from the Pluto Field, Mariner treated the Pluto Flowline with paraffin and hydrate inhibition chemicals. Affidavit of Cory Loegering ¶ 19 (March 2, 2011) [*hereinafter* "Loegering Affidavit"], IBLA PLEADING0002769-2777; *see also* W&T Facts ¶ 20. In March 2005, Mariner completed the Pluto No. 3 Well on Mississippi Canyon Block 718 and installed a 2-mile flowline to connect the Pluto No. 3 Well to the Pluto Flowline. W&T Facts ¶¶ 21-22. However, Mariner was unable to deliver production from the Pluto No. 3 Well into the Pluto Flowline because the flowline was once again obstructed by a paraffin plug that had

{N4034460.1}                                                    7

developed during the producing life of the Pluto No. 2 Well, prior to Mariner and W&T's acquisition of the Pluto Flowline. W&T Facts ¶¶ 23, 26-27. Mariner repeatedly attempted to remediate the plug through chemical solvents,[9] with partial success[10]; however, contrary to the successful 2003 remediation, Mariner was "unable to [fully] break up" the paraffin plug with chemical solvents alone. IBLA PLEADING0000844; *see also* W&T Facts ¶¶ 24, 25, 28.

After repeated chemical treatments failed, Mariner considered attempting to use a mechanical pig to clear the obstruction in the Pluto Flowline but decided that this approach would be imprudent. W&T Facts ¶ 29. In particular, Mariner determined that the operational and financial risks associated with a pigging operation were unacceptably high due to the likelihood that the pig would become stuck in the paraffin and thereby increase the costs of repairing the Pluto Flowline. *Id.* This decision was made based on Mariner's experience from owning the second largest portfolio of subsea tie-back pipelines in the Gulf of Mexico.

Having tried and failed with chemical treatments, and having determined in its business judgment and operational expertise that attempting a pigging operation would be imprudently risky, Mariner conducted the "surface lift" procedure that successfully cleared the Pluto Flowline. *Id.* at ¶ 29. The former Minerals Management Service (Interior's sub-agency) approved the

---

[9] *E.g.*, IBLA PLEADING0000773 ("introduce solvents into pipeline" on Aug. 18, 2005), 7378 ("40 bbls Ultra Solve 3800" on Aug. 25, 2005), 1932 (Sept. 10, 2005, invoice for "Techni-Solv 164 GL BLK"), 7442 (paraffin plug soaked in solvent multiple times on Sept. 18, 2005), 842 (on Sept. 18, 2005, Mariner Energy "continu[ed] to wash the wax plug and break through to clean out more pipeline"), 1933 (Sept. 19, 2005, invoice for "Techni-Solv 164 GL BLK"), 844 (on Sept. 20, 2005, Mariner Energy "allow[ed] TS-164 solvent to soak on paraffin plug"), , 2066 (Oct. 31, 2005, invoice for "600-750 GAL H Chem tk/D"), 2083 (Feb. 8, 2006, invoice for "600-750 GAL NH Chem"). *See also* IBLA PLEADING0002824 (Interior approval, stating: "A solvent wash was initiated" to remediate the plug). *See also* W&T Facts ¶¶ 24-25.

[10] *E.g.*, IBLA PLEADING0000777 (on August 25, 2005, Mariner recovered "55 gallons of paraffin" through the use of a chemical solvent), 842 (on September 18, 2005, Mariner "[broke] through" portions of the paraffin plug and recovered "large amount of paraffin in returns").

---

{N4034460.1}                                             8

"surface lift" remediation procedure and granted Mariner lease suspensions to accommodate the "surface lift" operation. W&T Facts ¶¶ 32-34. The total cost of $96,582,101 (of which W&T, having consented to Mariner's operational methods, paid its proportionate share) was higher than anticipated due to mechanical problems with the vessel that performed the "surface lift" operation and Gulf-wide shutdowns because of Hurricanes Katrina and Rita.[11]  W&T Facts ¶ 34. In September 2006, following the remediation, the Pluto No. 3 Well commenced production and produced through August 2008. W&T Facts ¶ 35.

**W&T's Deduction of Transportation Costs From Its Royalty Payments.** In 2009, in accordance with regulations allowing lessees to amend their previously-filed royalty reports and payments, W&T deducted a small portion of the costs that it incurred ($5 million of the more than $50 million spent) to remediate the Pluto Flowline in 2003 and 2005-2006. W&T Facts ¶ 39-43 (describing calculation underlying W&T's deduction).

### C.    Procedural Background

In an Order dated October 4, 2010 (the "Order"),[12] Interior asserted that W&T improperly deducted costs of remediating the Pluto Flowline and ordered W&T to pay $4,686,923.73. W&T Facts ¶ 45. The Order disallowed W&T's deduction of the 2005–2006 remediation costs based on findings that (i) the "surface lift" remediation procedure was neither "normal" nor "prudent" and resulted in an "extraordinary" expenditure, (ii) Mariner should have attempted to remediate the line through a pigging operation, and (iii) the costs were not "capital." *Id.*  Further, the Order

---

[11] The 2005 hurricane season involved storms that "were the worst in the history of the Gulf of Mexico oil and gas production" and "caused unprecedented and prolonged evacuations, as well as the shut-in of offshore facilities." IBLA PLEADING0002825. *See also* W&T Facts ¶ 36.

[12] Order to Report and Pay Additional Royalties (Oct. 4, 2010), 003319-003385.

disallowed W&T's deductions for the 2003 remediation costs on the basis that W&T purportedly did not incur those costs under an arm's-length contract for transportation. *Id.*

W&T appealed the Order to the ONRR Director and submitted the Loegering Affidavit, which established that pigging is the "least preferred" flow assurance method and that pigging would have been neither "normal" nor "prudent" under the circumstances.[13]  Loegering Affidavit, ¶ 15; W&T Facts ¶ 45.  In addition, W&T submitted sworn testimony supporting W&T's treatment of the disputed costs as "capital" and establishing that an independent auditor, Ernst & Young, had accepted W&T's treatment of the costs as "capital."[14]  *Id.*  Ignoring this testimony, the ONRR Director summarily upheld the Order's rejection of W&T's deductions.    IBLA PLEADING0002894-2915.

W&T appealed the Director's Decision to the IBLA.  In further support of its demonstration that pigging would have been neither "normal" nor "prudent" and that the "surface lift" remediation approach was reasonable in the circumstances, W&T submitted an expert report by Dr. A.H. Mousselli, Ph.D., P.E.[15]  W&T Facts ¶ 46.  And, in further support of its position that the remediation costs were "capital" costs, W&T submitted an expert report by Holly Sharp, CPA, CFE, CFF.[16]  *Id.*  Without offering any contradictory expert testimony, *id.* at ¶ 48, Interior

---

[13] At Mariner, Mr. Loegering managed the second largest portfolio of Gulf of Mexico subsea tieback operations, and his Affidavit forms an essential part of the Administrative Record.

[14] Affidavit of Karen Acree (April 12, 2011), IBLA PLEADING0002829-2830 [*hereinafter* "Acree Affidavit"]; Affidavit of Mike Wichterich (April 13, 2011) [*hereinafter* "2011 Wichterich Affidavit"], IBLA PLEADING0001880-1885.

[15] Expert Report of Dr. A.H. Mousselli, Ph.D., P.E. (Nov. 21, 2014) [*hereinafter* the "Mousselli Report"], IBLA PLEADING0002778-2794.  Dr. Mousselli is a pipeline engineer with forty years of experience in the design, analysis, maintenance, and repair of offshore pipelines.

[16] Expert Report of Holly Sharp, CPA, CFE, CFF (Nov. 21, 2014) [*hereinafter* "Sharp Report"], IBLA PLEADING0002831-2843.

continued to insist that any costs incurred for a "surface lift" operation are not deductible, primarily because Mariner should have used a pigging operation to clear the obstruction; and, Interior continued to assert that the costs were not "capital." Further, despite W&T's demonstration that the 2003 costs were incurred pursuant to *two* arm's-length contracts (the Operations and Maintenance Agreement and the Unit Operating Agreement), Interior continued to disallow the 2003 costs. Thereafter, in 2018, the IBLA denied W&T's request for reconsideration.

**III.     STANDARD OF REVIEW**

A court will overturn agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, …; [or] (D) without observance of the procedure required by law." 5 U.S.C. § 706(2). As in prior royalty disputes applying this standard, Interior's Final Decision should be reversed.[17]

**IV.     ARGUMENT**

   **A.     W&T Properly Deducted The 2005-2006 Remediation Costs.**

Faced with a paraffin obstruction blocking the flow of revenue-generating (and *royalty-*generating) oil and gas from the newly drilled Pluto No. 3 Well, Mariner and W&T were incentivized to utilize their business judgment to identify and pursue the least risky, most cost-effective approach to remediating the obstruction. While Interior's royalty auditors would later balk at the price tag, Mariner and W&T's interests were fully aligned with Interior's interests: both

---

[17] *See W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227 (5th Cir. 2019) (violated APA); *Kerr-McGee v. U.S.D.O.I.*, 554 F.3d 1082 (5th Cir. 2009) (exceeded statutory authority); *Santa Fe Snyder Corp. v. Norton*, 385 F.3d 884 (5th Cir. 2004) (exceeded statutory authority); *Fina Oil & Chem. Co.*, *supra* (contradicted regulations); *Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) (violated APA and contradicted regulations); *Phillips Petroleum Co.*, *supra* (same); *Diamond Shamrock Expl'n Co. v. Hodel*, 853 F.2d 1159 (5th Cir. 1988) (contradicted statute).

{N4034460.1}                                        11

the lessees and their lessor shared an interest in resuming production as cost-effectively as possible. Interior's after-the-fact attempt to avoid bearing its share of the costs of remediating the Pluto Flowline and resuming royalty-bearing production is both patently unfair and unlawful.

### i.    Interior's Final Decision Deprives W&T Of "Fair Notice."

Interior does not dispute that pipeline repair costs can be deductible "transportation" costs.[18] Rather, based on its determination that "hauling the affected segment of the Pipeline to the ocean's surface" involved "extraordinary measures … when it should have continued its chemical treatment and, if necessary, pig the Pipeline," the IBLA held that *none* of the 2005-2006 remediation expenses "are properly deductible as 'reasonable' transportation costs." 2017 IBLA Decision at 263. But prior to disallowing W&T's deduction of costs, *Interior had never before communicated to the regulated community* that costs incurred to remediate a flowline through a "surface lift" operation would be considered "extraordinary" *per se* and therefore disallowed, whereas costs associated with a mechanical pigging operation may be deductible. *See* W&T Facts ¶ 38. Interior cannot point to any regulation, agency guidance, or decision that articulated this standard to offshore oil and gas lessees. To the contrary, Interior had repeatedly recognized that using a "surface lift" procedure to repair a damaged subsea flowline was standard industry practice.

Interior included in the record a "Deepwater Pipeline Maintenance and Repair Manual" (the "Pipeline Repair Manual") that explicitly contradicts Interior's characterization of the "surface lift" method of remediating the Pluto Flowline as "not … [a] normal operation" and an "extraordinary measure." 002866-003107. After twice identifying "surface lift" as one of the

---

[18] *See*, *e.g.*, 2017 IBLA Decision at 259 ("[T]he actual transportation costs incurred by W&T were properly deducted so long as they were 'reasonable.'"); Director's Decision, p. 16 ("ONRR and W&T agree that removing a paraffin plug from the Pluto Pipeline is a cost associated with transporting oil and gas production").

"primary techniques" for repairing subsea pipelines, the Pipeline Repair Manual characterizes "surface lift" as an "established construction technique[] for repair … of a damaged pipeline" and notes that "surface lift" is "widely used throughout the industry."[19]  Further, although the Pipeline Repair Manual addresses pipeline repair techniques at length, it addresses pigging *only* as a means of identifying and assessing damages within a pipeline,[20] and says nothing about using a mechanical pig to repair a flowline that has become obstructed.

Consistently with the Pipeline Repair Manual, Interior's website contains additional reports that characterize "surface lift" operations as being the industry norm, rather than extraordinary.[21]  One such report, dated May 23, 2000, states that "*[t]ypical* deepwater repair procedures in the Gulf of Mexico rely on pipeline end surface lifts" and notes that "surface lift repair has several advantages."[22]  This same report notes that "surface lift" was the primary pipeline repair method used by Shell, which at the time owned 60 percent of the deepwater

---

[19] *See* Pipeline Repair Manual, §§ 2.1.7.1 (twice describing "surface lift" as a "primary technique"), 8.2 ("surface lift" is an "established construction technique for repair and replacement of a damaged pipeline"), 8.2.3.1 ("surface lift" is "widely used throughout industry"), 8.2.6.3 ("several types of surface lift methods … are used in a repair capacity by contractors worldwide"), 8.2-6 ("surface lift" is an "established" procedure).

[20] *See e.g.* Pipeline Repair Manual §§ 2.2.3; 6.3 (discussing pigging as a "damage location and assessment" device).

[21] Interior devotes an entire website to its Technology Assessment Program ("TAP"), through which Interior "administer[s] … research and development projects" "through contracts with universities, private firms, and government laboratories." https://www.bsee.gov/what-we-do/research/tap (last visited June 21, 2020).  Interior uses the TAP studies to "provid[e] [agency] decision makers with engineering support" regarding various operational issues and to "investigate[] and assess[] industry applications of technological innovations[.]" *Id.*

[22] Project Consulting Services, Inc. for the MMS, Assessment of Deepwater Pipeline Repair in the Gulf of Mexico, pp. 18, 49 (May 23, 2000), TAP 317, *available at* https://www.bsee.gov/research-record/tap-317-deep-water-pipeline-repair-methods   [hereinafter "TAP 317"].  A copy of this report (and the related slides) is attached to this Memorandum as Exhibit 2.

{N4034460.1}                                          13

pipelines in the Gulf of Mexico. *Id*. at 48. And, this same report *identifies a 1999 repair of a leak in the Pluto Flowline as an example of a successful "surface lift" operation*.[23]

Another report from 2005, also published on Interior's website,[24] was intended to be "an up-to-date, comprehensive discussion of the deepwater repair scenarios" (*id.* at p. 3) and summarized "current state of the art" repair systems. *Id.* at p. 10. Regarding small-diameter flowlines like the Pluto Flowline, the report stated:

> *For flowline repair, the recommendation is to cut the flowline on bottom* [and] *lift the ends to the surface ...*
>
> The *flowline* repair system is characterized by smaller diameter (4" to 10"), high pressure (up to 15,000 psi) pipe. *Repairs are conducted by cutting the pipe subsea, then recovering it to the surface*, where PLETS are installed.

*Id.* at pp. 2, 5.[25]

---

[23] "The Mariner Energy Pluto 8″ deepwater pipeline repair was made in October 1999. … The pipeline repair was made by having [a] contractor lift the severed pipeline ends to the surface after Oceaneering performed the pipe cut." TAP 317 at 56.

[24] Stress Subsea, Inc., Deep Water Response to Underwater Pipeline Emergencies (2005), TAP 532aa, *available at* https://www.bsee.gov/research-record/tap-532-dw-rupe-deepwater-gulf-mexico-pipelines-induced-damage-characteristics [*hereinafter* "TAP 532aa"]. A copy is attached to this Memorandum as Exhibit 3. TAP 532aa addressed the first phase of a "Joint Industry Project" established to develop repair techniques for "pipelines and flowlines in water depts. in the 1,000-10,000 ft range, in the U.S. Gulf of Mexico," involving numerous participants, including Interior.

[25] The court's consideration of these documents on Interior's website is appropriate to evaluate whether Interior's "regulations or *other public statements*" afforded W&T fair notice of Interior's regulatory interpretation. *General Electric Co. v. United States EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (emphasis added) (*quoted by ExxonMobil Pipeline*, 867 F.3d at 578-579). *See also Moss*, 872 F.3d at 313-315 (considering publicly-available information in fair notice analysis); *cf. Shell Offshore, Inc.*, 238 F.3d at 630 n.1 (considering publicly available documents as "evidence of [Interior] policy"); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice); *Ensco Offshore Co. v. Salazar*, 2011 U.S. Dist. LEXIS 163477 (E.D. La. 2011) (taking judicial notice of publicly-available Interior documents); *Holy Cross v. U.S. Army Corps of Eng'rs,* 455 F. Supp. 2d 532 (E.D. La. 2006) (considering extra-record evidence).

Each of these documents directly contradicts Interior's position that Mariner's "surface lift" procedure was "not … [a] normal operation" and that it involved the "extraordinary measure[] of hauling the affected segment of the Pipeline to the ocean's surface."  2017 IBLA Decision at 263.  To the contrary, the "surface lift" procedure used to repair the Pluto Flowline was a "primary technique" that was "widely used throughout the industry" (including by the majority owner of deepwater pipelines in the Gulf of Mexico),[26] "typical,"[27] "state of the art," and a "recommend[ed]"[28] practice.  Indeed, it had previously been employed to repair a leak in the Pluto Flowline in 1999.  TAP 317, p. 56.  Moreover, the record reflects that *Interior approved* Mariner's *operational* plan to repair the Pluto Flowline (0001630), and *Interior granted a Suspension of Production* ("SOP") to ensure that the Pluto leases did not terminate while the pipeline was being repaired.  IBLA PLEADING0002824; *see also* W&T Facts ¶ 33.  Critically, in issuing the SOP, Interior necessarily determined that the "surface lift" operation satisfied the regulatory mandate of "*a reasonable schedule of work* leading to the commencement or restoration of [production from the Pluto Field leases]."  30 C.F.R. §§ 250.171(b) & 250.174 (emphasis added).

Thus, when the decision was made (after repeated chemical treatments failed) to remediate the Pluto Flowline through a "surface lift" procedure rather than attempting a pigging procedure, there was no way for W&T to know that Interior would find that the "surface lift" operation was "extraordinary" and, therefore, that the deduction of the repair costs would not be allowed.  To the contrary, agency materials recognized that "surface lift" was considered standard operating

---

[26] Pipeline Repair Manual, §§ 2.1.7.1, 8.2.3.1.

[27] TAP 317, pp. 19, 49.

[28] TAP 532aa, pp. 2, 5, 10.

procedure, a fact that was confirmed by the multiple agency approvals associated with the Pluto Flowline repair.  Based on this absence of notice to W&T, Interior's decision cannot stand.

In *ExxonMobil Pipeline v. U.S. Dep't of Transp.*, *supra*, the Fifth Circuit held that the Department of Transportation had unlawfully deprived ExxonMobil Pipeline of fair notice of the regulatory standard that would be applied in a pipeline enforcement proceeding:

> the relevant inquiry is whether the agency's interpretation of the pipeline integrity regulations could have been understood with "ascertainable certainty" by ExxonMobil at the time it engaged in the conduct that allegedly exposed it to this enforcement action.

867 F.3d at 578 (*citing Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976)).  The Fifth Circuit in *ExxonMobil Pipeline* relied on the Supreme Court's emphatic endorsement of the "fair notice doctrine" in *Christopher v. SmithKline Beecham Corp.*, 547 U.S. 142 (2012), which refused to accept an agency's regulatory interpretation due to the lack of "fair notice" to the regulated community.  *See also Moss*, 872 F.3d at 313-315 (rejecting application of offshore regulations on "fair notice" grounds).

Applied here, the "relevant inquiry" is whether Interior's current interpretation of the royalty valuation regulations governing deductible transportation costs "could have been understood with 'ascertainable certainty,'" *ExxonMobil Pipeline*, 867 F.3d at 578, by W&T at the time the Pluto Flowline was repaired in 2005-2006.  The answer is clear: considering Interior's acknowledgment that employing a "surface lift" operation to repair a damaged flowline was standard industry practice, there was no way for W&T to know that Interior (i) would find that "hauling the affected segment of the Pipeline to the ocean's surface and drilling out the paraffin plug" (2017 IBLA Decision at p. 248) was "extraordinary" and, therefore, (ii) would reject W&T's deduction of its "actual costs of transportation" (*e.g.*, 30 C.F.R. §§ 1206.109, 1206.156).  This lack

of notice was exacerbated by Interior *approving* the "surface lift" procedure and *extending* the lease term by granting the SOP.  0001630; IBLA PLEADING0002824; 30 C.F.R. § 250.171(b).

Because *W&T had no notice* that Interior would disallow a deduction of costs incurred in a "surface lift" operation, Interior's final decision upholding the royalty payment Order is both arbitrary and capricious and "contrary to constitutional right."  *See Christopher, supra* (arbitrary and capricious); *FCC v. Fox*, *supra* (due process).  Based solely on the "fair notice" doctrine, Interior unlawfully rejected W&T's deduction of costs it incurred for the 2005-2006 "surface lift" operation.  If the Court agrees that Interior's decision deprived W&T of fair notice, then it is unnecessary to address W&T's additional arguments pertaining to the 2005-2006 costs.[29]

> **ii.  Interior's Conclusion That The 2005-2006 Costs Were Not Reasonable Lacks Any Rational Basis And Contradicts Record Evidence.**

Agency action must be based on "reasoned decisionmaking,"[30] must reflect a consideration of all "relevant factors," and must articulate "'a rational connection between the facts found and the choice made.'"[31]  Accordingly, an agency must "provide adequate reasons explaining why it has rejected uncontradicted evidence, including testimonial evidence."  *Redeemed Christian Church of God*, 387 F. Supp. 3d at 750-751.  Here, in addition to other dispositive errors, Interior's Final Decision violates these basic standards.  Time and again, Interior ignored facts and rejected

---

[29] If Interior were to give industry notice that "surface lift" repair costs are considered *per se* not deductible, Interior would likely violate APA rulemaking requirements, as the Fifth Circuit has found in three prior royalty disputes.  *See W&T Offshore, Inc. v. Bernhardt*, *supra*; *Shell Offshore, Inc. v. Babbitt*, *supra*; *Phillips Petroleum Co.*, *supra*.

[30] *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998).

[31] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (*quoting Burlington Truck Lines, Inc.*, *supra*); *ExxonMobil Pipeline Co.*, 867 F.3d at 571 (*quoting Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004)).

sworn testimony without providing either a reasoned basis or conflicting testimony.  As in prior cases involving Interior Department decisions,[32] Interior's decision is arbitrary and capricious on this basis alone (independent of issues of "fair notice" and regulatory interpretation).

### a.     Mariner Attempted Chemical Treatment.

In disallowing W&T's deduction of the 2005-2006 Pluto Flowline remediation costs, Interior concluded that Mariner had not used chemicals either to prevent the accumulation of paraffin or to clear the paraffin plug from the Pluto Flowline.[33]  The record explicitly contradicts Interior's conclusions.  Uncontradicted testimony by both fact and expert witnesses establishes that Mariner only undertook the "surface lift" operation *after* Mariner attempted, but failed, to dissolve the obstruction through chemical treatments.  Mr. Loegering's Affidavit details Mariner's use of chemicals (in both 2003 and 2005-2006) and explains that Mariner was unable to remediate the later plug using the chemical treatment that had successfully remediated the 2003 plug.  *See e.g.*, Loegering Affidavit, ¶¶ 17, 19, 23.  And, after reviewing voluminous documents detailing Mariner's remediation efforts, Dr. Mousselli concluded that Mariner "decided to drill out the paraffin plug" only "[a]fter additional chemical treatment and a careful evaluation of removal options[.]"  Mousselli Report, p. 4.  Numerous record documents support this testimony.[34]

---

[32] *See, e.g.*, *Woods Petroleum Corp. v. U.S. Dep't of Int.*, 47 F.3d 1032, 1038 (10th Cir. 1995); *Cotton Petroleum Corp. v. U.S. Dep't of Interior*, 870 F.2d 1515, 1526 (10th Cir. 1989); *Black Butte Coal Co. v. United States*, 38 F. Supp. 2d 963, 972 (D. Wyo. 1999).

[33] *See e.g.* 2017 IBLA Decision at 262 (stating that the record did not support that "Mariner made an effort to chemically treat the Pipeline" "[f]ollowing the May 2004 shut-in of the Pluto No. 2 well."; "Mariner did not seek to chemically treat the line for paraffin."; "The record includes no evidence that Mariner undertook to chemically treat the Pipeline once the Pluto No. 3 well was ready to produce in July 2005."); 2018 IBLA Decision at 40 ("There is no evidence that Mariner sought to … chemically treat the Pipeline for the buildup of paraffin.").

[34] *E.g.*, IBLA PLEADING000773, 842, 844.  *See supra* n. 9; W&T Fact ¶¶ 24-25.

### b.    Pigging The Pluto Flowline Would Have Been Neither "Normal" Nor "Prudent."

From the beginning, Interior has faulted Mariner for not employing a mechanical pigging procedure to clear the paraffin plug from the Pluto Flowline.  Before the IBLA, ONRR asserted that mechanical pigging is the "principal means" of resolving paraffin buildup in deepwater transportation lines and that attempting to clear the paraffin obstruction through a pigging operation would have been "normal."  *See* 2017 IBLA Decision at pp. 261, 263.  Critically, however, ONRR never provided any written evidence or testimony from agency or industry personnel supporting these conclusions.  Nor can Interior point to any support in its regulations for the assertions that pigging is the "normal" method of clearing pipeline obstructions and the *only* method that will generate deductible transportation costs.  Notwithstanding the absence of supporting evidence, the IBLA summarily accepted that pigging was the principal and normal operation merely because ONRR "deemed" it so.  *See* 2017 IBLA Decision at 261, 263.

The APA requires that Interior provide more than "bare conclusion[s]."[35]  This is particularly true where, as here, "there is considerable evidence in conflict" with the agency's decision.  *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (EPA decision was arbitrary and capricious because EPA "failed to offer substantial evidence to support its finding …, ignored evidence undercutting its conclusion, and [] failed to state a reasoned basis" for its conclusion).  "[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation."  *Id.* at 346.  Here, Interior's decision is belied by the *only* sworn testimony in the record concerning the methods of dealing with hydrate

---

[35] *Texas v. U.S. EPA*, 690 F.3d 670, 678 (5th Cir. 2012) (EPA action unlawful where the EPA "failed not only to put forth evidence" supporting its conclusion, "but also to put forth a cogent theory" explaining its conclusion).

and paraffin plugs in subsea tieback pipelines, namely, the uncontradicted testimony of Mr. Loegering and Dr. Mousselli.   Mr. Loegering testified that pigging is the *least preferred* remediation tactic.  Loegering Affidavit, ¶ 15.  Further, he testified that after considering the possibility of using a mechanical pig, Mariner decided that pigging would not have been "reasonable" because "*the risk of permanently plugging the line with a pig was very high*."  *Id.* at ¶ 23 (emphasis added).  "Accordingly, pigging the flow line was not either a normal or reasonable option under the circumstances."[36]  *Id.*  Consistently, Dr. Mousselli's expert report – based on his 40 years of experience, his doctorate in engineering, and his review of thousands of records – establishes that Mariner's "decision not to attempt to pig the flowline was reasonable and consistent with industry practice[.]"  Mousselli Report, p. 4.  Dr. Mousselli concluded that, given the circumstances, the "surface lift" operation was "the most feasible, least risky, and least costly option."  *Id.* at p. 5.  This testimony aligns with Pipeline Repair Manual, which characterizes "surface lift" as a "primary technique" that is "widely used throughout the industry" for flowline repairs.  Pipeline Repair Manual, §§ 2.1.7.1; 2.3.1.

Moreover, both Mr. Loegering and Dr. Mousselli emphatically rejected the idea of any single "principal" or "normal" method of preventing and resolving paraffin formation in subsea tieback pipelines because each circumstance "requires individual analysis to come up with the best prevention, maintenance, and remedial solutions." Mousselli Report, pp. 3-5; Loegering Affidavit, ¶ 15; *see also* Pipeline Repair Manual ("Each repair solution is different" depending on the circumstances). Thus, contrary to Interior's conclusion that pigging was the *only* appropriate

---

[36] Considering that a pig likely would become stuck in the line, a "surface lift" operation would have likely been required even if Mariner had first attempted pigging; undertaking both would have resulted in even higher remediation costs and lower royalty payments.

solution, the evidence establishes that there is no one-size-fits-all approach. The opinions by these individuals with "extensive relevant industry experience" are entitled to weight.[37]

Critically, *Interior offered no support during the administrative proceeding – no* witness testimony, *no* documentation, *no* agency studies, *no* industry standards, *no* recommended practices, *no* industry custom – substantiating its conclusion that using a mechanical pig to clear the Pluto Flowline was the "principal," "normal," and *only* method of pipeline repair that would result in deductible transportation costs in this case. Not having contradicted W&T's evidence, Interior fails the basic requirements that it establish a "rational connection between the facts found and the choice made,'"[38] and "provide adequate reasons explaining why it has rejected uncontradicted evidence, including testimonial evidence." *Redeemed Christian Church of God*, 387 F. Supp. 3d at 750-751. As the Fifth Circuit held in *ExxonMobil Pipeline Co.*, an agency's decision is "arbitrary and capricious" when "the agency acted contrary to the evidence before it." 867 F.3d at 583. *See also In re Vioxx Prod. Liab. Litig.*, 235 F.R.D. 334, 346 (E.D. La. 2006) (reversing agency decision that contradicted the evidence).

### c.    There Was No Construction Design Flaw.

Exacerbating its erroneous assumption that pigging was the only appropriate method of clearing the paraffin obstruction, Interior's denial of W&T's deduction is based on the flawed premise that the Pluto Flowline "suffered from a construction design flaw" that precluded remediating the paraffin obstruction by pigging. *E.g.* 2017 IBLA Decision at 248. Given the evidence that pigging would have been neither normal nor prudent in the circumstances, whether the Pluto Flowline had a design flaw that prevented pigging is irrelevant. In any case, the record

---

[37] *La. Generating, L.L.C. v. Ill. Union Ins. Co.*, 831 F.3d 618, 632 n.47 (5th Cir. 2016).

[38] *Motor Vehicle Mfrs.*, 463 U.S. at 43; *ExxonMobil Pipeline*, 867 F.3d at 577.

contradicts Interior's conclusion that a "design flaw" made pigging impossible. Documentary evidence establishes that the Pluto Flowline was designed with a "pig launcher/receiver system located on the Marathon platform SP89B."[39] And, Mr. Loegering testified that rather than being *unable* to use a pig, Mariner *decided* that pigging the line would have been imprudent given the "very high" risk that the pig would become stuck. Loegering Affidavit at ¶ 23. Dr. Mousselli concurred that "the pipeline owners' decision not to attempt to pig the flowline was reasonable and consistent with industry practice." Mousselli Report, p. 4.

Fixating on the erroneous premise that Mariner's failure to conduct a pigging operation negates W&T's right to deduct any pipeline repair costs, Interior blindly adheres to a 2010 email from Michael Wichterich, an accountant with no engineering expertise, as evidence that the Pluto Flowline had a design flaw. *See e.g.*, 2017 IBLA Decision at 261, 2018 IBLA Decision at 40-41. While Mr. Wichterich did say in an email that a "construction design flaw" prevented pigging the Pluto Flowline, 002257, Mr. Wichterich was mistaken, a fact that he established in sworn record testimony[40] which clarified that his unsworn 2010 email statement was based on a "misunderstanding" and "inaccurate assumption," and "was not based on technical engineering expertise or on information provided to [him] by anyone with personal knowledge concerning the reasons why Mariner did not attempt to utilize a pigging operation to remediate the Pluto Flow Line." 2017 Wichterich Declaration, ¶ 4. Mr. Wichterich's testimony establishes that he was not qualified to determine whether the Pluto Flowline had a design or construction flaw.

---

[39] Purchase and Sale Agreement, Schedule 1.1(a) (April 28, 2004), IBLA PLEADING0002346-2393. *See* W&T Facts ¶ 30.

[40] Declaration of Mike Wichterich (March 23, 2017) [*hereinafter* "2017 Wichterich Declaration"], IBLA PLEADING0001867-1868.

Interior's insistent reliance on Mr. Wichterich's erroneous 2010 statement "regardless of his [] lack of expertise" (2018 IBLA Decision at 43) is particularly egregious considering the countervailing testimony from Mr. Loegering, an engineer with vast experience who was *personally involved* in the design, construction, and repair of the Pluto Flowline. In short, Interior *accepted* the erroneous, unsworn, later-disavowed statement of an accountant with *neither* personal factual knowledge *nor* engineering expertise and *rejected* the sworn statements of an engineer with *both* personal factual knowledge *and* extensive engineering experience. 2018 IBLA Decision at 41 (rejecting Loegering's testimony "[r]egardless of his proven technical engineering expertise."). Interior's reliance on a single "email[] of dubious relevance" rather than "sworn declarations of obvious weight" is arbitrary and capricious. *Aircraft Charter Solutions, Inc. v. U.S.*, 109 Fed. Cl. 398, 420 (2013). *See also ExxonMobil Pipeline Co.*, 867 F.3d at 583.

### d.      The Record Contains No Evidence That The Costs Were "Extraordinary."

Interior denied W&T's deduction of the 2005-2006 remediation costs because those costs were purportedly "extraordinary." Yet, over the decade since issuing the Order, Interior has introduced *no evidence* demonstrating that the costs were "extraordinary." Not once has Interior explained what amount of remediation expenses would have been "ordinary" in the circumstances. Not once has Interior introduced evidence that a pigging operation would have been successful *and* would have been less costly. Further, Interior ignored record evidence establishing that the costs were increased by two hurricane events and a technical problem with the service vessel for the repair (*see* W&T Facts ¶¶ 31, 34), conditions that would have inflated remediation costs

regardless of the method employed.[41]   Because "conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice[,]" *Genuine Parts Co.*, 890 F.3d at 312 (internal quotations omitted), Interior's unsubstantiated conclusion that the costs were "extraordinary" fails.  *See Tripoli Rocketry Ass'n v. BATFE*, 437 F.3d 75, 81 (D.C. Cir. 2006) (rejecting agency's "unbounded comparative analysis" where it "never pointed to evidence establishing the data points necessary to make a comparison").

### iii.    Interior's Decision Violates The "Reasonable, Actual Cost" Regulatory Standard.

Interior rejected W&T's deduction of the 2005-2006 costs on the basis that the "surface lift" operation involved the "extraordinary measures of hauling the affected segment of the Pipeline to the ocean's surface and drilling out the plug," purportedly making the costs excessive, rather than "reasonable."  2017 IBLA Decision at 263.  When Interior's regulations are considered "holistically, accounting for the full text, … structure, and subject matter," *Elgin Nursing*, 718 F.3d at 494 (internal quotations omitted), Interior's decision cannot stand.

### a.    Interior Unlawfully Contradicts The "Overall Structure" Of The Regulations.

In *Fina Oil & Chem.*, *supra*, the D.C. Circuit held that Interior was "quite wrong" when its royalty payment order contradicted the "overall structure" of the royalty valuation regulations. 332 F.3d at 677.  Here, too, Interior's decision is arbitrary and capricious because it unlawfully contradicts the "overall structure," *id.*, of Interior's royalty valuation regulations.

*First*, Interior ignores express regulatory provisions that protect Interior against *exactly* what it objects to here, *viz.* a lessee's deduction of purportedly excessive transportation-related

---

[41] In granting the SOPs, Interior acknowledged the delays caused by these events and accepted the delayed timeframe for the remediation events without question.  *See* IBLA PLEADING0002823-2824.

costs. To ensure that a lessee's "actual" transportation costs will not deprive the government of royalty, Interior's regulations presumptively prohibit a lessee from deducting transportation costs that exceed 50 percent of the value of the production. *See* 30 C.F.R. §§ 1206.109(c) (oil); 1206.156(c) (gas). Thus, Interior's regulations provide a functional, objective, mathematical constraint that provides certainty and avoids the slippery, subjective "it just does not appear … normal" (Order, p. 8 (003326)) standard that Interior applies here. Critically, *Interior agrees that* W&T "did not, in the case of any production month, deduct transportation costs in excess of 50% of the value of oil and gas produced in that month." 2017 IBLA Decision at 247. *See* W&T Facts ¶¶ 40-41. Thus, the regulatory limitation protected Interior from bearing excessive transportation costs, and Interior's finding that W&T's costs were nonetheless excessive unlawfully contradicts the "overall structure" of the regulations.

*Second*, Interior's second-guessing of the costs incurred to remove the paraffin plug from the Pluto Flowline contradicts Interior's careful division of deductible costs between those incurred under an "arm's-length" transportation contract and those incurred, as in 2005-2006, under "non-arm's-length" circumstances. Interior's "arm's-length" regulations establish specific grounds for the agency to challenge the "reasonableness" of the transportation costs, including:

> … [where] the contract reflects more than the consideration actually transferred either directly or indirectly from the lessee to the transporter for transportation[;] [where] the consideration paid pursuant to an arm's-length contract does not reflect the reasonable value of the transportation because of misconduct between the parties[;] or [where] the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor[.]

30 C.F.R. §§ 1206.157(a)(1)(ii)-(iii); *see also* 1206.110(a). In contrast to these express regulatory checks on a lessee's deduction of arm's-length transportation costs, the regulations governing the deduction of non-arm's-length costs contain no such limitations. Rather, Interior's non-arm's-

length transportation allowance regulations ask *only* whether the costs are "capital" costs, operating and maintenance costs, overhead, depreciation, and a return on undepreciated "capital" investments, on which a deduction "shall be based" if actually incurred. *E.g.*, 30 C.F.R. §§ 1206.157(b)(2). *As long as the lessee's non-arm's-length costs fall within one of these well-established accounting categories, they are – within the structure of Interior's regulations – "reasonable." Id.*

By analyzing whether the "surface lift" operation was "prudent" and therefore generated "reasonable" costs, Interior has unlawfully applied to "non-arm's-length" circumstances the type of subjective analysis that Interior's regulations reserve *solely* for "arm's-length" transportation costs. Federal courts have repeatedly held that Interior acts unlawfully where it bases a royalty demand on a standard that, under the structure of the controlling statute or regulation, is categorically inapplicable. Thus, in *Fina Oil & Chem.*, the D.C. Circuit held that Interior unlawfully expanded a regulatory standard ("marketing affiliate") beyond its explicit textual limits. 332 F.3d at 677. Similarly, in *Kerr-McGee v. U.S. Dep't of Interior, supra,* and *Santa Fe Snyder v. Norton*, *supra* – cases in which billions of dollars of royalties were at stake – the Fifth Circuit held that Interior's royalty demands were unlawful because Interior had applied statutory standards from one section of the Deep Water Royalty Relief Act to leases governed by a different section of that Act. *See* 554 F.3d at 1086; 385 F.3d at 889-90. Similarly here, Interior's application of a subjective analysis reserved for arm's-length transportation costs to W&T's deduction of non-arm's-length costs "cannot be squared with the plain language of the valuation regulations," *Continental Res. v. Gould*, 410 F. Supp. 3d 30, 35 (D.D.C. 2019).

### b.    Interior Unlawfully Rewrites The Regulations.

Rather than applying the regulatory "reasonable, actual cost" standard, Interior disallowed W&T's non-arm's-length costs on the basis that the costs were incurred for the purported

{N4034460.1}                                         26

"extraordinary measure of hauling the affected segment of the Pipeline to the ocean's surface and drilling out the plug." 2017 IBLA Decision at 263. Setting aside Interior's recognition that a "surface lift" operation was standard industry practice, and independently of Interior's misapplication of the "overall structure" of the regulations, Interior also misapplies the "reasonable, actual cost" provision. Contrary to Interior's decision, the words "reasonable" and "extraordinary" are not mutually exclusive.[42] Depending on market conditions, paying $5 for a gallon of gas may be simultaneously "extraordinary" (because prices have recently spiked) and "reasonable" (because the spike in gasoline prices is the product of a sudden, but explicable, change in crude oil prices).[43] Interior's interpretation effectively replaces the regulatory term "reasonable" with the word "ordinary," a term that does not appear anywhere in ONRR's multiple transportation allowance regulations. For example, under Interior's interpretation, 30 C.F.R. §§ 1206.111(a)(oil) and 1206.156(a)(gas) would need to be modified to provide for a deduction of:

> the ~~reasonable~~ *ordinary*, actual costs [for transportation]…

Further, Interior's disallowance of W&T's *entire* remediation-related deduction exceeds the scope of Interior's regulations, which mandate that Interior "shall allow" a deduction for the reasonable costs of transportation. At a minimum, some portion of the remediation costs were "reasonable." *See Devon Energy Production Co., L.P. v. Gould*, 421 F. Supp. 3d 1213, 1230 (D. Wyo. 2019) (where some portion of the transportation costs are deductible, it is "improper not to permit any deduction at all"). As in *Fina Oil & Chem.*, Interior cannot impose extra-regulatory standards and

---

[42] *See In re Scoggins*, 517 B.R. 206 (E.D. Cal. 2014) (rejecting application of a "purely extra-statutory" "extraordinary" standard where the statute applied a "reasonableness" standard).

[43] *Cf. Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291 (S.D. Miss. 2014) (recovery was "very reasonable" given "extraordinary obstacles" faced by plaintiffs).

limitations "under the guise of [regulatory] interpretation."  332 F.3d at 676.  *See also Phillips Petroleum Co., supra*; *Continental Res. v. Gould*, *supra*.

### iv.    The 2005-2006 Pipeline Repair Costs Were "Capital Expenses."

#### a.    Regulatory Interpretation

In addition to contradicting the "reasonable, actual cost" regulatory standard, Interior also contradicted the regulation authorizing a lessee that transports production through a pipeline that it owns to deduct "allowable capital costs," which are "generally those for depreciable fixed assets (including costs of delivery and installation of capital equipment) which are an integral part of a transportation system."  30 C.F.R. §§ 1206.111(c), 1206.157(b)(2).  As in tax law, three characteristics of "capital" costs are important here.  *First*, costs incurred to improve the condition of property as compared to when that property was acquired are "capital," particularly when the property was essentially useless at acquisition.  *See Jones v. Commissioner*, 242 F.2d 616 (5th Cir. 1957); *see also* Sharp Report, p. 6.  *Second*, costs incurred to "put [a] particular capital asset in efficient operating condition … are capital in nature" (as opposed to costs incurred to "keep" an asset in operating condition).  *See e.g.*, *Dominion Resources, Inc. v. United States*, 219 F.3d 359 (4th Cir. 2000) (*citing Jones*, *supra*) (internal quotations omitted).  *Third*, costs incurred as one part of a plan to improve "capital" property or make that property functional for a new use are "capital."  *Jones v. Commissioner, supra*.

The Fifth Circuit's decision in *Jones v. Commissioner* is a seminal case concerning these hallmarks of "capital" costs.[44]  There, Mr. Jones acquired property that, prior to his acquisition,

---

[44] *E.g.*, *Stoeltzing v. Commissioner*, 266 F.2d 374 (3rd Cir. 1959) (citing *Jones* to conclude that costs incurred to improve the condition of a building as compared to its condition when purchased were capital); *Dominion Res., Inc.*, 219 F.3d at 372 (relying on *Jones* to hold that costs incurred for a substantial environmental cleanup project that "lifted the property out of what was essentially a condition of uselessness" were capital); *United Dairy Farmers, Inc. v. United States*, 267 F.3d 510, 517 (6th Cir. 2001) (relying on *Jones* and *Dominion* for the "clear principle" that

{N4034460.1}                                        28

was effectively useless. *Id.* at 617. After acquiring the property, Mr. Jones "undertook to put the building into such condition as would permit it again to be used[.]" *Id.* at 617-18. Seeking to expense the remediation costs, Mr. Jones deducted those costs against his taxes for the year in which the costs were incurred. *Id.* at 618. The IRS rejected the deduction on the basis that the costs were "capital" in nature. *Id.* The Fifth Circuit agreed, finding that the remediation costs were "capital" because they were part of a project to make useless property usable. Relying on *Jones*, in *Bayou Verret Land Co. v. Comm'r*, the Fifth Circuit concluded that remediation costs were "capital" when incurred post-acquisition to remediate property that had, pre-acquisition, "been permitted to deteriorate and had become unusable." 450 F.2d 850, 858 (5th Cir. 1971).

*Jones* and *Bayou Verret* are squarely on point. Like the property at issue in those cases, the Pluto Flowline had deteriorated *prior to* W&T's acquisition of the pipeline in 2004.[45] And, like the taxpayers in *Jones* and *Bayou Verret*, W&T and Mariner undertook the remediation as part of an overall project to "put the [Pluto Flowline] into such a condition as would permit it to be used[.]"[46] *Jones*, 242 F.2d at 617-18. Finally, as in *Jones* and *Bayou Verret*, after the remediation, the Pluto Flow Line was "restored to service," meaning that the condition of the Pluto Flowline was unquestionably improved as compared to its condition when acquired by W&T and Mariner.

---

costs incurred to "improve property defects that were present" upon acquisition "are capital in nature"); *United States v. Wehrli*, 400 F.2d 686, 689-90 (10th Cir. 1968) (citing *Jones* for proposition that "an expenditure made for an item which is part of a 'general plan' of rehabilitation, modernization, and improvement of the property, must be capitalized").

[45] 2017 IBLA Decision at 266 (the paraffin plug accumulated "prior to the cessation of production" from the Pluto No. 2 Well); 2017 IBLA Decision at 245 ("At the end of April 2004, Mariner and W&T purchased the Pipeline from MEGS.").

[46] This project also entailed the cost of installing a two-mile subsea connection from the Pluto No. 3 Well to the Pluto Flowline. *See* IBLA PLEADING0002677-2680. *See also* W&T Facts ¶ 32.

Similarly, in *Mountain Fuel Supply Co. v. United States*, applying *Jones*, the Tenth Circuit found that costs incurred to recondition segments of a pipeline were "capital" costs.  449 F.2d 816 (10th Cir. 1971), *cert. den.* 405 U.S. 989 (1972).  As in *Jones*, *Bayou Verret*, and *Mountain Fuel Supply Co.*, the 2005-2006 remediation costs were "capital" costs.[47]  Interior's finding that the remediation costs were not "capital" violates Interior's regulations and is therefore "arbitrary and capricious." *E.g.*, *Fina Oil & Chem.*, *supra*; *Phillips Petroleum Co.*, *supra*.

**b.**      <u>Interior's Conclusion That The 2005-2006 Remediation Costs Were Not "Capital" Lacks Any Rational Basis Or Record Support.</u>

As with Interior's "reasonable, actual cost" determination, Interior's conclusion that the Pluto Flowline remediation costs were not "capital" lacks any reasoned basis and contradicts record evidence, including testimonial evidence, without explanation.  For example, although Interior agrees that the costs of "putting an asset to a new use" or "alter[ing] the use" of an asset are "capital," it disallowed remediation costs that put the Pluto Flowline to a "new use" – *viz.*, to service the Pluto No. 3 Well.  Similarly, although Interior agrees that costs incurred to improve an asset, make an asset more efficient, and prolong the useful life of an asset are "capital," it disallowed the remediation costs that unquestionably improved the Pluto Flowline and prolonged its useful life as compared to the condition of the Pluto Flowline when Mariner and W&T acquired

---

[47] That the repair exceeded the original construction and purchase price of the pipeline is irrelevant, as "capital" repairs frequently exceed the value of the property prior to repair; the substantial costs to remediate the Pluto Flowline *support* their "capital" nature.  *E.g.*, *Jones*, *supra* (capital repair was unable to be performed on any basis other than "cost-plus"); *Dominion Res. Inc.*, 219 F.3d at 372 (Where cleanup costs "dwarfed the value of the property itself prior to the cleanup[,]" the disparity belies the contention that the cleanup" was not a capital expenditure); *United Dairy Farmers, Inc. v. United States*, 267 F.3d 510 (6th Cir. 2001) ("large … costs, relative to property value, cast doubt on a taxpayer's claim" that the costs are not capital).

it in 2004.[48]  Interior's admissions concerning the elements of a "capital" expenditure cannot be squared with Interior's rejection of the "capital" nature of W&T's expenditures.

Moreover, *and again without providing an explanation or offering contradictory evidence*, Interior summarily rejected the opinions of two Certified Public Accountants – Michael Wichterich[49] and Holly Sharp – who, based on the same voluminous invoices and records as those presented to Interior, concluded that remediation costs were "capital" in nature.[50]  Both Mr. Wichterich and Ms. Sharp issued unqualified opinions concluding that W&T's treatment of the 2005-2006 remediation costs as "capital" costs complied with GAAP and industry practice. Consistently, Ernst & Young approved W&T's treatment of the remediation costs as "capital" costs.  *See* Affidavit of Karen Acree ¶¶ 5-6.  Although these opinions by individuals with "extensive relevant industry experience" are entitled to weight,[51] Interior summarily "rejected … that any of [the accountants' sworn testimony], alone or together, supported the conclusion that the costs of remediating the pipeline were capital costs."  2018 IBLA Decision at 43.  Interior offered no evidence, testimony, or explanation supporting its rejection of this testimony.

---

[48]  Mousselli Report, p. 5 ("The plug would have substantially formed during production[.]"); Sharp Report, p. 3 ("The remediation costs incurred by W&T extended the life and improved the efficiency of the Pluto Flow Line. …  The condition of the transportation system was improved after it was acquired by W&T.").

[49] 2011 Wichterich Affidavit.

[50] The qualifications of these witnesses (set out in their declarations) regarding this accounting issue cannot be overstated.  Mr. Wichterich is a CPA and former Chief Financial Officer with decades of experience with accounting and financial issues relating to offshore and onshore oil and gas operations.  Ms. Sharp is a CPA and Certified Fraud Examiner; she is also Certified in Financial Forensics.  She has extensive experience analyzing costs under principles established by GAAP, including costs relating to oil and gas operations.

[51] *La. Generating, L.L.C.*, 831 F.3d at 632 n.47.

"Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice[.]" *Genuine Parts Co.*, 890 F.3d at 346.  Here, because Interior failed to meet its "minimal obligation to provide adequate reasons explaining why it has rejected uncontradicted evidence, including testimonial evidence[,]" *Redeemed Christian Church of God,* 387 F. Supp. 3d at 750, its conclusion that the costs were not "capital" cannot withstand scrutiny.  *See ExxonMobil Pipeline Co.*, 867 F.3d at 583 (agency decision was arbitrary and capricious because it was "contrary to the evidence").

> c.        **The Costs Are Also Deductible as "Maintenance" Costs.**

Although W&T properly deducted the 2005-2006 repair costs as "capital" costs, even if the costs constitute "maintenance" costs (as Interior asserts), they were deductible.  Although Interior asserts that "maintenance" costs can only be allocated to the period in which the costs were paid – here, the pipeline repair occurred when royalty-bearing production could not flow – it is appropriate under GAAP to account for expenses "in the same accounting period as the revenues associated with those costs." *See* Sharp Report, p. 7 (*quoting* GAAP).  Thus, "[c]osts that provide benefits over several periods are allocated to those periods[.]" *Id.* (*quoting* GAAP).[52]  Here, W&T properly deducted the remediation costs over the "several periods," *id.*, of revenue-generating (and royalty-generating) production that the pipeline repair made possible.

---

[52] Interior royalty audits must be conducted "in accordance with" GAAP.  *See* 30 C.F.R. §§ 1206.101, 1206.151.  Further, Federal courts have recognized that, under the GAAP "matching" principle, "expenses incurred to generate revenue [must] be recognized in the same accounting period as the resulting revenue." *In re Triton Energy Ltd. Secs. Litigation*, 2001 U.S. Dist. LEXIS 5920, *23-*24 (E.D. Tex. 2001).

B.      **W&T Properly Deducted The Costs Of Repairing The Pluto Flowline in 2003.**

i.      **W&T Incurred The 2003 Costs Under An Arm's-Length Contract.**

Interior disallowed the 2003 remediation costs on the basis that those costs were not incurred under the Gas Gathering Agreement, which, according to Interior "was the applicable arm's-length transportation contract." 2018 IBLA Decision at 45.[53]  As with the 2005-2006 costs, here, too, Interior's conclusion turns a blind eye to the record evidence.

The Unit Operating Agreement governed the "rights and obligations" of Mariner, as Operator of the Pluto Unit, and W&T (as successor to Burlington Resources), as non-Operator, including (*inter alia*) "gathering … of Hydrocarbons."  Unit Operating Agreement, Art. 1.1.  Under the Unit Operating Agreement: (i) Mariner was required to conduct and to "pay all Costs of joint operations," including contracting for services "reasonably necessary for the Operator to conduct" the joint operations (*id.* at Art. 5.1) and to resolve "specific … problems" on the property used for operations "even if not owned by the Joint Account" (*id.* at Exhibit C); and (ii) W&T was obligated to reimburse Mariner for W&T's share of those costs (*see id.* at Art. 6.1 & Exhibit C).

Contemporaneously with the 1999 sale of the Pluto Flow Line by Mariner and Burlington to MEGS, and as a condition to that sale, Mariner and MEGS executed the Operations and Maintenance Agreement whereby Mariner (as Operator of the Pluto Flowline) assumed the obligation to "supervise and pay for all repairs . . . to the Gathering System[.]"  Operations and Maintenance Agreement, § 2.3(iv), IBLA PLEADING0002795-2816.  Thus, Mariner, as Unit Operator, entered into the arm's-length Operations and Maintenance Agreement for the benefit of

---

[53] *See also* 2017 IBLA Decision at 258 (concluding that ONRR "properly disallowed the deduction … of any of the 2003/2004 remediation costs[] as a transportation allowance[] since they were not incurred by W&T under the [Gas Gathering Agreement] or the [Operations and Maintenance Agreement.").

the Joint Operations under the arm's-length Unit Operating Agreement.  Pursuant to the Operations and Maintenance Agreement, Mariner incurred transportation-related expenses on behalf of both Mariner and W&T; and pursuant to the Unit Operating Agreement, Mariner billed the joint account for those expenses, and W&T paid its share of those costs.  Thus, the record is clear that, pursuant to the Unit Operating Agreement and the Operations and Maintenance Agreement (two, separate arm's-length contracts), "W&T received invoices from Mariner [for the 2003] remediation costs, and W&T paid those costs."  *See* 2011 Wichterich Affidavit ¶ 9, and attachments thereto, IBLA PLEADING0001886-2332.  Interior's decision, which inexplicably concludes that W&T paid Mariner more than $3 million that it was not contractually required to pay, lacks a rational basis.

### ii.    W&T's Adjustments For The 2003 Remediation Were Timely.

Recognizing that lessees often "adjust" or modify their prior royalty payments and reports, Congress created a six-year "Adjustment Period" during which lessees can unilaterally revise prior-period reports and payments to correct either underpayments or overpayments.  30 U.S.C. § 1721a(a).  Separately, Congress provided that either Interior or a lessee may initiate a "judicial proceeding or demand" arising from an "obligation" "within seven years from the date on which the obligation becomes due[.]"  30 U.S.C. § 1724(b)(1).

Here, Interior erroneously rejected W&T's October 2009 adjustments to capture the transportation costs relating to production months July 2003 and August 2003 on the basis that W&T's adjustments were untimely.  Interior made two errors.  First, Interior ignored that in June 2006 and January 2008 – i.e., *prior to* October 2009 – W&T made amendments to its royalty payments relating to production months July 2003 and August 2003 that resulted in W&T having overpaid royalties for those two production months. 3360, 3839-3840.  Because W&T made the relevant overpayments in June 2006 and January 2008, W&T's October 2009 adjustments were well within six years of when the overpayments occurred.

{N4034460.1}                                                          34

Second, on September 3, 2009, and September 24, 2009, W&T submitted written demands to ONRR asserting that W&T had overpaid its royalties by not deducting all of the transportation costs to which it was entitled under the regulations and, therefore, was entitled to a refund.  4027-4050, 4003-4014; *see also* Order, 1.  Because W&T's 2009 submissions were written, asserted that the transportation costs were deductible but had not yet been deducted, and were made within seven years of the original July/August 2003 production months, when W&T's "obligation" to pay royalties accrued,[54] W&T's adjustments to recover its overpayments attributable to production months July and August 2003 were also timely under the seven-year limitations period.

## V.   <u>CONCLUSION</u>

Plaintiff W&T Offshore, Inc. respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,

*/s/ Jonathan A. Hunter*
Jonathan A. Hunter
Sarah Y. Dicharry
JONES WALKER, LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana  70170-5100
Telephone:  504-582-8000
Email: jhunter@joneswalker.com
      sdicharry@joneswalker.com

Dated:  June 22, 2020                Attorneys for W&T Offshore, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing pleading was made via the Court's electronic filing system on June 22, 2020.

*s/ Jonathan A. Hunter*

N4034460.1

---

[54] *See* 30 U.S.C. § 1702 (23)(B) & 30 U.S.C. § 1724(b)(1).