# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**W&T OFFSHORE, INC.**                         **CIVIL ACTION**

**VERSUS**                                     **NO. 17-7102**

**UNITED STATES DEPARTMENT**                   **SECTION: D (3)**
**OF INTERIOR, ET AL.**

## ORDER AND REASONS

Before the Court is W&T Offshore, Inc.'s ("W&T") Motion for Summary Judgment.[1] Doug Burgum, Secretary of the United States Department of Interior, and Howard Cantor, Director of the Office of Natural Resources Revenue,[2] each in their official capacity, have filed an opposition to which W&T has filed a reply.[3] Also before the Court is Interior's Motion for Summary Judgment.[4] W&T has filed an opposition,[5] and Interior has filed a reply.[6] The Court denied W&T's Motion to file a sur-reply.[7] After careful review of the parties' memoranda, the record,[8] and the

---

[1] R. Doc. 77.

[2] In accordance with Fed. R. Civ. P. 25(d), Doug Burgum, Secretary of the United States Department of the Interior, is substituted in place of David Bernhardt. Howard Cantor, Director of the Office of Natural Resources Revenue, is substituted in place of Gregory Gould.

[3] R. Doc. 82; R. Doc. 90. Defendants include the Department of Interior, Secretary of Interior Doug Burgum, the Office of Natural Resources Revenue, and Director of the Office of Natural Resources Revenue Howard Cantor. For the sake of convenience only, the Court refers to all defendants as "Interior."

[4] R. Doc. 83.

[5] R. Doc. 87.

[6] R. Doc. 94.

[7] R. Doc. 98.

[8] The Administrative Records contains two portions with separate Bates labels, the "Original Administrative Record filed with the IBLA" portion (Bates numbered 000003–004545) and the "IBLA Pleadings and Orders" portion (Bates IBLA Pleading 0000001–0003151). The Court, when citing to the administrative record, will do so in conformity with such designations. On August 13, 2025, the Court received five supplemental documents to the administrative record from Defendants' counsel.

applicable law, the Court **GRANTS IN PART and DENIES IN PART** W&T's Motion for Summary Judgment[9] and **GRANTS IN PART and DENIES IN PART** Interior's Motion for Summary Judgment.[10]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case challenges a final decision by the United States Department of the Interior requiring W&T to pay millions of dollars in additional royalties on oil and gas produced from two offshore federal leases in the Gulf of Mexico.[11] W&T is a lessee and operator of numerous offshore federal oil and gas leases issued by Interior pursuant to the Outer Continental Shelf Lands Act.[12] The dispute concerns two oil and gas leases (jointly referred to as "Pluto Unit") and a pipeline ("Pluto Flowline")[13] constructed to transport oil and gas produced from the Pluto Unit to a host platform for processing.[14]

### A.    Pluto Unit and Pluto Flowline

On April 30, 1999, Interior granted Mariner Energy, Inc. ("Mariner") a right-of-way to install and operate a pipeline to transport oil and gas from the Pluto Unit.[15] Effective May 1, 1999, Mariner and Burlington Resources ("Burlington") entered into a Unit Operating Agreement ("UOA") governing their rights and obligations

---

Plaintiff's counsel does not object to Defendants supplementation of the administrative record. Accordingly, the Court has considered these supplemental documents in issuing this Order.

[9] R. Doc. 77.

[10] R. Doc. 83.

[11] R. Doc. 26-2.

[12] R. Doc. 26 at 2; 43 U.S.C. § 1331, *et seq*.

[13] The Pluto Pipeline is a "29.8 mile long eight-inch diameter deepwater subsea tieback flowline" in which production from the lease is transported to the host platform. R. Doc. 83-1 at 14.

[14] R. Doc. 26 at 3.

[15] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000766, Approval of Right-of-Way dated April 30, 1999.

regarding the Pluto Unit.[16] Under the UOA, Mariner, as the operator, agreed to pay all costs of joint operations, and Burlington was obligated to reimburse Mariner for costs of each joint operation.[17] Shortly thereafter, Mariner and Burlington built the Pluto Flowline to transport production[18] back to the host platform.[19] In December 1999, MEGS, LLC ("MEGS") bought the Pluto Flowline from Mariner and Burlington.[20] Contemporaneously with the sale, Mariner and MEGS executed an Operations and Maintenance Agreement ("O&MA"), which required Mariner to operate the Pluto Flowline and assume all obligations to supervise and pay for repairs to the Pluto Flowline.[21] Burlington was not in contractual privity to the O&MA.[22] Also contemporaneous with the sale, Mariner and Burlington executed a Gas Gathering Agreement ("GGA") with MEGS, whereby Mariner and Burlington agreed to ship production to MEGS using the Pluto Flowline.[23] Pursuant to the GGA, Mariner and Burlington each agreed to pay MEGS a "Monthly Payment" equal to the greater of each's "Monthly Gathering Fee for that Month"[24] or each's "Minimum

---

[16] *Id.* at Bates 000827–000979, Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[17] *Id.* at Bates 000844.

[18] For the purposes of this Order, production refers to the production of oil and gas.

[19] R. Doc. 26 at 3–4.

[20] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000751, MMS Approval of Assignment and Bill of Sale.

[21] R. Doc. 26-1 at 8. *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002795 – 0002816, Operations and Maintenance Agreement between MEGS and Mariner dated December 29, 1999.

[22] R. Doc. 26-1 at 8.

[23] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000671, Gas Gathering Agreement between MEGS, Mariner, and Burlington dated December 29, 1999.

[24] *Id.* at Bates 000671–000702, Gas Gathering Agreement. Pursuant to Article 1 of the GGA, the Monthly Gathering Fee is defined as "the product of (i) the Gathering Rate for that Month multiplied by (ii) the total quantity (in MMBtu's) of Gas and Condensate gathered and redelivered for that Shipper in that Month in Gathering System." The Gathering Rate is "(i) until the date on which the aggregate amount of the Monthly Payments that Shippers have paid to Gather under Article 9, Section

Monthly Payment for that Month."[25]

Effective January 1, 2002, Burlington assigned its 49% interest in the Pluto Unit to Offshore Energy I, LLC, a wholly-owned affiliate of W&T.[26] Offshore Energy I, LLC subsequently assigned its interest in the leases to W&T.[27] From 2003-2006, Mariner owned a 51% interest in production from the Pluto Unit while W&T owned a 49% interest.[28] Throughout this three-year period, Mariner was the designated operator of the Pluto Unit.[29] Pursuant to the O&MA, Mariner paid for all costs and repairs pertaining to the Pluto Flowline.[30] W&T, in turn, would reimburse Mariner its share of costs of joint operations as defined by the UOA.[31]

On April 28, 2004, W&T and Mariner bought the Pluto Flowline from MEGS, which resulted in the termination of the O&MA and GGA.[32] The UOA was thereafter the governing document regarding the Pluto Flowline.[33]

### B.    Pluto Unit Production

Production from the Pluto Unit occurred in two phases, Phase I beginning in

---

1 of this Agreement equals or exceeds the Aggregate Dollar Commitment, $0.2575 per MMBtu and (ii) thereafter, $0.05 per MMBtu." *Id.* at Bates 000672–000676.

[25] *Id.* at Bates 000674. The Minimum Monthly Payment is defined as "(i) the Minimum Dollar Commitment for that Shipper in that Month less (ii) the Annual Excess Payments for that Shipper in the prior Contract Year, if any, divided by 12."

[26] R. Doc. 77-1 at 3.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002795–0002816, Operations and Maintenance Agreement between MEGS and Mariner dated December 29, 1999.

[31] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000928–000937, Exhibit C to the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[32] *Id.* at Bates 000703, Purchase and Sale Agreement between MEGS, W&T, and Mariner dated April 28, 2004.

[33] *Id.* at Bates 000825.

December 1999 and ceasing in April 2004 and Phase II beginning in 2005 and ceasing in 2008.[34]    During both phases, the Pluto Flowline developed paraffin plug blockages.[35] In 2003, Mariner discovered a paraffin blockage that prevented the production of oil and gas.[36] Accordingly, Mariner chemically treated the paraffin buildup at a cost of $6,367,469.[37] Production resumed, and in May 2004, Mariner and W&T shut in[38] the Pluto Flowline due to low pressure and increased water production.[39] Mariner did not flush the Pluto Flowline and fill it with inhibited seawater during its non-operational period, but did treat the Pluto Flowline beforehand with paraffin and hydrate chemicals to prevent the occurrence of blockages during the shut-in period.[40] In the same period, Mariner drilled a second well ("Pluto No. 3") that was ready for production by July 2005.[41] Production, however, was inhibited by what Mariner believed at the time to be a hydrate blockage in the Pluto Flowline.[42]

Mariner believed the blockage resulted from a formation of hydrate and treated the line for a hydrate buildup.[43] Mariner's treatment for a hydrate build up was

---

[34] R. Doc. 26 at 4–5.
[35] *Id.*
[36] R. Doc. 83-2 at 3.
[37] *Id.* at 4.
[38] Shut in is a "generic term used to refer to the closing of the valves through which oil and gas flow through a well, [and] its *legal* meaning refers to the closing of valves when production at a well capable of producing in paying quantities is temporarily halted to repair or clean the well, to allow reservoir pressure to build, or for lack of market." *Norman v. Apache Corp.*, 19 F.3d 1017, 1027 (5th Cir. 1983)(emphasis original).
[39] R. Doc. 77-1 at 8.
[40] *Id.*; R. Doc. 83-2 at 4.
[41] R. Doc. 83-2 at 4.
[42] R. Doc. 77-1 at 8–9; R. Doc. 83-2 at 5.
[43] R. Doc. 26-1 at 10.

unsuccessful.[44] Although discovered in 2005, the blockage had gradually collected in the Pluto Flowline during production in Phase I, resulting in a 9,000-foot paraffin blockage.[45] The chemical treatment Mariner Energy had used to remediate the first plug in 2003 was ineffective in preventing or remediating the second plug discovered in 2005.[46]

Mariner considered various options to remove the plug, namely replacing, remediating, or pigging the Pluto Flowline.[47] Due to the risk of permanently plugging the Pluto Flowline with a pig and the significant costs associated with doing so,[48] Mariner eliminated pigging as an option and ultimately determined it would be more cost-effective to remediate the Pluto Flowline rather than replace it.[49] In August 2005, Mariner elected to surface-lift the 9,000-foot paraffin plugged portion of the Pluto Flowline to the surface of the ocean to drill through the paraffin plug and return it to the ocean floor.[50] The remediation cost was approximately $96.6 million, partially due to the increased costs and delays caused by the 2005 hurricane season.[51]

Considering these delays that caused difficulties in removing the paraffin plug and restoring flow to the Pluto Flowline, Interior granted Mariner two Suspensions of Production ("SOPs") to ensure that the Pluto Unit leases did not expire under federal law.[52] The first SOP ran from September 19, 2005 to March 31, 2006, and the

---

[44] R. Doc. 77-1 at 9; R. Doc. 83-2 at 5.
[45] R. Doc. 83-2 at 5.
[46] *Id.*; R. Doc. 26 at 5.
[47] R. Doc. 26 at 5.
[48] R. Doc. 77-2 at 32.
[49] R. Doc. 26 at 6.
[50] R. Doc. 83-2 at 5.
[51] *Id.*
[52] R. Doc. 77-1 at 12.

second SOP covered August 1, 2006 to September 30, 2006.[53] In the letter approving the first SOP, Minerals Management Service ("MMS") noted that "[o]n September 11, 2005, the pipeline end termination was recovered to the surface and coiled tubing operations to remediate the pipeline blockage were commenced."[54] Additionally, in an email from Bureau of Safety and Environmental Enforcement to an ONRR employee, Interior approved phase three of Mariner's remediation plan on June 5, 2006.[55] Phase three included, among other things, reinstalling a pipeline end termination system and laying it back down "on [the] seabed[.]"[56] Pluto No. 3 was restored to service in September 2006 and produced through August 2008.[57]

## C.    Remediation Costs

The Pluto Flowline remediations costs for all three years, 2003, 2005, and 2006, totaled approximately $102,949,570.[58]  Holding a 49% interest in the leases, W&T incurred more than $50 million of the total costs to remediate the Pluto Unit Flow Line.[59]

W&T did not originally deduct any costs incurred to transport production from the Pluto Unit to the host platform from its royalty payments owed to the federal government.[60] On September 3, 2009, and September 24, 2009, W&T submitted to

---

[53] *Id.*
[54] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002823–0002824, Letters from Michael Melancom, MMS, to Cory Loegering, Mariner Energy, approving SOPs dated October 27, 2005 and August 16, 2006.
[55] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 001629–001630, Email from BSEE employee to ONRR employee dated May 6, 2013.
[56] *Id.*
[57] R. Doc. 26 at 6.
[58] *Id.*
[59] *Id.*
[60] *Id.* at 7.

Interior what it called "handbooks" regarding the calculation of the Pluto Unit's subsea pipeline allowance.[61] At the time, the MMS had a procedure to allow lessees to self-report their transportation allowances and report it on a Report of Sales and Royalty Remittance form ("Form MMS-2014").[62]

The following month, on October 1, 2009, W&T submitted its Form MMS-2014 for its royalty reports for the production months covering 2003 through 2008 to deduct the costs of remediating the Pluto Flowline as a part of a transportation allowance.[63] W&T, in conformity with Interior's regulations, limited its deductions to less than fifty percent of the value of production.[64] Accordingly, W&T deducted $5,266,017.73 in remediation costs as part of its transportation allowance.[65]

---

[61] R. Doc. 77-2 at 44. As discussed *infra* Part III.B.1, the parties dispute the proper classification of the handbooks under the applicable regulatory framework.

[62] *Id.*

[63] *Id.*

[64] R. Doc. 26 at 7.

[65] R. Doc. 26-1 at 11. W&T arrived at its deduction in two steps. First, W&T calculated its gas transportation analysis. Although the total amount of the Pluto Flowline remediation costs equaled $102,949,570, the total amount of capital expenditure allocated to gas depreciation was $77,138.116. W&T added $697,541, the portion of lease operating expenses attributable to what it calls gas transportation, to the total amount of capital expenditure allocated to gas depreciation, equaling $77,835,657. Such number was then multiplied by the rate of return for each year in question, equaling a $12,561,109 return on investment. The return on investment was then added back to $77,835,657, leading to a gross gas transportation analysis of $90,396,756. From there, W&T applied the 50% maximum deduction rule, which resulted in a revised gross gas transportation allowance of $56,377,178. The revised gross gas transportation allowance was then divided by 1/8, giving a total of $7,047,147. Because W&T had a 49% interest in the Pluto Flowline, the gas deduction equated to 49% of the total, or $3,452,883. Thus, W&T's gas deduction was $3,452,883. W&T next underwent an identical analysis for its oil deduction, which calculated to $1,813,131. By adding both its oil and gas deductions, W&T arrived at its transportation allowance that it reported on the Form MMS-2014, $5,266,014. *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0001880–0001885, Affidavit of Mike Wichterich (April 13, 2011). The Court also notes a potential rounding error in the Affidavit of Mike Wichterich, as W&T's Form MMS-2014 evidenced a deduction totaling $5,266,017.73, not $5,266,014 as stated in the affidavit. Because $5,266,017.73 is provided in the Form MMS-2014, the Court uses that number in its analysis.

### D.    Procedural History

The Minerals Management Service ("MMS"),[66] disallowed nearly all of the remediation costs deducted by W&T on various grounds.[67] First, MMS found that W&T's transportation allowance deductions for the production months of August and July 2003 were improper because the statute of limitations had passed.[68] Second, for the 2005-2006 transportation allowance deductions, MMS found that the surface lift remediation was not "normal" or "prudent" and resulted in an "extraordinary" expenditure.[69] Nor did the surface lift remediations constitute capital expenses or maintenance expenses, according to MMS.[70]

MMS ordered W&T to remit additional royalties of $4,686,923.73.[71] W&T appealed that order to the Director of the ONRR.[72] In support of its appeal, W&T submitted an affidavit[73] from Cory Loegering, Mariner's Vice President who assisted with the design, construction, operation, and remediation of the Pluto Flowline.[74] Mr.

---

[66] 76 Fed. Reg. 64432, 64432 (Oct. 18, 2011). On May 19, 2010, the Secretary of the Department of the Interior issued Secretarial Order No. 3299, which eliminated the MMS and split MMS into three new bureaus within the Interior Department. The three new bureaus included the Bureau of Ocean Energy Management, the Bureau of Safety and Environmental Enforcement ("BSEE"), and the Office of Natural Resource Revenue ("ONRR"). Shortly thereafter, on June 18, 2010, the Secretary issued Secretarial Order No. 3302, which changed the name of the former MMS to the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE"). BOEMRE was the official name of the former MMS for the transition period starting on June 18, 2010 and ending on October 1, 2011, the date when the three new bureaus would be officially established. *Id.* Thus, even though the Court refers to MMS when discussing the Order to remit additional royalties, it is for convenience only. R. Doc. 26-4 at 1. The Court acknowledges that it was BOEMRE who issued the Order, which was dated October 4, 2010, during the former MMS' transitional period. *Id.*
[67] R. Doc. 26 at 7; R. Doc. 26-4.
[68] R. Doc. 26-4 at 10.
[69] *Id.* at 8.
[70] *Id.* at 6–7.
[71] R. Doc. 26 at 7.
[72] *Id.* at 7–8.
[73] R. Doc. 26-6 at 15–23.
[74] *Id.*; R. Doc. 77-2 at 15–16.

Loegering stated that pigging the Pluto Flowline was the least preferred remediation tactic, as the "risk of permanently plugging the line with a pig was very high."[75] The ONRR Director denied W&T's appeal.[76]

W&T then appealed the ONRR Director's order to the Interior Board of Land Appeals ("IBLA"). While on appeal with the IBLA, W&T submitted expert reports from Dr. A.H. Mousselli, Ph.D, P.E.[77] and Holly Sharp, CPA, CFE, CFF.[78] Dr. Mousselli opined that W&T's surface lift operation was "the most feasible, least risky, and least costly option."[79] Dr. Mousselli further emphasized that paraffin remediation is a fact intensive endeavor that varies which each different scenario.[80] In support of W&T's argument that the costs associated with the surface lift remediation procedure were capital costs, Ms. Sharp stated that, under the Generally Accepted Accounting Principles ("GAAP"), W&T's surface lift remediation expenses qualified as capital costs.[81] The IBLA issued a final decision (the "Final Decision")

---

[75] R. Doc. 26-6 at 22.

[76] R. Doc. 26-5. While on appeal at the ONRR, Michael Wichterich, W&T's accountant who prepared its royalty amendment reports, stated that the Pluto Flowline possessed a construction design flaw that made pigging impossible in an email to the ONRR. *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 003372, E-mail from Mike Wichterich to Ohmer Daniel at the ONRR dated February 22, 2010. Mr. Wichterich later recanted his testimony based on his lack of engineering expertise. *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0001867–0001877, Declaration of Mike Wichterich (March 23, 2017).

[77] R. Doc. 77-2 at 19. *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002778–0002794, Expert Report of Dr. A.H. Mousselli, Ph.D., P.E. (Nov. 21, 2014).

[78] R. Doc. 77-2 at 19. *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002831–0002843, Expert Report of Holly Sharp, CPA, CFE, CFF (Nov. 21, 2014).

[79] R. Doc. 77-2 at 29.

[80] *Id.*

[81] *Id.* at 40.

affirming the ONRR Director's decision and denying W&T's appeal.[82] W&T's motion

seeking reconsideration of the Final Decision was also denied.[83]

Thereafter, W&T filed its Complaint in this matter seeking reversal of the

Final Decision and alleging the Final Decision was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law[.]"[84] Specifically, W&T alleged

that:

> The Final Decision is arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law, 5 U.S.C. § 706(2)(A),because it
> contradicts ONRR's royalty valuation regulations, including 30 C.F.R. §
> 206.157(a)(1)(i) (renumbered as § 1206.157(a)(1)(i)) and 30 C.F.R. §
> 206.156(a) (renumbered as § 1206.156(a)), by disallowing W&T's
> deduction of its reasonable, actual arm's-length costs of transportation
> incurred to remediate the Pluto Flow Line in 2003.

***

> The Final Decision is arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), because it
> contradicts ONRR's royalty valuation regulations, including 30 C.F.R. §
> 206.157(b)(1) (renumbered as § 1206.157(b)(1)) and 30 C.F.R. §
> 206.156(a) (renumbered as § 1206.156(a)), by disallowing W&T's
> deduction of its reasonable, actual non-arm's-length costs of
> transportation incurred to remediate the Pluto Flow Line during 2005
> and 2006.

***

> The Final Decision is arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), because it
> ignores the agency's regulatory determination that a deduction is
> excessive only if it exceeds fifty percent of the value of production.

***

> The Final Decision is arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), because

---

[82] R. Doc. 26 at 8.
[83] R. Doc. 26-2.
[84] R. Doc. 26 at 10.

Interior failed both to consider relevant factors and to articulate a rational connection between the facts and its decision. For example (and without limitation), in concluding that the 2005-2006 remediation costs were not deductible, Interior failed to articulate a rational connection between its conclusion and the following facts, which were each supported by evidence submitted by W&T: (i) Mariner Energy attempted to chemically treat the plug, but that attempt was unsuccessful; (ii) there was no construction design flaw in the Pluto Flow Line; (iii) the idling of the Pluto Flow Line did not cause the plug; and (iv) the remediation costs were capital expenditures. Further, Interior failed to articulate a rational connection between its disallowance of the 2003 remediation costs and the record evidence establishing that W&T incurred those costs under an arm's-length arrangement with Mariner. Neither did Interior submit any evidence of its own contradicting the evidence submitted by W&T during its administrative appeal.

***

The Final Decision is unlawful under 5 U.S.C. § 706 because Interior failed to provide evidence supporting its conclusions and ignored evidence contradicting its conclusions. For example (and without limitation), in concluding that the 2005-2006 remediation costs were not deductible, Interior ignored evidence establishing that: (i) Mariner Energy attempted to chemically treat the plug, but that attempt was unsuccessful; (ii) there was no construction design flaw in the Pluto Flow Line; (iii) the idling of the Pluto Flow Line did not cause the plug; and (iv) the remediation costs were capital expenditures. Further, record evidence establishes that Mariner invoiced W&T for the 2003 remediation costs pursuant to an arm'slength agreement. Despite W&T's submission of evidence supporting each of the factual conclusions listed above, Interior did not submit any evidence supporting its own conclusions to the contrary.

***

The Final Decision disallowed W&T's deduction of transportation costs based on the conclusion that those costs were extraordinary and were incurred for remediation activities that deviated from what was considered normal operations in clearing a paraffin buildup. 189 IBLA at 263. In applying this extraordinary cost and "normal operations" analysis, Interior applied a new substantive rule without having gone through the rulemaking process mandated by the APA. Accordingly, the Final Decision fails to comply with a procedure required by law, is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law, and is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2).

\*\*\*

Prior to issuing the MMS Order, DOI had not given the regulated community notice of the standards that it applied in denying W&T's transportation allowance – *viz.*, a normal operations standard, and an extraordinary cost standard. Because DOI deprived W&T of the fair notice to which it is entitled under both the United States Constitution and the APA, the Final Decision is contrary to constitutional right, power, privilege, and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

\*\*\*

The Final Decision is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706, because the Final Decision requires W&T to remit deductible transportation costs that W&T timely claimed in 2009 to correct overpayments attributable to July and August 2003. W&T's recovery of those overpayments was timely under 30 U.S.C. §§ 1721a(a)(3) & 1724(b)(1).

\*\*\*

To the extent not otherwise urged herein, the arguments asserted by W&T in support of its administrative appeal in ONRR-10-0128-OCS, IBLA-2014-0206, and IBLA-2014-0206-1 are incorporated by reference and, for the reasons set forth therein, the Final Decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).[85]

W&T and Interior have filed cross motions for summary judgment.[86]  Each has filed an opposition to the other's cross-motion,[87] and each has also filed a reply.[88]

---

[85] *Id.* at 10–17.
[86] R. Doc. 77; R. Doc. 83.
[87] R. Doc. 82; R. Doc. 87.
[88] R. Doc. 90; R. Doc. 94.

In its motion for summary judgment, W&T significantly narrows its argument.[89] Pertaining to deductions covering the July and August 2003 production months, W&T states that Interior acted beyond its statutory authority pursuant to 30 U.S.C. §§ 1721a(a)(3), 1724 when Interior denied its transportation allowance deductions.[90] For the deductions covering the September 2003 through April 2004 production months, W&T states that it incurred such costs under two arm's-length contracts, namely the UOA and O&MA and thus claims that the Final Decision is incorrect.[91]

Addressing the 2005-2006 surface lift remediation costs, W&T first claims that the Final Decision finding that the surface lift remediation costs were unreasonable deprives W&T of the fair notice required by the Fifth Amendment.[92] W&T further asserts that Interior failed to establish a rational connection between the factual record and the Final Decision.[93] Third, W&T maintains that the Final Decision contradicts Interior's royalty valuation regulations by rejecting W&T's deductions, thus unlawfully rewriting the royalty regulations under the guise of interpreting them.[94] Lastly, W&T states that the surface lift remediation costs were capital expenses and/or maintenance costs, thereby making such costs deductible.[95]

---

[89] R. Doc. 77-2.
[90] *Id.* at 43
[91] *Id.* at 42.
[92] *Id.* at 21.
[93] *Id.* at 26.
[94] *Id.* at 33.
[95] *Id.* at 37–41.

Interior opposes W&T's motion.[96] In its motion for summary judgment, Interior states that it properly denied the July 2003 and August 2003 deductions because such deductions were temporally barred by statute.[97] Regarding the deductions for the September 2003 through April 2004 production months, Interior asserts that it correctly disallowed the deductions because W&T did not incur such costs under the GGA as the applicable transportation contract.[98]

Addressing the surface lift remediation costs, Interior claims that although there were no specific regulations addressing surface lift remediation operations, W&T had fair notice because Interior applied the regulations to novel scenario and "nonetheless took evidence and heard argument from W&T at multiple levels of review, considered the circumstances and decisions that led to the costs, and determined the costs were not reasonable."[99] Interior further contends that it properly disallowed the surface lift remediation costs because the costs were unreasonable when considered in context.[100] Lastly, Interior asserts that such costs do not qualify as capital costs because the surface lift remediation merely returned the Pluto Flowline to its original condition.[101] Nor do the costs constitute maintenance

---

[96] R. Doc. 82. Interior further notes that its opposition is identical to its Memorandum in Support of its Motion for Summary judgment, R. Doc. 83-1, except, to fit within the scheduling order's 25-page limit, such opposition incorporates the background sections from Interior's Memorandum in Support of its Motion for Summary Judgment by reference only. R. Doc. 82 at 1.

[97] R. Doc. 83-1 at 19.

[98] *Id.* at 22.

[99] *Id.* at 35.

[100] *Id.* at 24–25.

[101] *Id.* at 31.

costs under applicable regulations, according to Interior, because the maintenance costs were not incurred during a reporting period.[102]

## II.    LEGAL STANDARD

### A. Administrative Procedure Act

The Administrative Procedure Act ("APA") governs appeals of administrative adjudications.  Under the APA, any "person adversely affected or aggrieved by agency action"[103] is entitled to judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy."[104]  The APA authorizes the reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subjection to section 556 and 557 of this title or otherwise reviewed on the record of any agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."[105]

The party challenging the agency's action bears the burden of showing that the agency's determination was arbitrary and capricious.[106]

---

[102] *Id.* at 32.
[103] 5 U.S.C. § 702.
[104] 5 U.S.C. § 704.
[105] 5 U.S.C. § 706.
[106] *La. Pub. Serv. Comm'n v. F.E.R.C.*, 761 F.3d 540, 558 (5th Cir. 2014).

### B. Summary Judgment standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[107] When assessing whether a dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[108] While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only a scintilla of evidence."[109] Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[110]

"When parties file cross-motions for summary judgment," the court must "review 'each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'"[111] "This is because 'each party, as a movant for summary judgment, bears the burden of establishing that no genuine dispute of material fact exists and that the movant is entitled to a judgment as a matter of law.'"[112]

---

[107] Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[108] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citations omitted).

[109] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal quotation marks omitted)).

[110] *Delta & Pine Land Co.*, 530 F.3d at 399 (citing *Anderson*, 477 U.S. at 248).

[111] *Cooley v. Hous. Auth. of City of Slidell*, 747 F.3d 295, 297–98 (5th Cir. 2014) (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)).

[112] *Gruver v. La. ex rel. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 654 F.Supp.3d 539, 545 (M.D. La. 2023) (quoting 10A Mary Kay Kane, Federal Practice and Procedure (Wright & Miller) § 2720 (4th ed. 2022)).

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."[113] "However, where the Court is reviewing the decision of an administrative agency, a motion for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the Court's review."[114] A district court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."[115] Stated otherwise, a district court acts "as an appellate tribunal[,]" and "[t]he case on review is a question of law."[116] And "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."[117]

## III.   ANALYSIS

### A.  The Federal Oil and Gas Royalty Management Act and Subsequent Regulations

The Outer Continental Shelf Lands Act of 1953 ("OCSLA")[118] provides the Secretary of Interior (the "Secretary") with the authority to lease Outer Continental Shelf (i.e., offshore) lands for mineral development.[119] Lessees of such land must pay the government royalty payments based on the value of production derived from the

---

[113] *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F.Supp.2d 42, 52 (D.D.C. 2010).

[114] *Bouquet Oyster House, Inc. v. U.S.*, Civil Action No. 09-3537, 2011 WL 5187292, at *4 (E.D. La. Oct. 31, 2011)(internal quotation marks omitted).

[115] *Reilly v. Secretary of Navy*, 12 F. Supp.3d 125, 133 (D.D.C. 2014).

[116] *Id.* (internal quotation marks omitted).

[117] *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

[118] 43 U.S.C. §§ 1301–1356.

[119] *Id.*

land.[120] The Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA") authorizes the Secretary to audit and enforce royalty payment obligations under the OCSLA.[121] Pursuant to FOGRMA, the Secretary has promulgated regulations establishing royalty calculation standards pertaining to oil and gas.

The value of royalty production is calculated as "the gross proceeds accruing to [the seller] under the arm's-length contract less applicable allowances . . . ."[122] One such allowance is a transportation allowance, which includes "reasonable, actual costs incurred" for transporting oil and gas to an off-lease delivery point that the lessee incurs "under an arm's-length transportation contract."[123] An "arm's length contract" is "a contract or agreement between independent persons who are not affiliates and who have opposing economic interests regarding that contract."[124]

If, however, the lessee transports production through a pipeline it owns (i.e., a non-arm's length contract), then the lessee's transportation costs are based on reasonable "[a]llowable capital costs," which include operating and maintenance expenses, overhead, depreciation, and a return on undepreciated capital investments.[125] Maintenance expenses include costs pertaining to "[m]aintenance of the transportation system[;] maintenance of equipment[;] maintenance labor[;] [and] other directly allocable and attributable maintenance expenses that [the lessee] can document."[126] A lessee's transportation allowance is capped at fifty percent of the

---

[120] *Id.*
[121] 30 U.S.C. §§ 1701-1759.
[122] 30 C.F.R. § 1206.101(a).
[123] 30 C.F.R. §§ 1206.111(a)(oil), 1206.153(a)(1)(gas).
[124] 30 C.F.R. § 1206.20.
[125] 30 C.F.R. §§ 1206.112(a)-(c)(oil), 1206.154(a)-(c)(gas).
[126] 30 C.F.R. §§ 1206.112(g)(oil), 1206.154(g)(gas).

value of the production that the lessee transports.[127] Today, the Office of Natural Resource Revenue ("ONRR"), a subagency of Interior, is the federal agency tasked with collecting revenue deriving from mineral leases issued pursuant to the OCSLA.[128]

Congress, despite delegating much of its authority in this arena, has retained its authority to establish temporal limits regarding a lessee's adjustment of royalties owed to the government.[129] After calculating its royalty payments, a lessee has a six-year adjustment period "following the date on which an obligation [becomes] due[]" for the purposes of correcting an underpayment or overpayment of royalties.[130] "[A]n obligation becomes due when the right to enforce the obligation is fixed."[131] And "[t]he right to enforce any royalty obligation for any given production month for a lease is fixed for purposes of this chapter on the last day of the calendar month following the month in which oil or gas is produced."[132]

---

[127] 30 C.F.R. §§ 1206.110(d)(oil), 1206.152(e)(gas).

[128] The ONRR is one of the successors to the Minerals Management Service. *See supra* note 66. Contemporaneously with the ONRR's formation, the ONRR moved all valuation regulations from Part 206 to Part 1206 of Title without implementing any substantive changes. 75 Fed. Reg. 61069 (Oct. 4, 2010).

[129] *See* 30 U.S.C. § 1721.

[130] 30 U.S.C. §1721a(a)(3)-(4). §1721a(a)(3)-(4) provides, in pertinent part:

> (3) An adjustment or a request for a refund for an obligation may be made after the adjustment period only upon written notice to and approval by the Secretary or the applicable delegated State, as appropriate, during an audit of the period which includes the production month for which the adjustment is being made[.]
>
> (4) For purposes of this section, the adjustment period for any obligation shall be the six-year period following the date on which an obligation became due. The adjustment period shall be suspended, tolled, extended, enlarged, or terminated by the same actions as the limitation period in section 1724 of this title[.]

[131] 30 U.S.C. § 1724(c)(1).

[132] 30 U.S.C. § 1724(c)(2). Cross-referenced in § 1721a, § 1724(c)(2) provides that "[t]he right to enforce any royalty obligation for any given production month for a lease is fixed," and, therefore, becomes due, "for purposes of this chapter on the last day of the calendar month following the month in which oil or gas is produced."

To adjust or request a refund[133] for an obligation beyond the adjustment period, a lessee may submit such a request "only upon written notice to and approval by the Secretary . . . during an audit of the period which includes the production month for which the adjustment is being made."[134] The request must be made within one year after the adjustment period, which equates to seven years after the royalty obligation became due.[135]

## B. Statutory Interpretation, Regulatory Interpretation, and Judicial Deference

The instant dispute is divisible into two categories. The first category pertains to W&T's claim that Interior acted beyond its statutory authority when it denied W&T's deductions for the July 2003 and August 2003 production months.[136] The second category encompasses W&T's claims that Interior impermissibly applied its own regulations, including such claims pertaining to the transportation allowance deductions for the September 2003 through April 2004 production months[137] and the 2005-2006 surface lift remediation deductions.[138] The Court addresses each category in turn.

---

[133] Section 1721a(b)(1)(a) also provides that a refund request is sufficient if such request is "made in writing to the Secretary and, for purposes of section 1724 of this title, is specifically identified as a demand[,]" among other things.
[134] 30 U.S.C. § 1721a(a)(3).
[135] 30 U.S.C. § 1724(b)(1).
[136] R. Doc. 77-2 at 43; R. Doc. 83-1 at 19.
[137] R. Doc. 77-2 at 42; R. Doc. 83-1 at 22.
[138] R. Doc. 77-2 at 20; R. Doc. 83-1 at 24.

1.    *July 2003 and August 2003 Production Months*

The parties dispute whether Interior, pursuant to its authority under 30 USC § 1721a(a) and § 1724, properly disallowed W&T's transportation allowance deductions for the July and August 2003 production months.[139]

Before turning to the merits, the Court must first determine if any deference to the agency's interpretation is warranted.[140] The APA requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority."[141] "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."[142] Courts fulfill such obligation by identifying constitutional delegations, setting the boundaries of the delegated authority, and "ensuring the agency has engaged in reasoned decisionmaking within those boundaries[.]"[143] "By doing so, a court upholds the traditional conception of the judicial function that the APA adopts."[144] The Court will therefore review the Final Decision pertaining to July 2003 and August 2003 production months *de novo*.

W&T claims that Interior exceeded its statutory authority provided by §§ 1721a and 1724.[145] Interior, on the other hand, maintains that it correctly disallowed W&T's deductions because W&T failed to request a refund for its alleged

---

[139] R. Doc. 77-2 at 43; R. Doc. 83-1 at 19.
[140] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).
[141] *Id*. at 412 ("*Chevron* is overruled.").
[142] *Id* at 371.
[143] *Id*. at 395 (internal citations and quotation marks omitted).
[144] *Id*. at 395–96.
[145] R. Doc. 77-2 at 43.

overpayment within the statutory six-year adjustment period provided by FOGRMA.[146] According to Interior, W&T's October 1, 2009, adjustment to its royalty reports for the July and August 2003 production months was untimely because any adjustments or requests for refund were due by the end of August and September 2009, respectively.[147]

W&T disagrees, arguing that Interior mistakenly calculated the applicable adjustment period from the time when W&T's royalty payments were initially due rather than from when W&T overpaid its royalty obligations in 2006 and 2008.[148] W&T also argues that because it submitted two written demands in the form of handbooks to Interior in September 2009, it is entitled to a refund.[149]

Although the statutory framework governing royalty obligations and adjustment periods is dense, the Court finds its application in this matter to be straightforward. 30 U.S.C. § 1721a(a) provides, in pertinent part:

> (1) If, during the adjustment period, a lessee or its designee determines that an adjustment or refund request is necessary to correct an underpayment or overpayment of an obligation, the lessee or its designee shall make such adjustment or request a refund within a reasonable period of time and only during the adjustment period. The filing of a royalty report which reflects the underpayment or overpayment of an obligation shall constitute prior written notice to the Secretary or the applicable delegated State of an adjustment.

> ***

> (3) An adjustment or a request for a refund for an obligation may be made after the adjustment period only upon written notice to and approval by the Secretary or the applicable delegated State, as appropriate, during an audit of the period which includes the

---

[146] R. Doc. 83-1 at 19.
[147] *Id.*
[148] R. Doc. 77-2 at 43.
[149] *Id.* at 44; R. Doc. 26-1 at 20.

production month for which the adjustment is being made. If an overpayment is identified during an audit, then the Secretary or the applicable delegated State, as appropriate, shall allow a credit or refund in the amount of the overpayment.

(4) For purposes of this section, the adjustment period for any obligation *shall be the six-year period following the date on which an obligation became due.* The adjustment period shall be suspended, tolled, extended, enlarged, or terminated by the same actions as the limitation period in section 1724 of this title.[150]

While § 1721a provides a six-year adjustment period, § 1724(a)(1) states that a "demand which arises from, or relates to an obligation, shall be commenced within *seven years from the date on which the obligation becomes due* and if not so commenced shall be barred."[151] The seven-year period only applies if a lessee provides written notice to the Secretary, the Secretary grants his approval, and the lessee gives written notice during an ongoing audit of the period that includes the production month for which the adjustment is sought.[152]

For purposes of both § 1721 and § 1724, "an obligation becomes due when the right to enforce the obligation is fixed."[153] And "[t]he right to enforce any royalty obligation for any given production month for a lease is fixed for purposes of this chapter on the last day of the calendar month following the month in which oil or gas is produced."[154] Thus, each period under § 1721 and § 1724 commences on the last day of the subsequent month in which production occurs.

---

[150] 30 U.S.C. § 1721a(a)(emphasis added).
[151] 30 U.S.C. § 1724(a)(1) (emphasis added).
[152] 30 U.S.C. § 1721a(a)(3).
[153] 30 U.S.C. § 1724(c)(1).
[154] 30 U.S.C. § 1724(c)(2).

Both parties agree that because W&T's royalty obligations for the July and August 2003 production months became due in August and September 2003.[155] Accordingly, the cutoffs, at least initially, for W&T to either adjust or request a refund for any overpayment of royalty obligations for those months were August and September 2009, respectively – six years after the obligations became due.[156] If there had been an audit for the production months of July and August 2003, then W&T would have an additional year – August and September 2010 – to file an adjustment[157] or refund[158] for its July and August 2003 royalties.[159] W&T failed to adjust or request a refund prior to August and September 2009, and there was no subsequent audit that extended the six-year period to a seven-year period. Thus, under the plain language of the statute, W&T had until August and September 2009 to request a refund, and the Court's analysis should end here.[160]

W&T makes two counterarguments. First, it disputes that the adjustment period applies to its October 1, 2009 amendment to its royalty reports.[161] Instead, W&T believes that because it made overpayments in June 2006 and January 2008, the adjustment period started anew.[162] In other words, W&T claims that it had six

---

[155] *See* R. Doc. 77-2 at 43–44; R. Doc. 83-1 at 19.

[156] *See* R. Doc. 77-2 at 43–44; R. Doc. 83-1 at 19.

[157] 30 U.S.C. § 1702(17). An "adjustment" is "an amendment to a previously filed report on an obligation, and any additional payment or credit, if any, applicable thereto, to rectify an underpayment or overpayment on an obligation[.]" 30 U.S.C. § 1702(17).

[158] 30 U.S.C. § 1702(30). A "refund" is "the return of an overpayment[.]"

[159] *See* R. Doc. 77-2 at 43–44; R. Doc. 83-1 at 19.

[160] *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002)("As in all statutory construction cases, we begin with the language of the statute. The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent.")(internal citations and quotation marks omitted).

[161] R. Doc. 77-2 at 43.

[162] *Id.*

years from the date of the overpayment to file any adjustment or request for refund, thereby making its October 1, 2009, amended royalty report timely.[163]

To support its reading of the statute, W&T argues that its overpayments in 2006 and 2008 triggered an obligation on the part of Interior to pay W&T a refund and that such obligation is the relevant obligation for calculating the six-year adjustment period.[164] W&T maintains that because an overpayment triggers an obligation on the part of Interior to make a refund, W&T had six years from the date of the overpayment to make any adjustment.[165]

While novel, W&T's argument ignores the statutory language. Under W&T's interpretation of § 1724(c), it would have until June 2012 and January 2014 to make any adjustments regarding its royalty obligations. Adopting this approach would allow lessees to create their own adjustment periods. In essence, under W&T's approach, a lessee could purposefully make an overpayment on royalty obligation to ensure the revival of the adjustment period. The Court finds no support for this manipulation of the statute.

Further, this approach would render the entirety of § 1724(c)(2) meaningless. Congress specifically provided that the six-year adjustment period commences when a royalty obligation becomes due, which is "on the last day of the calendar month following the month in which oil or gas is produced."[166] W&T's interpretation would cause the near entirety of § 1724(c)(2) to ring hollow. Because "[a] statute should be

---

[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] 30 U.S.C. § 1724(c)(2).

construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void, or insignificant[,]"[167] the Court finds no justification for adopting W&T's reading of the statute. Further, W&T's approach rewrites the statutory language, authority left only to Congress.

W&T's second counterargument is that it made a written demand during an audit for the production months of July and August 2003.[168] Specifically, W&T asserts that its handbooks, submitted on September 3, 2009, and September 24, 2009, constituted a written demand.[169] According to Interior, the purpose of the handbooks was to allow its subagency to "review the deepwater subsea transportation allowance for the Pluto Prospect."[170] Interior, however, maintains that the handbooks do not constitute written demands and that even if so, the written demands were not submitted during an audit of the production months.[171]

Regardless of whether the handbooks meet the definition set forth in § 1702(23)(B),[172] the Court finds that W&T's argument fails because there was no audit as required by the statute. Again, § 1721a(a)(3) provides that "a request for a

[167] *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)(internal quotation marks omitted).
[168] R. Doc. 77-2 at 44.
[169] *Id.*
[170] R. Doc. 26-4 at 1.
[171] R. Doc. 83-1 at 21.
[172] 30 U.S.C. § 1702(23)(B) provides that a demand is "a separate written request by a lessee or its designee which asserts an obligation due the lessee or its designee that provides a reasonable basis to conclude that the obligation in the amount of the demand is due and owing, but does not mean any royalty or production report, or any information contained therein, required by the Secretary or a delegated State[.]" Here, W&T's handbook dated September 3, 2009 is titled "Subsea Pipeline Allowance Mississippi Canyon 674/718 Unit[.]" This handbook provides an "Overpayment Interest Rate" table for alleged overpayments beginning in January 2003 through December 2008. While the September 24, 2009 handbook is based on the September 3, 2009 handbook, it does not mention any overpayments on behalf of W&T. *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 004502–004514, 004517–004544.

27

refund for an obligation may be made . . . during *an audit* of the period which includes the production month for which the adjustment is made.[173] The "Secretary may conduct any investigation or other inquiry necessary and appropriate and may conduct, *after notice*, any hearing or audit, necessary and appropriate to carrying out his duties under this chapter."[174] Interior has also promulgated regulations stating that "[a]ll audits will be conducted in accordance with the notice and other requirements of 30 U.S.C. [§] 1717."[175]

The administrative record reveals no audit for the production months of July and August 2003. If ONRR's denial of W&T's adjustment for July and August 2003 truly constituted an audit, as W&T contends, then the Secretary was required to provide W&T with notice of such audit. Nowhere can such notice be found in the record. Again, to accept W&T's argument would render the entire phrase "during an audit of the period which includes the production month for which the adjustment is being made" meaningless, and the Court will not do so.[176] And as a final point, ONRR's policy at the time was to allow regulated parties to submit adjustments for its royalties owed using the Form MMS-2014.[177] W&T failed to submit its Form MMS-2014 in a timely manner. Thus, the Court "cannot say that the IBLA's decision to hold [a regulated party] to the procedural requirements set out in Interior's rules was arbitrary and capricious or should otherwise be overturned."[178]

---

[173] 30 U.S.C. § 1721a(a)(3) (emphasis added).

[174] 30 U.S.C. § 1717(a)(emphasis added).

[175] 30 C.F.R. § 1217.10.

[176] *Hibbs*, 542 U.S. at 88.

[177] R. Doc. 26-4 at 1.

[178] *Citation Oil & Gas Corp. v. U.S. Dept. of Interior*, 448 Fed. Appx 441, 447 (5th Cir. 2011).

For the reasons above and because Interior correctly interpreted and applied the applicable statutory limitations, the Court finds that the Final Decision pertaining to  W&T's deductions for the July 2003 and August 2003 production months was not "arbitrary and capricious [or] an abuse of discretion[,]" exceeding Interior's statutory authority.

### 2.    September 2003 through April 2004 Production Months

The parties dispute whether Interior properly applied its own regulations pertaining to W&T's transportation allowance deductions for the September 2003 through April 2004 production months and the 2005-2006 surface lift remediation deductions.[179] Again, the Court must first determine whether any deference to Interior's regulatory interpretation is appropriate.[180]

### a.  Regulatory Interpretations

30 C.F.R. § 1206.111(a)(1) provides:

> If you or your affiliate incur transportation costs under an arm's-length transportation contract, you may claim a transportation allowance for the reasonable, actual costs incurred, as more fully explained in paragraph (b) of this section, except as provided in § 1206.110(f) and subject to the limitation in § 1206.110(d).[181]

The crux of the parties' dispute turns on the first sentence of the regulation, particularly the term "under an arm's-length transportation contract."[182]   In the administrative appeal, the IBLA stated that  "W&T did not incur any of the 2003/2004 remediation costs under the GGA or the O&MA. Those contracts required Mariner to

---

[179] R. Doc. 77-2 at 42; R. Doc. 83-1 at 22.
[180] *Kisor v. Wilkie*, 588 U.S. 558 (2019).
[181] Section 1206.110(f) is inapplicable, and it is undisputed that W&T complied with § 1206.110(d).
[182] R. Doc. 77-2 at 42; R. Doc. 83-1 at 22; 30 C.F.R. § 1206.111(a).

bear the remediation costs at issue. ONRR properly disallowed the deduction from gross proceeds of any of the 2003/4 remediation costs, as a transportation allowance, since they were not incurred by W&T under the GGA or the O&MA."[183]  In reply, W&T argues that under the O&MA, Mariner incurred Pluto Flowline remediation expenses on behalf of both Mariner and W&T.[184] According to W&T, it was contractually obligated, under the UOA, to pay for its share of the Pluto Flowline remediation expenses arising under the O&MA incurred by Mariner.[185]

The Court initially determines whether Interior's interpretation of § 1206.111 is worthy of *Auer* deference,[186] in which *Kisor v. Wilkie* provides the governing framework to make this determination.[187]  First, the Court must determine whether a regulation is genuinely ambiguous.[188]  If so, the Court must then determine whether the agency's reading is reasonable.[189]  Thereafter, should the Court determine that the agency's reading is reasonable, then it must independently inquire as to whether "the character and context of the agency interpretation entitles it to controlling weight."[190]  This inquiry involves determining whether the regulation is the agency's authoritative or official position, whether the agency's interpretation in some way implicates its substantive expertise, and whether the rule reflects the agency's "fair and considered judgment."[191]

---

[183] R. Doc. 26-1 at 22.
[184] R. Doc 77-2 at 42–43.
[185] *Id.*
[186] *Auer v. Robbins*, 519 U.S. 452 (1997).
[187] 588 U.S. 558 (2019).
[188] *Id.* at 574.
[189] *Id.* at 575.
[190] *Id.* at 576.
[191] *Id.* at 579 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

The Court first considers whether the regulation is genuinely ambiguous.[192] A Court must "exhaust all the 'traditional tools' of construction" before finding a regulation ambiguous.[193] These tools include the "text, structure, history, and purpose of a regulation."[194] Here, the parties dispute the ambiguity of the phrase "under an arm's length transportation contract" in § 1206.111.[195] More specifically, the parties disagree on whether W&T incurred transportation expenses under the applicable arm's length transportation contract.[196] The Court finds the phrase "under an arm's length transportation contract" unambiguous.

"The starting point to analyze this dispute begins with the actual text of the statute or regulation, where the words should be given their ordinary meaning."[197] While, the phrase "transportation contract" is not defined in the regulation, the overall structure of the regulation provides insightful definitions. An "arm's length contract" is "a contract or agreement between independent persons who are not affiliates and who have opposing economic interests regarding that contract."[198] If transportation costs are incurred under an "arm's length contract[,]" the transportation allowance is the "reasonable, actual costs incurred"[199] for moving "[o]il

---

[192] *Id.* at 574.
[193] *Id.* at 575 (quoting *Chevron U.S.A. Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).
[194] *Id.*
[195] R. Doc. 77-2 at 42; R. Doc. 83-1 at 22.
[196] R. Doc. 77-2 at 42; R. Doc. 83-1 at 22.
[197] *Texas v. United States*, 201 F. Supp. 3d 810, 831 (N.D. Tex. 2016); *see also United States v. Hegwood*, 934 F.3d 414, 418 (5th Cir. 2019).
[198] 30 C.F.R. § 1206.20.
[199] 30 C.F.R. § 1206.111.

to a point of sale or delivery off of the lease, unit area, or communitized area[.]"[200] Gathering costs are not included in the transportation allowance.[201]

Here, the text and structure of Interior's regulations are clear.[202] To deduct the reasonable, actual costs of transportation, the costs must be incurred under an arm-length's transportation contract.[203] As a preliminary matter, Interior does not dispute that the remainder of the deductions for the September 2003 through April 2004 productions months were reasonable, actual costs deductible as a part of a transportation allowance.[204] Instead, Interior asserts that they were not incurred under the applicable arm's-length transportation contract.[205] The Court agrees.

W&T has an arm's length contract with Mariner under the UOA, as it is "a contract or agreement between independent persons who are not affiliates and who have opposing economic interests regarding that contract."[206] W&T and Mariner are not affiliates as they are two separate entities with no common ownership, and they

[200] 30 C.F.R. § 1206.20 (defining the term "transportation allowance").
[201] *Id.* Gathering is defined as "the movement of lease production to a central accumulation or treatment point on the lease, unit, or communitized area, or to a central accumulation or treatment point off of the lease, unit, or communitized area that BLM or BSEE approves for onshore and offshore leases, respectively, including any movement of bulk production from the wellhead to a platform offshore."
[202] *Texas v. United States Environmental Protection Agency*, 137 F.4th 353, 372 (5th Cir. 2025)("The text and structure of a regulation is where the search for meaning begins . . . In this instance, because we find no ambiguity, the search also ends there.")(internal citations omitted).
[203] 30 C.F.R. § 1206.111.
[204] R. Doc. 82 at 14–16; R. Doc. 83-1 at 22–23.
[205] R. Doc. 82 at 14–16; R. Doc. 83-1 at 22–23.
[206] 30 C.F.R. § 1206.111. *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000827–000979, Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

32

both have opposing economic interests because both owe separate amounts under the UOA.[207]

The record does not support that W&T has an arm's length *transportation* contract with Mariner. While a transportation contract is not defined in the structure of the regulations, the term "transportation allowance" is helpful.[208] It contemplates that "reasonable, actual costs [a] lessee incurs for moving [] [o]il to a point of sale or delivery off of the lease, unit area, or communitized area[]" may be deducted.[209]

Moreover, the sentence structure of the regulation provides that "transportation" is an adjective describing the noun "contract[.]"[210] So, the Court must look to the nature of the contract – the UOA – to answer the question of whether W&T incurs costs for moving oil to a point of sale or delivery off the lease or unit area under the UOA. As specifically disputed here, the inquiry is whether W&T incurred costs under the UOA for remediation of the Pluto Flowline. The Court finds that it did not.

Article 27.4.2 of the UOA provides a choice-of-law provision selecting federal law and Texas law to govern any disputes arising out of the UOA.[211] Under Texas law,[212] the cornerstone of contractual interpretation is to "give effect to the intentions

---

[207] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000827–000979, Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.
[208] 30 C.F.R. § 1206.20.
[209] *Id.*
[210] 30 C.F.R. § 1206.111.
[211] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000919, Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.
[212] The Court notes that, because it is not exercising subject matter jurisdiction pursuant to diversity of citizenship, the substantive law of the forum state is inapplicable. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). Accordingly, the Court interprets the UOA according to Texas law, as envisioned by the parties.

of the parties as expressed by the [contract]."[213] To do so, courts "construe all parts of the document together,"[214] and "consider the contract as a whole."[215] And, throughout this process, contractual terms are "given their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning."[216]

Here, the UOA provides that the "Operator shall pay all Costs of joint operations and each Participating Party shall reimburse the Operator, in proportion to its Participating Interest Share, for the Costs of each joint operation."[217] Costs are defined as "[t]he monetary amount of all expenses (or indebtedness) incurred by the Operator and the Participating Parties in the conduct of activities and operations pursuant to this Agreement."[218] And the "Agreement governs the rights and obligations of the Parties, relating, without limitation, to the exploration, development, operation, production, treatment, gathering, and storage of Hydrocarbons."[219]

Further defined by the UOA, Hydrocarbons are "[t]he oil and gas and associated liquid and gaseous by-products (except helium) that may be produced from

---

[213] *American Nat. General Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001).
[214] *Cicciarella v. Amica Mut. Ins. Co.*, 66 F.3d 764, 768 (5th Cir. 1995).
[215] *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 656 (5th Cir. 1999).
[216] *American Nat. General Ins. Co.*, 274 F.3d at 323.
[217] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000844, Article 6.1 of the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.
[218] *Id.* at Bates 000831, Article 2.11 of the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.
[219] *Id.* at Bates 000829, Article 1.1 of the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

a wellbore located on the Contract Area."[220] The Contract Area is defined by Exhibit A, which includes the Pluto Project Area.[221] However, the Pluto Project Area does not cover the Pluto Flowline, and the Pluto Flowline is not included in Exhibit A.[222] Therefore, W&T, under the UOA, was obligated to reimburse Mariner, the operator, for costs of joint operations pertaining to oil and gas activities occurring on the Pluto Project Area, which does not entail the Pluto Flowline.[223]

The term "joint operations" is not defined in the UOA itself, but is defined in Exhibit C to the UOA, which defines the term "joint operations" as the "activities required to handle specific operating conditions and problems for the exploration, appraisal, development, production, protection, maintenance, abandonment, and restoration of the Joint Property."[224] However, "joint property" is defined as "the real and personal property subject to the Agreement . . . ."[225] Because the Pluto Flowline is nowhere mentioned in Exhibit A, which lists all the property subject to the UOA, W&T did not incur Pluto Flowline remediation costs under the UOA.[226]

W&T further argues that it incurred Pluto Flowline remediation costs under the O&MA. As an initial matter, W&T's predecessor in interest, Burlington, was not

---

[220] *Id.* at Bates 000833, Article 2.31 of the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[221] *Id.* at Bates 000831, Article 2.10 of the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[222] *Id.* at Bates 000922, Exhibit A to the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[223] *Id.*

[224] *Id.* at Bates 000928, Exhibit C to the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[225] *Id.*

[226] *Id.* at Bates 000922, Exhibit A to the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

in contractual privity to the O&MA.[227] But Mariner, as the operator of the Pluto Flowline under the O&MA, was obligated to provide numerous services pertaining to the Pluto Flowline, including paying "for all repairs and replacements to the Gathering System and the purchase and use of all materials and supplies in connection with the operation and maintenance of the Gathering System[.]"[228] Put differently, Mariner was liable for remediation costs relating to the Pluto Flowline under the O&MA.[229] Under the UOA, W&T was obligated to reimburse Mariner for costs of all "joint operations."[230] Problematic for W&T, the Pluto Flowline was not listed as "joint property" under the UOA. Therefore, costs to remediate the Pluto Flowline under the O&MA did not constitute a "joint operation."[231] Further and importantly, W&T's reliance on the O&MA to assert that it incurred Pluto Flowline remediation expenses constitutes a reliance upon extrinsic evidence. Here, because the UOA is unambiguous, consideration of extrinsic evidence to ascertain the parties' intent would be inappropriate.[232]

---

[227] R. Doc. 77-2 at 42.

[228] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002795–0002816, Operations and Maintenance Agreement between MEGS and Mariner dated December 29, 1999.

[229] *Id.*

[230] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 000827–000979, Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[231] *Id.* at Bates 000928, Exhibit C to the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[232] *Id.* at Bates 000920, Article 27.8 of the Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc. Article 27.8 of the UOA provides that the UOA is a fully integrated agreement. Under Texas law, parole evidence is inadmissible when a contract is fully integrated. *Jack H. Brown & Co., Inc. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990)(quoting *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex.1958)("'When parties have concluded a valid integrated agreement with respect to a particular subject matter, the parol evidence rule precludes the enforcement of inconsistent prior or contemporaneous agreements.'")(cleaned up).

Accordingly, the Court finds Interior's interpretation reasonable. Although the UOA between W&T Mariner is an arm's length contract, it did not cover remediation costs for the Pluto Flowline.[233] W&T did not owe Mariner reimbursements for costs of remediating the Pluto Flowline under the UOA.[234]

Because the Court has found that Interior's interpretation is reasonable, the Court must analyze further considerations required by *Kisor*, including whether Interior's interpretation is one informed by substantive expertise.[235] Interior's substantive expertise encompasses offshore oil and gas activities.[236] But the question of whether W&T incurred costs for transporting oil and gas under a contract is one that is based on the general common law principles of contract interpretation. Accordingly, because "[a]n agency's interpretation of its own regulation is not entitled to great deference if it is based on general common law principles rather than the agency's expertise[,]" Interior's interpretation does not invoke its substantive expertise.[237]

The Court's finding that Interior's interpretation of the statute is reasonable, but not informed by Interior's substantive expertise, renders *Auer* deference inapplicable to Interior's interpretation of 30 C.F.R. § 1206.111. As such, it is only

---

[233] *Id.* at Bates 000827–000979, Unit Operating Agreement between Mariner Energy, Inc. and Burlington Resources Offshore, Inc.

[234] *Id.*

[235] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019).

[236] *See* 30 U.S.C. § 1701.

[237] *Board of County Com'rs of County of Adams v. Isaac*, 18 F.3d 1492, 1497 (10th Cir. 1994)("An agency's interpretation of its own regulation is not entitled to great deference if  it is based on general common law principles rather than the agency's expertise . . . .").

entitled to *Skidmore* deference,[238] or the "deference its persuasiveness warrants."[239] "*Skidmore* deference is a weaker form of deference that accords 'weight' to an agency's judgment depending on 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"[240]

Given that the Court has already found Interior's interpretation of the regulation reasonable, the Court finds the interpretation reasonable under *Skidmore*, for the exact same reasons detailed above. The Court, undergoing an independent analysis, reaches the same conclusion as Interior. Therefore, for the reasons set forth above, the Court determines that the Final Decision, as it pertains to the deduction costs for the September 2003 through April 2004 production months, is not arbitrary and capricious.[241]

### 3. *2005-2006 Surface Lift Remediation Costs*

#### a. *Fair Notice and Change-in-Position Doctrines*

The parties dispute whether W&T received fair notice of 30 C.F.R. § 1206.112 as interpreted and applied to prohibit deduction allowances for the surface lift procedure.[242] W&T points to the 2017 IBLA Decision wherein Interior advised that "the actual transportation costs incurred by W&T were properly deducted so long as

---

[238] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

[239] *Environmental Integrity Project v. United States Environmental Protection Agency*, 969 F.3d 529, 540 (5th Cir. 2020) (quoting *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 580 (D.C. Cir. 2016)).

[240] *Id.* (quoting *Dhuka v. Holder*, 716 F.3d 149, 154 (5th Cir. 2013)).

[241] W&T does not contest Interior's finding that the GGA merely required W&T to pay a monthly fee to MEGS and therefore did not cover transportation costs. As such, the Court need not address this issue.

[242] R. Doc. 77-2 at 21; R. Doc. 83-1 at 33.

they were 'reasonable,'" but disallowed the remediation costs as an extraordinary measure.[243] W&T argues that Interior cannot point to any regulations, agency guidance, or decision and "*had never before communicated to the regulated community* that costs incurred to remediate a flowline through a 'surface lift' operation would be considered 'extraordinary' per se and therefore disallowed."[244]

W&T further directs the Court to a Deepwater Pipeline Maintenance and Repair Manual which was included in the record by Interior (the "Manual"), as well as reports included on the Interior's website that characterize surface lift operations as being the "industry norm."[245] W&T contends that it had no way of knowing that the Department of the Interior would ultimately determine that the surface lift operation was "extraordinary," thereby denying the deduction of the repair costs.[246] Citing Fifth Circuit precedent, W&T contends that the relevant inquiry is whether Interior's current interpretation of the royalty valuation regulations governing deductible transportation costs "could have been understood with 'ascertainable certainty.'"[247] W&T contends that, "[b]ecause W&T had no notice that Interior would disallow a deduction of costs incurred in a 'surface lift' operation, the Final Decision upholding the royalty payment Order is both arbitrary and capricious and 'contrary to constitutional right.'"[248]

---

[243] R. Doc. 77-2 at 21 n.18.

[244] R. Doc. 77-2 at 21 (emphasis original).

[245] *Id.* at 22–23. W&T points to a report on Interior's website that indicates that the "'surface lift' was the primary pipeline repair method used by Shell, which at the time owned 60 percent of the deepwater pipelines in the Gulf of Mexico. . . And, this same report *identifies a 1999 repair of a leak in the Pluto flowline as an example of a successful 'surface lift' remediation.*" (emphasis original).

[246] *Id.* at 21.

[247] *Id.* (quoting *ExxonMobil Pipeline v. U.S. Dep't of Transp.,* 867 F.3d 564 (5th Cir. 2017)).

[248] R. Doc. 77-2 at 26.

W&T further points to MMS' two approvals of the SOPs to argue that its surface level remediation costs were reasonable. W&T contends that "[i]n approving the SOPs, Interior necessarily determined that Mariner's SOP applications satisfied the regulatory mandate of 'a reasonable schedule of work leading to the commencement or restoration of [production from the Pluto Field leases].'"[249] W&T also highlights that "Mariner submitted a report to the MMS describing [phase three of] the remediation plan[] which the MMS approved on June 5, 2006."[250]

In contrast, Interior argues that W&T "presented a novel situation" by deducting "costs to remove a paraffin plug using a surface lift procedure."[251] Interior maintains that "[t]he procedure had never before been used to remove a paraffin plug, and it cost four times as much to complete as it cost to build the pipeline."[252] And, through "multiple levels of review," Interior asserts that it considered all relevant facts and circumstances and rationally determined that the costs were unreasonable.[253]

Interior further contends that it "has never taken the position that remediation costs similar to Mariner's and W&T's are 'reasonable' transportation deductions."[254] Addressing W&T's reliance on the Manual, Interior argues that W&T is misguided for numerous reasons. First, Interior notes that the Manual only provides "repair techniques" for "'pipeline system damage' to the pipeline itself, including physical

---

[249] R. Doc. 77-1 at 12 (quoting 30 C.F.R. §§ 250.171(b)).
[250] *Id. See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 001629–001630, Email from BSEE employee to ONRR employee dated May 6, 2013.
[251] R. Doc. 82 at 27.
[252] *Id.*
[253] *Id.*
[254] *Id.* at 27.

damage to pipe wall, overstressing or fatigue damage, exterior damage or
deterioration, and damage or failure of components—*it does not mention obstructions
or buildup.*"[255] Second, Interior maintains that the Manual "only discusses the
surface lift procedure as a repair technique for welding, swivel repair, and bottom
connect repair."[256] Put simply, Interior believes that the Manual "does not cover
obstruction removal, only pipe damage."[257]

In response to W&T's reliance on publications on Interior's website that
allegedly establish that surface lift operations were the industry custom to repair
paraffin blockages, Interior notes that such publications were not included in the
administrative record and therefore Interior argues that they are not properly before
the Court for review.[258] Even if so, Interior argues that one publication explained that
although Shell contemplated a surface lift procedure, it ultimately relied on a
different method of repair.[259] In sum, Interior argues that none of its publications
establish surface lift procedure as an industry norm.[260]

Lastly, as to W&T's assertion that the SOPs implied that Mariner's repairs
were reasonable, Interior maintains that a mere approval of an SOP does not evaluate
or indicate whether Mariner's remediation plan entailed reasonable expenses.[261]
Interior further highlights that MMS' June 5, 2006, approval of Mariner's
remediation plan was an email from the Bureau of Safety and Environmental

---

[255] *Id.* at 28 (quoting the Manual)(emphasis original).
[256] *Id.*
[257] *Id.*
[258] *Id.*
[259] *Id.* at 29.
[260] *Id.*
[261] *Id.* at 30.

Enforcement to an ONRR employee and thus contends that does not "suggest in any way that Interior evaluated or indicated whether Mariner had acted reasonably, or that its planned remediation involved reasonable expenses for transportation allowance purposes."[262] The Court finds Interior's arguments unpersuasive.

An agency's regulation must give fair notice of conduct that is forbidden to whomever it is regulating.[263] "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law[.]"[264] In other words, an agency must "state with ascertainable certainty what is meant by the standards [it] has promulgated."[265]

Although clarity of regulation is fundamental to the protections provided by the Fifth Amendment's Due Process Clause, "there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest."[266]

Whether a regulation is insufficiently vague depends on the regulatory context. "[E]conomic regulation is subject to a less strict vagueness test because its subject

---

[262] *Id.*
[263] *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).
[264] *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).
[265] *Diamond Roofing Co., Inc. v. Occupational Safety and Health Review Com'n*, 528 F.2d 645, 649 (5th Cir. 1976).
[266] *U. S. Civil Service Commission v. National Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 578–79 (1973).

matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."[267] Yet, "[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability."[268]

Considering the law and the administrative record,[269] the Court finds that Interior has violated the fair notice doctrine. The Court acknowledges that there is only so much Interior can cover its in regulation limiting transportation allowances. The Supreme Court has explained:

> In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards.[270]

But since "this is [] a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on [Interior's]

---

[267] *Village of Hoffman Estates v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 498 (1982)(citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *United States v. National Dairy Products Corp.*, 372 U.S. 29 (1963).

[268] *Commodities Futures Trading Commission v. EOX Holdings, LLC*, 90 F.4th 439, 444 (5th Cir. 2024)(quoting *ExxonMobil Pipeline Co.*, 867 F.3d at 578).

[269] The Court does not consider any evidence beyond the administrative record. Accordingly, to the extent W&T relies on publications located on Interior's website to assert that Interior violated the fair notice doctrine, the Court deems consideration of such publications inappropriate.

[270] *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293 (1974).

pronouncements, [and] fines or damages [are] involved here[,]" the Court must continue its analysis.[271]

The Fifth Circuit has recently provided insight regarding the fair notice doctrine. In *Commodity Futures Trading Commission v. EOX Holdings, L.L.C.*,[272] the Fifth Circuit addressed the issue of whether the Commodity Futures Trading Commission's ("CFTC") regulation prohibiting commodities traders from "taking the other side of orders"[273] provided fair notice to both defendants – a futures broker company and a broker employed at the company.[274] The CTFC filed a civil enforcement suit against the defendants for their role as futures brokers dealing with electric energy block futures.[275] The defendants' client granted the employee broker with a power of attorney to trade upon his behalf, and the power of attorney granted the defendant broker with discretion "to enter into block trade transactions[.]"[276] This discretionary arrangement was problematic, as it created a conflict of interest where the employee broker could "make specific trades, determining the quantity, price, and timing of the trades" while simultaneously serving as a broker for other clients at the futures broker company.[277]

At trial, defendants argued that "taking the other side of an order" meant "becoming a counterparty with a financial interest and the possibility of profit and loss[,]" whereas the CFTC contended that the term only equated to "mak[ing] the

---

[271] *Id.* at 295.
[272] 90 F.4th 439, 444 (5th Cir. 2024).
[273] 17 C.F.R. § 155.4(b)(2)(i).
[274] *Commodity Futures Trading Commission*, 90 F.4th at 443.
[275] *Id.* at 441.
[276] *Id.*
[277] *Id.* at 441–42.

decision to trade opposite the order and execut[ing] the trade opposite the order[]" even without taking a financial interest.[278] In essence, defendants' interpretation would exclude themselves from liability under the regulations.[279] The district court adopted CFTC's interpretation of the regulation, and the jury found that the employee broker "took the other side of orders" on numerous transactions, in violation of the contested regulation.[280]

The Fifth Circuit determined that the CFTC regulation failed to provide fair notice to the defendants.[281] In its opinion, the Fifth Circuit began with the basics that

> the agency 'must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents.'[282] 'In the absence of notice—for example, where the regulation is not sufficiently cleared to warrant a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability.'[283]

The Fifth Circuit explained that "the CFTC had *never* publicly stated that to 'take the other side of trades' includes the broker's trading for a discretionary account without himself having a financial interest in that account."[284] CFTC's interpretation was the "first time the [it] advanced this interpretation of the [r]ule[,]" in which the rule had been in existence for nearly four decades.[285] The Fifth Circuit highlighted that the defendants obtained prior approval from the authoritative agency governing traders

---

[278] *Id.* at 443.
[279] *Id.*
[280] *Id.*
[281] *Id.* at 449.
[282] *Id.* at 444 (quoting *Diamond Roofing Co.*, 528 F.2d at 649).
[283] *Id.* (quoting *ExxonMobil Pipeline Co.*, 867 F.3d at 578).
[284] *Id.* at 446 (emphasis original).
[285] *Id.*

and that they obtained further approval from other financial institutions.[286] Nowhere throughout its process of obtaining approval did the CFTC issue any "guidance that might have put the [d]efendants on notice that they were violating" the applicable regulation.[287] Plainly, "over the course of nearly four decades, the CFTC had taken 'no steps to advise the public that it believed the practice was questionable.'"[288]

Further within its analysis, the Fifth Circuit highlighted three persuasive cases that the Court analyzes in turn. The Fifth Circuit first turned to the Second Circuit's decision in *Upton v. Securities and Exchange Commission*.[289] In *Upton*, the Second Circuit resolved the issue of whether an SEC rule regulating broker-dealers provided fair notice to a broker-dealer who followed the technicalities of the rule but evaded its impact using other methods.[290]

Throughout the relevant period, the SEC knew that brokers were evading the impact of the regulation through alternative methods.[291] But the SEC, however, failed to notify any brokers that they were violating the regulations.[292] The Second Circuit found that the SEC's regulation failed to provide broker-dealers with fair notice.[293] In its reasoning, the Second Circuit explained that the SEC merely issued "one consent order carrying little, if any, precedential weight" years prior penalizing a broker who engaged in the same alternative methods as the broker-dealer in

---

[286] *Id.*
[287] *Id.*
[288] *Id.* (quoting *Upton v. Securities and Exchange Commission*, 75 F.3d 92, 98 (2d Cir. 1996)).
[289] 75 F.3d 92 (2d Cir. 1996).
[290] *Id.* at 93.
[291] *Id.*
[292] *Id.*
[293] *Id.* at 98.

*Upton.*[294] As such, the Second Circuit found that the SEC failed to reasonably communicate the change in policy to the public.[295]

Next, the Fifth Circuit pointed to its previous decision in *Employer Solutions Staffing Group II, LLC v. Office of the Chief Administrative Hearing Officer*.[296] In *Employer Solutions*, the Fifth Circuit resolved the question of whether the Immigration and Nationality Act ("INA") provided fair notice to an employer who was required to "'attest . . . on a form [established by the appropriate agency] by regulation, that it has verified that the individual is not an unauthorized alien by examining' employee documents."[297] The verification process occurred in two steps: an examination of the documents presented by the prospective employee and subsequent attestation of having done such examination.[298] The attestation occurred on the I-9 Form, which required that the form was "'[t]o be completed and signed by [an] employer.'"[299]

The employer outsourced the first step to a subcontracted agency in Texas, who would examine the prospective employees' documents and send photocopies to the employer's office in Minnesota.[300] From there, the employer attested to the veracity of the documents inspected by the subcontracted agency.[301] Through an

---

[294] *Id.*
[295] *Id.*
[296] 833 F.3d 480, 491 (5th Cir. 2016).
[297] *Commodity Futures Trading Commission*, 90 F.4th at 445 (quoting *Employer Solutions Staffing Group II, LLC*, 833 F.3d at 485).
[298] *Employer Solutions Staffing Group II, LLC*, 833 F.3d at 483.
[299] *Commodity Futures Trading Commission*, 90 F.4th at 445 (quoting *Employer Solutions Staffing Group II, LLC*, 833 F.3d at 488).
[300] *Employer Solutions Staffing Group II, LLC*, 833 F.3d at 483.
[301] *Id.*

administrative investigation, Immigration and Customs Enforcement ("ICE") determined that the employer violated the INA and ordered the employer to pay $226,270 for its violations.[302] The Fifth Circuit disagreed and found that ICE's interpretation deprived the employer of fair notice.[303] In its reasoning, the Fifth Circuit explained that the administrative law judge "did not cite to any statute, regulation, or prior adjudication" that found that corporate attestation was prohibited by regulations.[304] Put differently, the Court explained that the agency's regulation failed to state "with ascertainable certainty what [was] meant by the standards [it] has promulgated."[305]

Lastly, the Fifth Circuit distinguished *Upton* and *Employer Solutions* with the Third Circuit's decision in *Consol Pennsylvania Coal Co. v. Federal Mine Safety & Health Review Commission*.[306] The regulation in question in *Consol Pennsylvania Coal Co.* required companies to notify the Mine Safety and Health Administration "'once the operator knows or should know that an accident has occurred involving . . . [a]n injury of an individual at the mine which has a reasonable potential to cause death.'"[307] Stemming from an injury where its employee was crushed "between two multi-ton pieces of mining equipment[,]" a mining company sued the Department of

---

[302] *Id.* at 483–84.
[303] *Id.* at 489–90.
[304] *Id.* at 489.
[305] *Id.* at 448 (internal quotation marks omitted).
[306] 941 F.3d 95 (3d Cir. 2019).
[307] *Commodity Futures Trading Commission*, 90 F.4th at 445 (quoting *Consol Pennsylvania Coal Company, LLC*, 941 F.3d at 104).

Labor, alleging that its subagency's regulation deprived the company of fair notice because it was unclear how the regulation would be applied to itself.[308]

The Third Circuit determined that the regulation provided adequate notice to the mining company and explained that it was "extraordinarily clear that the injuries in this case reflected a reasonable potential for death."[309] With the mining company's easy ability to ascertain that such injury triggered the notification requirements under the regulation, the Third Circuit found that the mining company had fair notice of the interpretation of the regulation.[310] The Fifth Circuit distinguished *Consol Pennsylvania Coal*, noting "[a]nd unlike *Consol Pennsylvania Coal*, where it was 'extraordinarily clear' to the court that having one's legs crushed in a piece of mining equipment 'has a reasonable potential to cause death,' it would not have been clear to the Defendants that the phrase 'taking both sides of an order' applied to their conduct."[311]

The underlying facts in the case at bar are remarkably similar to *Commodity Futures Trading Commission*, *Upton*, and *Employer Solutions*, if not stronger to refute fair notice, in numerous ways. First, Interior has never interpreted § 1206.112, throughout its nearly three-decade history at the time, to hold that surface lift remediation procedures are unreasonable.[312] On the contrary, Interior's

---

[308] *Consol Pennsylvania Coal Company, LLC*, 941 F.3d at 99.
[309] *Id*. at 113.
[310] *Id*.
[311] *Commodity Futures Trading Commission*, 90 F.4th at 446 (quoting *Consol Pennsylvania Coal Company, LLC*, 941 F.3d at 113).
[312] R. Doc. 83-1 at 5.

"announcement of its interpretation [was] preceded by a very lengthy period of conspicuous inaction," thereby creating an "acute" likelihood of an unfair surprise.[313]

Therefore, similar to *Commodity Futures Trading Commission*, this is an issue of first impression on a nearly four-decades old regulation. Second, Interior knew that its use of the term "reasonable" in this regulatory context was susceptible to ambiguity, yet it reinforced its decision with more ambiguity by defining "reasonable" as "moderate" or "fair[.]"[314] Third, Mariner, like the defendants in *Commodity Futures Trading Commission*, obtained multiple levels of approval by Interior in which the surface lift remediation procedure was described, and Interior failed to put W&T, through Mariner, on notice that they may have been violating the regulations by conducting a surface lift remediation procedure.[315]

Specifically, Mariner obtained two SOPs regarding the Pluto Flowline.[316] Pursuant to regulations, Interior must receive a "reasonable schedule of work leading to the commencement or restoration of the suspended activity[]" to approve an SOP.[317] The record substantiates that Mariner, in its request for SOPs, included its surface lift remediation plan regarding the Pluto Flowline.[318] And throughout this

---

[313] *SmithKline Beecham Corp.*, 567 U.S. at 158.

[314] 53 Fed. Reg. 1230, 1258 (Jan. 15, 1988). Some industry respondents commented that the term "reasonable" should be deleted and that "this term will only result in a wide diversity of opinion as to what a reasonable cost is." Another respondent suggested using "actual costs." MMS's response was that it would rely on the definition on reasonable in  the Merriam Webster Dictionary of "moderate, fair."

[315] 90 F.4th at 444.

[316] R. Doc. 77-1 at 12.

[317] *Id.*; 30 C.F.R. §§ 250.171(b) & 250.174(b).

[318] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002823–0002824, Letters from Michael Melancom, MMS, to Cory Loegering, Mariner Energy, approving SOPs dated October 27, 2005 and August 16, 2006.

approval process, Interior failed to notify Mariner that a surface lift remediation procedure violated its regulations.[319] The record reflects that not only did Interior fail to offer any guidance, it also granted Mariner's requests for approval, which involved a determination that the surface lift remediation procedure constituted a "reasonable schedule of work[.]"[320]

Unlike the regulatory entities in *Commodity Futures Trading Commission* and *Upton*, who failed to indicate that the conduct was illegal and relied upon a mere consent order respectively, Interior *actually approved* Mariner's prior commencement of a surface lift remediation procedure as a reasonable schedule of work pursuant to 30 C.F.R. §§ 250.171, 250.174.[321] Interior also had an opportunity to notify Mariner that its remediation plan was unreasonable, but instead, in June 2006, Interior approved phase three of Mariner's Pluto Flowline remediation plan.[322] Fourth, like the administrative decision in *Employer Solutions*, Interior "did not cite to any statute, regulation, or prior adjudication" finding a surface lift remediation procedure to be unreasonable.[323] And of significant consequence, Interior has not offered any expert testimony to support its decision or rebut W&T's experts' opinions.[324]

---

[319] R. Doc. 77-2 at 25-26.

[320] *Id.*; 30 C.F.R. §§ 250.171(b) & 250.174(b).

[321] R. Doc. 77-2 at 25-26.

[322] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 001629–001630, Email from BSEE employee to ONRR employee dated May 6, 2013.

[323] *Employer Solutions Staffing Group II, LLC*, 833 F.3d at 483. While the IBLA decision points to some of its prior adjudications, none of the adjudications address surface lift remediation procedures. R. Doc. 77-2 at 30 ("Critically, *Interior offered no support during the administrative proceeding – no* witness testimony, *no* documentation, *no* agency studies, *no* industry standards, *no* recommended practices, *no* industry custom – substantiating its conclusion that using a mechanical pig to clear the Pluto Flowline was the 'principal,' 'normal,' and *only* method of pipeline repair that would result in deductible transportation costs in this case.")(emphasis original).

[324] *See* R. Doc. 26-1.

Nor are the facts in the case at bar analogous to *Consol Pennsylvania Coal Company, LLC*.[325] This is not the readily apparent case where it is "extraordinarily clear" that an employee who was crushed between multi-ton mining equipment presented a "reasonable potential for death."[326] Here, conversely, W&T executed a judgment call to undergo a surface lift remediation procedure, as opposed to pigging, to remedy the Pluto Flowline.  As noted above, that information was then communicated to Interior.[327] And in accordance with Interior's regulation, W&T seeks to deduct the "reasonable, actual costs" it incurred to remediate the Pluto Flowline to allow for transportation.[328]

The Court thus finds, *a fortiori*, that W&T lacked fair notice of Interior's interpretation of its regulations. And because "[i]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability[,]" the Court determines that the Final Decision, as it pertains to the surface lift remediation procedure, does not apply to W&T for lack of fair notice.[329] Since the Court finds that Interior's interpretation deprives W&T of fair notice, Interior is not entitled to *Auer* deference.[330] The Court further finds that the Final Decision, as it

---

[325] 941 F.3d 95.
[326] *Id.* at 113.
[327] R. Doc. 77-2 at 25-26.
[328] 30 C.F.R. § 1206.111.
[329] *Commodity Futures Trading Commission*, 90 F.4th at 444 (quoting *ExxonMobil Pipeline Co.*, 867 F.3d at 578).
[330] *SmithKline Beecham Corp.*, 567 U.S. at 156 (quoting *ExxonMobil Pipeline Co.*, 867 F.3d at 578) ("In penalty cases, courts will not accord substantial deference to an agency's interpretation of an ambiguous rule in circumstances where the rule did not place the individual or firm on notice that the conduct at issue constituted a violation of a rule.").

pertains to the surface lift remediation procedure, does not apply to W&T and is thus reversed.[331]

Because the Supreme Court has noted that "it is unclear what, if any, daylight exists between that conception of "fair notice" and [the] change-in-position doctrine[,]"[332] the Court further analyzes the above issue in the context of the change-in-position doctrine.[333] Such doctrine provides that "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change."[334] Agencies must further recognize their changing position and contemplate the parties' substantial reliance interests on the agencies' position.[335] "The change-in-position doctrine asks two questions."[336]

First, a court must analyze whether an agency has changed an existing policy, which occurs when it renounces its prior agency action as unlawful, reverses former views, and acts inconsistently with a prior position.[337] Next, if an agency changes its position, then a court determines whether the agency displayed awareness of its changing position and offer "good reasons for the new policy[.]"[338] Although the agency need not show better reasons for the policy change or provide a detailed reasoning sufficient to be a new policy itself, the agency must demonstrate awareness

---

[331] *Commodity Futures Trading Commission*, 90 F.4th at 449.
[332] *Food and Drug Administration v. Wages and White Lion Investments, L.L.C.*, 145 S.Ct. 898, 916–17 (2025)(internal quotation marks omitted).
[333] The Court further notes that W&T does not argue that Interior had a change in position.
[334] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).
[335] *Wages and White Lion Investments, L.L.C.*, 145 S.Ct. at 916–17.
[336] *Id.* at 918.
[337] *Id.*
[338] *Id.* (quoting *Fox Television*, 556 U.S. at 515).

that longstanding policies may have created significant reliance interests in which a regulated party may rely upon.[339]

Here, the Court finds that Interior did not violate the change-in-position doctrine because Interior did not have a policy to change. Policy statements are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[340] Indeed, Interior admitted to having never provided any guidance on whether a surface lift remediation procedure would constitute "reasonable, actual costs" under the relevant regulations, and characterizing W&T's remediation actions as "a novel situation to the IBLA."[341] W&T, however, asserts that the Court should consider publications on Interior's website that allegedly attest to prominence of surface lift procedures in the pipeline treatment context.[342] Because W&T did not enter such publications in the administrative record, consideration of such would be inappropriate.[343] The Court thus finds the change-in-position doctrine inapplicable.

Although the Court finds the change-in-position doctrine inapplicable, the Court still finds that Interior's Final Decision failed to provide W&T with fair notice. Having found so, the Court's analysis could end here. The Court, however, finds that Interior acted arbitrary and capricious on an additional basis discussed below.

---

[339] *Id.*

[340] 32C Richard Murphy, Federal Practice & Procedure (Wright & Miller) § 8202 (2d ed. 2025). *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993).

[341] 30 C.F.R. § 1206.111; R. Doc. 82 at 27.

[342] R. Doc. 77-2 at 22-2.

[343] *See Camp v. Pitts*, 411 U.S. 138, 142 (1973).

### b. *Reasonable costs*

Assuming *arguendo* that Interior provided W&T with fair notice, the Court still finds that the Pluto Flowline remediation expenses were reasonable, capital costs under 30 C.F.R. § 1206.112. The parties disagree whether W&T properly deducted the 2005-2006 surface lift remediation as reasonable costs and whether such costs constituted capital costs or maintenance expenses.[344] Before reaching the merits, again, the Court must determine what deference, if any, is owed to Interior's interpretation of the applicable regulation.[345]

The parties dispute the term "reasonable" costs under § 1206.112.[346] To determine whether an ambiguity exists, the Court combed the text and structure of the regulation to find a statutory definition of the term "reasonable."[347] But it was to no avail. When the text and structure are unhelpful, the history of the regulation may become informative in determining whether an ambiguity exists.[348]

Here, it is. To address industry concerns regarding royalty valuation ambiguities, the MMS promulgated valuation rules.[349] In the preamble to the regulation, Interior explained that "[s]ome industry respondents commented that the term 'reasonable' should be deleted from this section. One industry concern was that this term will only result in a wide diversity of opinion as to what a reasonable cost is[.]"[350] In response, MMS stated that "[t]he term 'reasonable' is defined by the

---

[344] R. Doc. 77-2 at 26.
[345] *Kisor*, 588 U.S. 558.
[346] R. Doc. 77-2 at 26; R. Doc. 83-1 at 24.
[347] *See Kisor*, 588 U.S. at 575.
[348] *Id.*
[349] 53 Fed. Reg. 1230, 1258 (Jan. 15, 1988); 53 Fed. Reg. 1184 (Jan. 15, 1988).
[350] 53 Fed. Reg. 1230, 1258 (Jan. 15, 1988).

Merriam-Webster New Collegiate Dictionary as 'moderate, fair.' The MMS intends that this same definition apply in the determination of a transportation allowance."[351]

The Court finds the regulation ambiguous. The terms "moderate" and "fair" are inherently subjective and are susceptible to multiple meanings. Because the Court has determined that the regulation is ambiguous, the Court must next determine whether Interior's interpretation is reasonable.[352] As noted, it is impossible for Interior to provide a definition of "reasonable" as it pertains to every possible scenario regarding transportation costs. The Supreme Court, however, has admonished the agency practice of "promulgat[ing] vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrat[ing] the notice and predictability purposes of rulemaking.'"[353] Put differently:

> It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.[354]

Here, the Court finds it noteworthy that although Interior was notified of the regulation's potential ambiguity in the regulation, it failed to resolve the issue.[355] Although Interior's response to the industry commentary does not render the regulation arbitrary and capricious itself, it does support the finding that Interior's

---

[351] *Id.*

[352] *Kisor*, 588 U.S. at 575.

[353] *SmithKline Beecham Corp.*, 567 U.S. at 158 (quoting *Talk America, Inc. v. Michigan Bell Telephone Co.*, 564 U.S. 50, 69 (2011)).

[354] *Id.* at 158–59.

[355] 53 Fed. Reg. 1230, 1258 (Jan. 15, 1988).

interpretation is unreasonable.[356] An agency's reading of a regulation "must come within the zone of ambiguity the court has identified after employing all its interpretive tools."[357] In other words, "[t]he text, structure, history, and so forth at least establish the outer bounds of permissible interpretation."[358]

Here, although § 1206.112 provides a seemingly ubiquitous amount of leeway to Interior, it cannot be reasonably interpreted to prohibit businesses, such as W&T, from making judgment calls on decisions on how to most efficiently operate. When a regulation employs terms such as "reasonable" or "moderate" or "fair," the regulation presupposes that the agency will consider all the surrounding circumstances. Although Interior claimed it did so,[359] it seemingly failed to consider W&T's expert testimony establishing the well-reasoned decision to undergo the surface lift procedure.[360] Interior's interpretation of the term "reasonable" allows it to substitute its own judgment in the place of W&T's own business judgment *post hoc*. That is improper.

Although Interior may disagree with the surface lift decision, that does not render the surface lift decision unreasonable. Whether W&T's surface lift remediation procedure complied with § 1206.112 is, as explained by the Supreme

---

[356] *SmithKline Beecham Corp.*, 567 U.S. at 158–59. W&T does not assert that § 1206.112 was improperly promulgated due to Interior's responses during the notice and comment period, and therefore the Court does not reach that issue. The Court, solely for purposes of determining whether Interior's interpretation is entitled to deference, considers Interior's responses during the notice and comment period.

[357] *Kisor*, 588 U.S. at 576.

[358] *Id.*

[359] R. Doc. 83-1 at 24–25.

[360] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002769–0002777, Affidavit of Cory Loegering (Mar. 2, 2011); *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002778–0002794, Expert Report of Dr. A.H. Mousselli, Ph.D., P.E. (Nov. 21, 2014).

Court, one of many administrative law questions upon which "[r]easonable minds may disagree."[361] Thus, to hold that W&T's actions were unreasonable is itself unreasonable given the complexities at issue.

Accordingly, the Court determines that Interior's interpretation is unreasonable and thus *Auer* deference is unwarranted. The Court, therefore, defers to Interior's interpretation to the extent is it is persuasive.[362] And the persuasiveness of an agency's interpretation hinges upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[363] Because the Court finds the interpretation unreasonable under *Auer*, it is also unreasonable under *Skidmore*.

W&T claims that its costs to repair the Pluto Flowline were reasonable under § 1206.112 on various grounds.[364] First, W&T maintains that Mariner chose to undertake the surface lift procedure only after Mariner unsuccessfully attempted to remove the paraffin plug with chemical treatment, thereby making it reasonable.[365] In other words, W&T argues that Mariner did not immediately turn to a surface lift procedure as an initial resort.[366] Interior, in response, highlights that W&T previously treated a paraffin buildup of the Pluto Flowline in 2003 and still failed comply with regulatory requirements, such as flushing and filling the pipeline with

---

[361] *Biden v. Nebraska*, 600 U.S. 477, 507 (2023).
[362] *SmithKline Beecham Corp.*, 567 U.S. at 159.
[363] *Skidmore*, 323 U.S. at 140.
[364] R. Doc. 77.
[365] R. Doc. 77-2 at 27.
[366] *Id.*

inhibited seawater, when it suspended production on the Pluto Flowline in May 2004.[367] Furthermore, Interior argues that although W&T suspended production on the Pluto Flowline in May 2004, W&T waited until August 2005 – hurricane season – to treat the Pluto Flowline, thereby acting unreasonably.[368]

Next, W&T argues that pigging was neither prudent or normal under the circumstances.[369] To support its claim, W&T provided testimony from Mr. Loegering and Dr. Mousselli.[370] Mr. Loegering testified that pigging was the least preferred remediation method, as pigging would have been presented a significant risk of permanently plugging the Pluto Flowline.[371] Likewise, Dr. Mousselli testified that the surface lift procedure was, under the given circumstances, "the most feasible, least risky, and least costly option."[372] W&T also claims that Mr. Loegering and Dr. Mousselli's testimony corroborates with the Manual, in which the Manual states that there is "no one-size-fits-all approach."[373] Notably, Interior did not contradict the testimony of either Mr. Loegering or Dr. Mousselli.[374]

Third, W&T maintains that the Pluto Flowline did not possess a construction design flaw that made pigging an impossibility.[375] To support its argument, W&T first points to the Pluto Flowline purchase and sale agreement, where it states that

---

[367] R. Doc. 83-1 at 25.
[368] *Id.* at 26.
[369] R. Doc. 77-2 at 28.
[370] *Id.* at 29–30.
[371] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002769–0002777, Affidavit of Cory Loegering (Mar. 2, 2011).
[372] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002778–0002794, Expert Report of Dr. A.H. Mousselli, Ph.D., P.E. (Nov. 21, 2014).
[373] R. Doc. 77-2 at 30.
[374] *Id.*
[375] *Id.*

the "Pluto Flowline was designed with a "pig launcher/receiver system located on the Marathon platform SP89B."[376] W&T also contends that the testimony of both Mr. Loegering and Dr. Mousselli suggests that pigging was a possibility even though W&T elected to forego such option.[377] Next, W&T avers that Mr. Wichterich's statement that the Pluto Flowline had a design flaw was misguided and notes that it was later recanted in a declaration dated March 23, 2017.[378] Again, Interior did not offer any testimony rebutting W&T experts and witnesses.[379]

Fourth, W&T argues that its deduction of the remediation costs was not "extraordinary[,]" as determined by Interior.[380] W&T highlights that Interior has failed to introduce evidence that the costs were extraordinary and further ignored evidence suggesting that the remediation costs were increased due to the 2005 Hurricane season.[381] In its rebuttal, Interior asserts that "[t]he gross nature of Mariner and W&T's remediation expenses for 2005-2006 is not the *per se* reason the IBLA denied those costs as transportation allowances; spending four times the cost of the Pipeline's original installation on remediation is simply an indication of how unreasonable Mariner's actions were."[382]

Fifth, W&T claims that the Final Decision contradicts the overall structure of the regulations because the Final Decision found W&T's deductions excessive even

---

[376] R. Doc. 77-2 at 31 n.39. *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002346-0002393, Purchase and Sale Agreement, Schedule 1.1(a) (April 28, 2004).
[377] R. Doc. 77-2 at 31.
[378] *Id.*
[379] *Id.* at 30.
[380] *Id.* at 32.
[381] *Id.*
[382] R. Doc. 83-1 at 29.

though it did not exceed 50% of the value of the production, as set forth in the regulation.[383] In other words, because W&T's deductions did not exceed 50% of the value of production, W&T believes that its deductions are reasonable.[384] To further buttress its proposition that the Final Decision contradicts the overall structure of the regulation, W&T argues that its costs incurred pursuant to its non-arm's length contract are not required to be reasonable, unlike an arm's length contract.[385] Put differently, W&T asserts that Interior incorrectly applied its regulations pertaining to arm's length contracts when it should have applied its regulation pertaining to non-arm's length contracts.[386] In response, Interior claims that the 50% limit "supplements—not supplants—the reasonableness requirement[,]" and that W&T's interpretation of the statute would ignore the term "reasonable" in the statute.[387]

Finally, W&T argues that Interior unlawfully rewrites its regulations by finding that the surface lift procedure was not "ordinary[.]"[388] In essence, W&T believes that Interior replaces the word "reasonable" with "ordinary" in the regulations, thereby unlawfully rewriting the regulations.[389] And as a final point, W&T argues that because Interior is mandated to allow deductions with the language "shall allow[,]" at least some of its costs, W&T believes, are reasonable deductions.[390] To counter, Interior avers that W&T's argument is incorrect because "transportation

---

[383] R. Doc. 77-2 at 33–34.
[384] *Id.*
[385] *Id.* at 34.
[386] *Id.*
[387] R. Doc. 83-1 at 30.
[388] R. Doc. 77-2 at 36.
[389] *Id.*
[390] *Id.*

allowances for arm's length and non-arm's-length transportation contracts are both separately limited by the term 'reasonable, actual costs.'"[391]

The Court determines that W&T's costs incurred regarding the surface lift procedure are reasonable. As an initial and crucial point, Interior has failed to offer expert testimony of its own or rebut W&T's expert testimony. Nonetheless, Interior's arguments additionally fail on numerous grounds.

First, Mariner, as noted, obtained two SOPs from Interior, in which Interior approved a reasonable schedule of work to authorize taking the Pluto Flowline offline.[392] In applying for the SOPs, Mariner stated that it was undertaking a surface lift procedure as a reasonable schedule of work.[393] No objection was raised by Interior. Moreover, Interior approved phase three of Mariner's Pluto Flowline remediation plan on June 5, 2006, which included wrapping up the surface lift procedure.[394] As noted, Interior failed to indicate that to Mariner that its remediation plan was unreasonable. Thus, W&T was under the impression, from Interior's three approvals, that a surface lift procedure was reasonable.[395] Second, W&T provided testimony from Mr. Loegering and  Dr. Mousselli, who both stated that, under the unique circumstances, a surface lift procedure was the most risk averse option.[396] To its detriment, Interior counters with a "one-size-fits-all" approach by stating that

---

[391] R. Doc. 83-1 at 30–31.
[392] R. Doc. 77-1 at 12.
[393] *Id.* at 24.
[394] *See* R. Doc. 65, Original Administrative Record filed with the IBLA, Bates 001629–001630, Email from BSEE employee to ONRR employee dated May 6, 2013.
[395] *Id.*
[396] *Id.* at 29.

Interior has never found a surface lift procedure to be a reasonable remediation tactic.[397]

Next, Interior suggests to the Court that W&T's negligence in upkeep for the Pluto Flowline made the surface lift procedure unreasonable.[398] The administrative record is replete with thousands of documents that illustrate W&T's contingency studies, financial statements, and other confirmations of environmental compliance.[399] In essence, Interior asks the Court to determine that W&T acted so egregiously that its decision to undertake a surface lift procedure was unreasonable. But the administrative record reveals a different story. As such, the Court finds W&T's Pluto Flowline remediation procedure reasonable and thereby determines that it may deduct the "reasonable, actual costs" associated with the procedure.

### i. Capital Costs

W&T asserts that costs it incurred associated with the surface lift remediation treatment are deductible as "capital costs" under 30 C.F.R. § 1206.112 based on the Generally Accepted Accounting Principles (GAAP).[400] Interior, in response, claims that the surface lift remediation expenses were not "capital costs" because the expenses were incurred merely to return the Pluto Flowline to its original condition.[401]

---

[397] *Id.* at 30.
[398] R. Doc. 83-1 at 8.
[399] *See* R. Doc. 65.
[400] R. Doc. 77-2 at 40.
[401] R. Doc. 83-1 at 31.

Interior's reading of § 1206.112 is not entitled to *Auer* deference. The parties dispute the meaning of the term "capital costs[,]" in which the regulation defines as "generally those for depreciable fixed assets (including the costs of delivery and installation of capital equipment) that are an integral part of the transportation system."[402] "Depreciable fixed assets" are not defined by regulation, and nor does the structure and history of the regulation provide insight. The Court thus finds the regulation ambiguous and next determines whether Interior's interpretation is reasonable.[403]

Interior determined that capital costs are "[c]osts that improve an asset, prolong the useful life of an asset, alter the use of an asset, or add capacity to the asset are costs that should be capitalized."[404] Interior, however, rather than relying on GAAP, turned to Black's Law dictionary to define capital costs.[405] And although the Court does not find that *per se* unreasonable, it does note the ambiguity in the regulations. Put differently, because there is not "only one reasonable construction[,]" the Court finds that "the interpretive question still has no single right answer . . . ."[406]

Moreover, even though the Court finds Interior's interpretation reasonable, "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference."[407] Pertinent here, an "agency's interpretation must in some

---

[402] 30 C.F.R. § 1206.112 (e).
[403] *Kisor*, 588 U.S. at 575.
[404] R. Doc. 26-1 at 28.
[405] *Id.*
[406] *Kisor*, 588 U.S. at 575.
[407] *Id.* at 576.

way implicate its substantive expertise."[408] Although "agencies have a nuanced understanding of the regulations they administer[,]" various interpretive questions "may fall more naturally into a judge's bailiwick."[409]

The Secretary of Interior has the authority to establish a "production accounting . . . system to provide the capability to accurately determine oil and gas royalties . . . ."[410] In exercising his authority, the Secretary stated that a lessee may deduct "[a]llowable capital investment costs [that] are generally those for depreciable fixed assets (including the costs of delivery and installation of capital equipment) that are an integral part of the transportation system."[411] But resolving the ambiguity of what constitutes "allowable capital investment costs" or "capital costs" does not invoke the agency's substantive expertise.[412] In other words, Interior is not a substantive expert in interpreting its accounting regulations.[413] And just because Interior has the authority to promulgate accounting standards, it does not mean that Interior is an expert in interpretating its accounting regulations. If this was true by virtue of Interior's authority, then every executive agency would be an expert in interpreting its own regulations, thereby undercutting *Kisor*.

Because the Court finds Interior's interpretation unworthy of *Auer* deference, the Court considers whether Interior interpretation is worthy of *Skidmore*

---

[408] *Id.* at 577.
[409] *Id.* at 578 (citing *Jicarilla Apache Tribe v. FERC*, 578 F.2d 289, 292–93 (10th Cir. 1978); *West Va. Highlands Conservancy, Inc. v. Norton*, 343 F.3d 239 (4th Cir. 2003); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–50 (1990)).
[410] 30 U.S.C. § 1711.
[411] 30 C.F.R. § 1206.112(e).
[412] *Board of County Com'rs of County of Adams v. Isaac*, 18 F.3d 1492, 1497 (10th Cir. 1994).
[413] *Id.*

deference.[414] *Skidmore* deference hinges upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[415] Stated otherwise, *Skidmore* "reaffirmed the traditional rule that an agency's views about the law may persuade a court but can never control its judgment."[416]

As noted, the Court does not find Interior's interpretation unreasonable. The Court, however, also finds W&T's reliance on GAAP reasonable. The Securities and Exchange Commission delegated the task of developing uniform accounting standards in the United States to the Financial Accounting Standards Board (FASB). FASB in turn created GAAP, to which GAAP has become the "the accounting standards forming the bedrock of the U.S. financial reporting system."[417]

Here, W&T has provided expert testimony from a Certified Public Accountant attesting to the proposition that GAAP requires that the costs incurred by W&T to remediate the Pluto Flowline should be capitalized.[418] First, she points to GAAP § 39.200, which states that "tangible long-lived assets include property and equipment and other assets held for investment or used in a company's operations that have an estimated useful life longer than one year."[419] But "[t]he cost of a long-

---

[414] *Kisor*, 588 U.S. at 573.

[415] *Skidmore*, 323 U.S. at 140.

[416] *Kisor*, 588 U.S. at 598 (Gorsuch, J., concurring).

[417] *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 811 n.7 (1984)("Promulgated by the accounting profession's Financial Accounting Standards Board, 'generally accepted accounting principles' are the conventions, rules, and procedures that define accepted accounting practices.").

[418] *See* R. Doc. 65, IBLA Pleadings and Orders, Bates IBLA Pleading 0002831–0002843, Expert Report of Holly Sharp, CPA, CFE, CFF (Nov. 21 2014).

[419] *Id.* at Bates IBLA Pleading 0002836.

lived asset 'generally should not include routine repairs and maintenance costs that do not add to the utility of the asset.'"[420] Next, W&T turns to FASB ASC 410-30-25-18, which provides that certain costs may be capitalized if:

    a.  The costs extend the life, increase the capacity, or improve the safety or efficiency of property owned by the entity. For purposes of this criterion, the condition of that property after the costs are incurred must be improved as compared with the condition of that property when originally constructed or acquired, if later.

    b.  The costs mitigate or prevent environmental contamination that has yet to occur and that otherwise may result from future operations or activities. In addition, the costs improve the property compared with its condition when constructed or acquired, if later.

    c.  The costs are incurred in preparing for sale that property currently held for sale.[421]

Lastly, W&T's expert notes that GAAP Section 39-202 states that "an asset's estimated useful life is the period over which it is expected to contribute directly or indirectly to future cash flows."[422]

    Based on these principles, W&T's expert made the following determinations: "[t]he transportation system had an estimated useful life longer than one year[;] [t]he remediation costs incurred by W & T extended the life and improved the efficiency of the Pluto Flow Line [;] [t]he remediation costs provide benefits over several periods [;] [t]he benefits from the remediation costs were not exhausted in the period in which the costs were incurred[;] [and] [t]he condition of the transportation system was improved after it was acquired by W & T."[423] As such, the expert determined that

---

[420] *Id.* (quoting FASB ASC 360-10-30-1).
[421] *Id.*
[422] *Id.*
[423] *Id.* at Bates IBLA Pleading 0002838.

W&T "properly capitalized its transportation system on its financial statements as required by GAAP."[424] Once again, Interior did not rebut W&T's expert's opinion.

The Court finds Interior's interpretation unpersuasive. Instead of rebutting W&T's expert, Interior has merely reiterated the subagencies' finding, based on definitions provided by Black's Law Dictionary, that the surface lift remediation plan did not improve the life of the Pluto Flowline and only returned the Pluto Flowline back to its original condition.[425] This is insufficient.

As a final point, the Court finds it noteworthy that W&T became a publicly-listed company on the New York Stock Exchange on January 28, 2005.[426] As a publicly traded company, W&T was required to follow GAAP as ordered by the SEC.[427] W&T, as a publicly traded company at the time it incurred costs relating to the surface lift procedure, followed GAAP as required law.[428] No reasonable, ordinary prudent business operator would follow definitions, not even regulations, set forth by Black's Law Dictionary when it is required by law to report under GAAP.

Accordingly, the Court determines that W&T complied with § 1206.112 when it deducted costs it incurred relating to the surface lift remediation procedure as capital expenses. And having already found that such capital expenses were reasonable, the Court finds that, in the absence of a fair notice violation, W&T could

---

[424] *Id.*
[425] R. Doc. 26-1; R. Doc. 83-1 at 31.
[426] Fed. R. Ev. 201(b).
[427] Securities Exchange Act of 1934, Pub. L. 73–291, 15 U.S.C. § 78a, *et seq.*
[428] *See id.*

68

still deduct the reasonable, actual costs of the Pluto Flowline remediation procedure as capital expenses.

### ii. Maintenance Expenses

W&T avers that, in the alternative that its costs are not deductible as capital costs, its costs are deductible as maintenance costs under § 1206.112(b).[429] Interior counters by arguing that the plain language of the statute mandates that maintenance costs are only deductible during a reporting period, thereby disqualifying W&T's costs as maintenance costs.[430] The Court agrees with Interior.

The Court finds that § 1206.112(b) is unambiguous and therefore *Auer* deference is unnecessary. Section 1206.112(b) allows lessees to deduct a transportation allowance based on the "reasonable, actual costs for transportation *during the reporting period* . . . ."[431] Such "reasonable, actual costs" include "maintenance expenses[,]" and maintenance expenses include maintenance of a transportation system, equipment, or maintenance labor.[432]

Here, the Court acknowledges that W&T has undoubtedly incurred maintenance expenses in remediating the Pluto Flowline. Interior, however, correctly highlights that such expenses were incurred while the Pluto Flowline was offline.[433] When a pipeline is offline, there is no reporting period to report production.

---

[429] R. Doc. 77-2 at 41.
[430] R. Doc. 83-1 at 32–33.
[431] 30 C.F.R. § 1206.112 (emphasis added).
[432] 30 C.F.R. 1206.158(a)(ii) (gas).
[433] R. Doc. 83-1 at 33.

Accordingly, to adopt W&T's argument would render the phrase "during the reporting period" meaningless, in which the Court may not do so.[434]

## IV.    CONCLUSION

For the reasons set forth above, the Final Decision withstands arbitrary and capricious review as it pertains to W&T's transportation allowance for the July and August 2003 production months and September 2003 through April 2004 production months. However, in violation of the fair notice doctrine, the Final Decision is arbitrary and capricious in applying 30 C.F.R. § 1206.112 to W&T's transportation allowance for costs related to the surface lift remediation procedure. But even in the absence of a fair notice violation, the Court finds that W&T may deduct the actual costs of the Pluto Flowline remediation procedure as such costs constitute reasonable, capital costs. Accordingly, the Court vacates the Final Decision to the extent it violates the fair notice doctrine and remands the Final Decision to the ONRR to calculate W&T's royalty obligations.[435]

Accordingly,

**IT IS HEREBY ORDERED** that W&T's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and Interior's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**

---

[434] 30 C.F.R. § 1206.111.

[435] *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) ("Generally speaking, a court [] should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.").

**IT IS FURTHER ORDERED** that the Final Decision, solely as it pertains to W&T's transportation allowance for costs related to the surface lift remediation procedure, is **REVERSED.**

**IT IS FURTHER ORDERED** that this matter be remanded to the ONRR for further proceedings to calculate W&T's obligation to pay additional royalties after this Order.

New Orleans, Louisiana, August 25, 2025.

**WENDY B. VITTER**
**United States District Judge**